RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0253p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

AMERICAN CIVIL LIBERTIES UNION, *et al.*,
　　　　　　　　　*Plaintiffs-Appellees/*
　　　　　　　　　*Cross-Appellants,*

　　　*v.*

NATIONAL SECURITY AGENCY, *et al.*,
　　　　　　　　　*Defendants-Appellants/*
　　　　　　　　　*Cross-Appellees.*

> Nos. 06-2095/2140

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 06-10204—Anna Diggs Taylor, District Judge.

Argued: January 31, 2007

Decided and Filed: July 6, 2007

Before: BATCHELDER, GILMAN, and GIBBONS, Circuit Judges.

---

## COUNSEL

**ARGUED:** Gregory G. Garre, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Ann Beeson, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Appellees. **ON BRIEF:** Gregory G. Garre, Thomas M. Bondy, Douglas N. Letter, Anthony A. Yang, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Ann Beeson, Jameel Jaffer, Melissa Goodman, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, Michael J. Steinberg, Kary L. Moss, AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN, Detroit, Michigan, Randal L. Gainer, DAVIS WRIGHT TREMAINE LLP, Seattle, Washington, for Appellees. Andrew G. McBride, WILEY REIN LLP, Washington, D.C., Paul D. Kamenar, WASHINGTON LEGAL FOUNDATION, Washington, D.C., Paul J. Orfanedes, Meredith L. DiLiberto, JUDICIAL WATCH, INC., Washington, D.C., John C. Eastman, CHAPMAN UNIVERSITY SCHOOL OF LAW, Orange, California, Jay A. Sekulow, AMERICAN CENTER FOR LAW AND JUSTICE, Washington, D.C., Larry J. Saylor, Saul A. Green, MILLER, CANFIELD, PADDOCK & STONE, Detroit, Michigan, ASSOCIATION OF THE BAR OF THE CITY OF NEW YORK, Donald B. Verrilli Jr., JENNER & BLOCK, Washington, D.C., Kathleen M. Sullivan, STANFORD LAW SCHOOL, Stanford, California, Lucy A. Dalglish, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, Arlington, Virginia, Richard M. Corn, New York, New York, for Amici Curiae.

　　　　BATCHELDER, J., delivered the judgment of the court. GIBBONS, J. (pp. 36-40), delivered a separate opinion concurring in the judgment only. GILMAN, J. (pp. 41-64), delivered a separate dissenting opinion.

---

**OPINION**

---

ALICE M. BATCHELDER, Circuit Judge.  The United States National Security Agency ("NSA") appeals from the decision of the District Court for the Eastern District of Michigan that granted summary judgment against the NSA and imposed a permanent injunction.  The plaintiffs are a collection of associations and individuals led by the American Civil Liberties Union, and they cross-appeal.  Because we cannot find that any of the plaintiffs have standing for any of their claims, we must vacate the district court's order and remand for dismissal of the entire action.

**I.**

Sometime after the September 11, 2001, terrorist attacks, President Bush authorized the NSA to begin a counter-terrorism operation that has come to be known as the Terrorist Surveillance Program ("TSP").  Although the specifics remain undisclosed, it has been publicly acknowledged that the TSP includes the interception (i.e., wiretapping), without warrants, of telephone and email communications where one party to the communication is located outside the United States and the NSA has "a reasonable basis to conclude that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda, or working in support of al Qaeda."  *See* Press Briefing by Att'y Gen. Alberto Gonzales and Gen. Michael Hayden, Principal Deputy Dir. for Nat'l Intelligence (Dec. 19, 2005), *available at* http://www. whitehouse.gov/news/releases/2005/12/print/20051219-1.html (last visited July 2, 2007).[1]

---

[1] In *Hepting v. AT&T Corp.*, the District Court for the Northern District of California collected and documented certain publicly available information, which provides some background and context for the present case:

"The *New York Times* disclosed the [TSP] on December 16, 2005. (James Risen and Eric Lichthlau, *Bush Lets U.S. Spy on Callers Without Courts*, The New York Times (Dec 16, 2005)).  The following day, President George W Bush confirmed the existence of a 'terrorist surveillance program' in his weekly radio address:

'In the weeks following the [September 11, 2001] terrorist attacks on our Nation, I authorized the National Security Agency, consistent with U.S. law and the Constitution, to intercept the international communications of people with known links to Al Qaeda and related terrorist organizations.  Before we intercept these communications, the Government must have information that establishes a clear link to these terrorist networks.'

"[Transcript] *available at* http://www.whitehouse.gov/news/releases/2005/12/print/20051217.html (last visited July 19, 2006).  The President also described the mechanism by which the program is authorized and reviewed:

'The activities I authorized are reviewed approximately every 45 days.  Each review is based on a fresh intelligence assessment of terrorist threats to the continuity of our Government and the threat of catastrophic damage to our homeland.  During each assessment, previous activities under the authorization are reviewed.  The review includes approval by our Nation's top legal officials, including the Attorney General and the Counsel to the President.  I have reauthorized this program more than 30 times since the September the 11th attacks, and I intend to do so for as long as our Nation faces a continuing threat from Al Qaeda and related groups.

'The NSA's activities under this authorization are throughly reviewed by the Justice Department and NSA's top legal officials, including NSA's General Counsel and Inspector General.  Leaders in Congress have been briefed more than a dozen times on this authorization and the activities conducted under it.  Intelligence officials involved in this activity also receive extensive training to ensure they perform their duties consistent with the letter and intent of the authorization.'

"*Id.*

"Attorney General Alberto Gonzales subsequently confirmed that this program intercepts 'contents of communications where . . . one party to the communication is outside the United States' and the government has 'a reasonable basis to conclude that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda, or working in support of al Qaeda.' [Press Briefing] *available at* http://www.

The plaintiffs in this action include journalists, academics, and lawyers who regularly communicate with individuals located overseas, who the plaintiffs believe are the types of people the NSA suspects of being al Qaeda terrorists, affiliates, or supporters, and are therefore likely to be monitored under the TSP. From this suspicion, and the limited factual foundation in this case, the plaintiffs allege that they have a "well founded belief" that their communications are being tapped. According to the plaintiffs, the NSA's operation of the TSP — and the possibility of warrantless surveillance — subjects them to conditions that constitute an irreparable harm.

The plaintiffs filed suit in the Eastern District of Michigan, seeking a permanent injunction against the NSA's continuation of the TSP and a declaration that two particular aspects of the TSP — warrantless wiretapping and data mining — violate the First and Fourth Amendments, the Separation of Powers Doctrine, the Administrative Procedures Act ("APA"), Title III of the Omnibus Crime Control and Safe Streets Act ("Title III"), and the Foreign Intelligence Surveillance Act ("FISA"). Both sides moved for summary judgment. The district court dismissed the data mining aspect of the plaintiffs' claim, but granted judgment to the plaintiffs regarding the warrantless wiretapping. *See ACLU v. NSA*, 438 F. Supp. 2d 754, 782 (E.D. Mich. 2006).

The NSA had invoked the State Secrets Doctrine[2] to bar the discovery or admission of evidence that would "expose [confidential] matters which, in the interest of national security, should not be divulged." *See United States v. Reynolds*, 345 U.S. 1, 10 (1953). The NSA argued that, without the privileged information, none of the named plaintiffs could establish standing. The district court applied the state secrets privilege, but rejected the NSA's argument, holding instead that three publicly acknowledged facts about the TSP — (1) it eavesdrops, (2) without warrants, (3) on international telephone and email communications in which at least one of the parties is a suspected al Qaeda affiliate — were sufficient to establish standing.[3] Moreover, the district court

whitehouse.gov/news/releases/2005/12/print/20051219-1.html (last visited July 19, 2005). The Attorney General also noted, 'This [program] is not about wiretapping everyone. This is a very concentrated, very limited program focused at gaining information about our enemy.' *Id*. at 5. The President has also made a public statement, of which the court takes judicial notice, that the government's 'international activities strictly target al Qaeda and their known affiliates,' 'the government does not listen to domestic phone calls without court approval' and the government is 'not mining or trolling through the personal lives of millions of innocent Americans.' The White House, President Bush Discusses NSA Surveillance Program (May 11, 2006), [*available at*] http://www.whitehouse.gov/news/releases/2006/05/ 20060511-1.html (last visited July 19, 2005)."

*Hepting v. AT&T Corp.*, 439 F. Supp. 2d 974, 986-87 (N.D. Cal. 2006) (certain citation forms altered).

[2] The State Secrets Doctrine has two applications: a rule of evidentiary privilege, *see United States v. Reynolds*, 345 U.S. 1, 10 (1953), and a rule of non-justiciability, *see Tenet v. Doe*, 544 U.S. 1, 9 (2005). The present case implicates only the rule of state secrets evidentiary privilege. The rule of non-justiciability applies when the subject matter of the lawsuit is itself a state secret, so the claim cannot survive. *See id.* (espionage contract); *Weinberger v. Catholic Action of Haw./Peace Educ. Project*, 454 U.S. 139, 146-47 (1981) (storage of nuclear weapons); *Totten v. United States*, 92 U.S. 105, 107 (1875) (espionage contract). If litigation would necessitate admission or disclosure of even the existence of the secret, then the case is non-justiciable and must be dismissed on the pleadings. Because the government has already acknowledged the existence of the warrantless wiretaping in this case, there is no risk of such disclosure and the rule of non-justiciability does not apply. The alleged data mining, which has not been publicly acknowledged, might fall within this rule. But, under the present analysis, a decision on this matter is unnecessary.

[3] The plaintiffs have not challenged on appeal either the invocation or the grant of the state secrets privilege and that issue is not before the court. At oral argument, Judge Gilman asked the plaintiffs' counsel if the court should remand for further fact-finding in support of standing. Counsel asserted that the plaintiffs' injuries were clear and undisputed in the record and there was no need to remand for a hearing or admission of additional evidence on this issue. To be sure, the parties dispute the *implications* of the privilege (i.e., whether the publicly available information about the TSP is sufficient to establish their claims), but it would not be appropriate to inquire, *sua sponte*, into the propriety of the NSA's invocation of the privilege, the district court's grant of the privilege, or the scope of the privilege granted.

The government provided the district court an opportunity to review certain, secret documents, in camera and under seal, as support for the invocation of the state secrets privilege. The government provided each member of this

found these three facts sufficient to grant summary judgment to the plaintiffs on the merits of their claims, resulting in a declaratory judgment and the imposition of an injunction. These three facts constitute all the evidence in the record relating to the NSA's conduct under the TSP.

In deciding the merits, the district court construed the Fourth Amendment as an absolute rule that "requires prior warrants for any reasonable search," *ACLU v. NSA*, 438 F. Supp. 2d at 775, and announced that "searches conducted without prior approval by a judge or magistrate were per se unreasonable," *id*. at 771. Having found that the NSA was operating without warrants, the district court concluded without further explanation that President Bush had "undisputedly violated the Fourth [Amendment] . . . and accordingly ha[d] violated the First Amendment Rights of these Plaintiffs as well." *Id*. at 776. Proceeding from this conclusion, the court deemed the TSP unconstitutional and issued an order enjoining its further operation entirely:

> IT IS HEREBY ORDERED that Defendants [i.e., NSA], its agents, employees, representatives, and any other persons or entities in active concert or participation with Defendants, are permanently enjoined from directly or indirectly utilizing the Terrorist Surveillance Program (hereinafter 'TSP') in any way, including, but not limited to, conducting warrantless wiretaps of telephone and internet communications, in contravention of the Foreign Intelligence Surveillance Act (hereinafter 'FISA') and Title III;

> IT IS FURTHER ORDERED AND DECLARED that the TSP violates the Separation of Powers doctrine, the Administrative Procedures Act, the First and Fourth Amendments to the United States Constitution, the FISA and Title III[.]

*ACLU v. NSA*, E.D. Mich. Dist. Court, No. 2:06-CV-10204, "Judgment and Permanent Injunction Order" (Aug. 17, 2006). The NSA moved for a stay of the injunction pending appeal, which the district court denied. Meanwhile, the NSA appealed, arguing that the plaintiffs lacked standing and that the State Secrets Doctrine prevented adjudication on the merits. This court stayed the injunction pending the outcome of this appeal. *See ACLU v. NSA*, 467 F.3d 590, 591 (6th Cir. 2006).[4]

---

panel with an opportunity to review those same documents, also in camera and under seal, in order to provide a complete district-court record on appeal. Finally, the government provided each member of this panel an opportunity to review, in camera and under seal, certain additional, privileged documents as support for the government's contention that the appeal had been rendered moot. *See* fn. 4, *infra*. At the behest of the government, I reviewed these privileged documents, but their contents — being privileged — are excluded from our consideration and I have not relied on any of that information in this opinion. The state secrets privilege granted by the district court has been maintained on appeal and this opinion is decided solely on the publicly available information that was admitted by the district court and made a part of its record.

[4] On January 10, 2007, "a Judge of the Foreign Intelligence Surveillance Court issued orders authorizing the government to target for collection international communications into or out of the United States where there is probable cause to believe that one of the communicants is a member or agent of al Qaeda or an associated terrorist organization." Letter from Att'y Gen. Alberto Gonzales to Chair. of the Comm. on the Judiciary Patrick Leahy (Jan. 17, 2007), *available at*   http://graphics8.nytimes.com/packages/pdf/politics/20060117gonzales_Letter.pdf (last visited July 2, 2007). According to a letter written by the Attorney General,"any electronic surveillance that was occurring as part of the [TSP] will now be conducted subject to the approval of the Foreign Intelligence Surveillance Court." *Id.* The NSA filed a submission with this court, discussing the implication of the intervening FISA Court order and contending that the case should be dismissed as moot. The plaintiffs filed a response, disputing any notion that this appeal had been rendered moot by the FISA Court order. Based on the analysis presented herein, it is unnecessary to reach the issue of intervening mootness. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180 (2000).

## II.

This appeal presents a number of serious issues,[5] none of which can be addressed until a determination is made that these plaintiffs have standing to litigate them. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998) (stating that there is no "doctrine of hypothetical jurisdiction"). "Every federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even [if] the parties are prepared to concede it . . . . When the lower federal court lacks jurisdiction, we have jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit." *Id.* at 95 (quotation marks, citations, and edits omitted).

Standing is an aspect of justiciability, *Warth v. Selden*, 422 U.S. 490, 498 (1975), and "a plaintiff must demonstrate standing for each claim he seeks to press," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. --, 126 S. Ct. 1854, 1867 (2006); *accord Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd.*, 172 F.3d 397, 407 (6th Cir. 1999) (requiring proof of standing for each individual claim). "[T]he standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the *particular plaintiff* is entitled to an adjudication of the *particular claims* asserted." *Allen v. Wright*, 468 U.S. 737, 752 (1984) (emphasis added).

The "particular plaintiffs" to this action are a diverse group of associations and individuals, and it would require a rigorous undertaking to assure that each has standing to litigate. However, for purposes of the asserted declaratory judgment — though not necessarily for the requested injunction[6] — it is only necessary that one plaintiff has standing. *See Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (deciding a challenge to the constitutionality of a statute because at least one plaintiff had standing).[7] The injunction in this case is predicated on the declaratory judgment (i.e., a determination that the NSA's conduct is unlawful), so it follows that if the plaintiffs lack standing to litigate their declaratory judgment claim, they must also lack standing to pursue an injunction. The question is whether *any* plaintiff has standing to litigate the declaratory judgment claim.

As for the "particular claims," the plaintiffs have asserted six separate claims or causes of action — three constitutional (First Amendment, Fourth Amendment, and Separation of Powers) and three statutory (APA, Title III, and FISA)[8] — and the plaintiffs must establish that at least one

---

[5] On the merits of this appeal, this court is presented with a cascade of serious questions. Has the NSA violated the United States Constitution — the First Amendment, the Fourth Amendment, or the Separation of Powers Doctrine? Or, has the NSA violated federal statute — the APA, FISA, or Title III? If the NSA has violated a federal statute, is that statute constitutional when applied to the NSA in this manner? If the NSA has violated either the Constitution or a valid federal statute, is an injunction justified? And, if an injunction is justified, what is its proper scope? The district court answered all of the questions in the affirmative and imposed an injunction of the broadest possible scope.

[6] "[A] plaintiff must demonstrate standing separately for each form of relief sought." *Laidlaw*, 528 U.S. at 185 (*citing City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) (notwithstanding that the plaintiff had standing to pursue damages, he lacked standing to pursue injunctive relief)).

[7] After argument on this appeal, the plaintiffs filed a citation to supplemental authority, urging us to rely on the Supreme Court's recent decision in *Massachusetts v. EPA*, 549 U.S. --, 127 S. Ct. 1438, 1453 (2007) ("Only one of the petitioners needs to have standing to permit us to consider the petition for review."). That case, however, offers no direct legal support for the plaintiffs' claim of standing because it involves a "petition for review," a particular cause of action under 42 U.S.C. § 7607(b)(1), *see id.* at 1451 n.16, which has no applicability in the present case.

[8] The plaintiffs, in the plain language of their complaint, actually assert only one statutory cause of action, predicated on the APA, 5 U.S.C. § 702 (2000). They claim that the NSA violated the "substantive provisions" of FISA and Title III, and contend that this establishes standing for an APA cause of action even if they cannot establish standing to litigate a cause of action under either FISA's or Title III's civil suit provisions (i.e., under the relevant statutes). Because the APA itself has no applicability in the present circumstances, *see* Section IV.B.1, the plaintiffs' references

plaintiff has standing for each. *See Bowsher*, 478 U.S. at 721; *Cuno*, 126 S. Ct. at 1867. Because a cause of action is intertwined with an injury, the injuries being alleged must be described as precisely and unambiguously as possible. A particularized analysis is therefore necessary.

The conduct giving rise to the alleged injuries is undisputed: the NSA (1) eavesdrops, (2) without warrants, (3) on international telephone and email communications in which at least one of the parties is reasonably suspected of al Qaeda ties. The plaintiffs' objection to this conduct is also undisputed, and they demand that the NSA discontinue it. The plaintiffs do not contend — nor could they — that the mere practice of wiretapping (i.e., eavesdropping) is, by itself, unconstitutional, illegal, or even improper. Rather, the plaintiffs object to the NSA's eavesdropping without warrants, specifically FISA warrants with their associated limitations and minimization requirements. *See* 50 U.S.C. §§ 1804-06. According to the plaintiffs, it is the absence of these warrants that renders the NSA's conduct illegal and unconstitutional. But the plaintiffs do not — and because of the State Secrets Doctrine cannot — produce any evidence that any of their own communications have ever been intercepted by the NSA, under the TSP, or without warrants. Instead, they assert a mere belief, which they contend is reasonable and which they label a "well founded belief," that: their overseas contacts are the types of people targeted by the NSA; the plaintiffs are consequently subjected to the NSA's eavesdropping; the eavesdropping leads the NSA to discover (and possibly disclose) private or privileged information; and the mere possibility of such discovery (or disclosure) has injured them in three particular ways.

Notably, the plaintiffs do *not* allege as injury that they personally, either as individuals or associations, anticipate or fear any form of direct reprisal by the government (e.g., the NSA, the Justice Department, the Department of Homeland Security, etc.), such as criminal prosecution, deportation, administrative inquiry, civil litigation, or even public exposure. The injuries that these plaintiffs allege are not so direct; they are more amorphous and necessitate a pointed description.

The plaintiffs' primary alleged injury — the first of three — is their inability to communicate with their overseas contacts by telephone or email due to their self-governing ethical obligations.[9] Under this claim, the *immediate* injury results directly from the plaintiffs' own actions and decisions, based on (1) their subjective belief that the NSA might be intercepting their communications, and (2) the ethical requirements governing such circumstances, as dictated by their respective professional organizations or affiliations. Relying on the district court's three facts, the plaintiffs allege their "well founded belief" that the NSA is intercepting their communications with overseas contacts, to the perceived detriment of those overseas contacts. The plaintiffs explain that they have an ethical duty to keep their communications confidential, which, under the circumstances, requires that they refrain from communicating with the overseas contacts by telephone or email, lest they violate that duty.[10] The possibility that private communications may be revealed burdens the

_____

to FISA and Title III are construed liberally in this opinion, as assertions of independent causes of action under each, to consider whether the plaintiffs had standing to litigate their case despite the possible inartfulness of their pleading.

[9] This injury, as alleged, actually appears to implicate the Fifth or Sixth Amendments, *see*, *e.g.*, *United States v. Robel*, 389 U.S. 258, 270 (1967) (Brennan, J., concurring) (*quoting Greene v. McElroy*, 360 U.S. 474, 492 (1959)) (stating that "the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment"); *Sinclair v. Schriber*, 916 F.2d 1109, 1112-13 (6th Cir. 1990) (describing "a violation of the Sixth Amendment right to counsel ensuing from government surveillance"); *Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144, 161-62 (D.D.C. 1976) (considering an alleged violation of the Sixth Amendment due to "electronic surveillance of conversations between his attorney and a consultant"), but the plaintiffs have not asserted these causes of action.

[10] Some plaintiffs appear to describe this injury as an untenable choice, in which they must decide between their "professional duty" (i.e., completing the job) and complying with their ethical duties. Even accepting, *arguendo*, that these plaintiffs are bound by these duties, this description is incorrect. While these circumstances demand that the

plaintiffs' pursuit of their chosen professions or organizational objectives — i.e., in order to comply with their ethical duties, the plaintiffs must refrain from communicating by telephone or email, and are instead required either to travel overseas to meet with these contacts in person or else refrain from communicating with them altogether. The injury manifests itself in both a quantifiable way (as the added time and expense of traveling overseas) and a non-quantifiable way (as the incomplete or substandard performance of their professional responsibilities and obligations). The plaintiffs alleged this injury in their complaint and again on appeal, even though it went unaddressed by the district court.

The second alleged injury — and the only one expressly addressed by the district court — is the "chilling effect" on the overseas contacts' willingness to communicate with the plaintiffs by telephone or email. Under this claim, the *immediate* injury results directly from the actions of the overseas contacts who, the plaintiffs contend, fear that the NSA's discovery of otherwise private or privileged information (being communicated by telephone or email) will lead to some direct reprisal by the United States government, their own governments, or others. This fear causes the overseas contacts to refuse to communicate with the plaintiffs by telephone or email, and this refusal to communicate burdens the plaintiffs in the performance of their jobs or other lawful objectives, because, in order to pursue their chosen professions or organizational objectives, the plaintiffs must travel overseas to meet with these contacts in person. This injury manifests itself as both an added expense and an added burden.

The plaintiffs' third alleged injury is the NSA's violation of their legitimate expectation of privacy in their overseas telephone and email communications. Under this claim, the *immediate* injury comes directly from the actions of the NSA. The plaintiffs assert that the Fourth Amendment, Title III, and FISA limit the occasions and circumstances in which, and the manner by which, the government can lawfully intercept overseas electronic communications, giving rise to a legitimate expectation that their overseas communications will be intercepted only in accordance with these limits. The plaintiffs conclude that, because the NSA has conducted foreign electronic surveillance without obtaining FISA warrants (and presumably, without strict adherence to FISA's minimization requirements), the NSA has breached their legitimate expectation of privacy, thereby causing them injury. The plaintiffs alleged a violation of their privacy rights in their complaint, but the district court did not mention it and they have not pressed it on appeal.[11]

This third kind of injury, unlike the other two, is direct and personal; under this theory, the NSA has directly invaded the plaintiffs' interest and proof of such invasion is all that is necessary to establish standing. If, for instance, a plaintiff could demonstrate that her privacy had actually been breached (i.e., that her communications had actually been wiretapped), then she would have standing to assert a Fourth Amendment cause of action for breach of privacy.[12] In the present case, the plaintiffs concede that there is no single plaintiff who can show that he or she has actually been wiretapped. Moreover, due to the State Secrets Doctrine, the proof needed either to make or negate

plaintiffs comply with both obligations, this dual compliance is "tenable"; compliance with both obligations will simply be more costly, time consuming, and burdensome. The obligations are not conflicting or mutually exclusive. The *choice* is actually between paying the cost of this dual compliance or not completing the job, and therefore, the "injury" is the added cost of completing the job, in compliance with the ethical duties, under the present circumstances.

[11] At oral argument, the plaintiffs' counsel conceded that it would be unprecedented for a court to find standing for a person to litigate a Fourth Amendment cause of action without any evidence that the defendant (i.e., government) had actually subjected that particular person to an illegal search or seizure. The plaintiffs' briefs are not to the contrary.

[12] As will be discussed in Section IV.A.1, however, she could not — under this scenario — establish standing to litigate a *First Amendment* cause of action. *See Laird v. Tatum*, 408 U.S. 1, 10 (1972) (holding that standing is not satisfied "by a complainant who alleges that the exercise of his First Amendment rights is being chilled by the mere existence, without more, of a governmental investigative and data-gathering activity").

such a showing is privileged, and therefore withheld from discovery or disclosure. *See Tenenbaum v. Simonini*, 372 F.3d 776, 777 (6th Cir. 2004) (upholding dismissal because the defendants "cannot defend their conduct . . . without revealing the privileged information [so] the state secrets doctrine thus deprives [the d]efendants of a valid defense to the [plaintiff]s' claims"). This injury is not concrete or imminent under these circumstances, and this opinion focuses on the plaintiffs' two other alleged injuries.

One other issue demands attention, namely, that the plaintiffs' failure to subject themselves to actual harm does not, by itself, prevent a finding that they have standing — specifically, it does not deprive them of the right to seek declaratory judgment. *See* 28 U.S.C. § 2201(a) (empowering courts to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought"). Implicit in each of the plaintiffs' alleged injuries is the underlying *possibility* — which the plaintiffs label a "well founded belief" and seek to treat as a probability or even a certainty — that the NSA is presently intercepting, or will eventually intercept, communications to or from one or more of these particular plaintiffs, and that such interception would be detrimental to the plaintiffs' clients, sources, or overseas contacts. This is the premise upon which the plaintiffs' entire theory is built. But even though the plaintiffs' beliefs — based on their superior knowledge of their contacts' activities — may be reasonable,[13] the alternative possibility remains that the NSA might *not* be intercepting, and might *never* actually intercept, any communication by any of the plaintiffs named in this lawsuit.

A plaintiff's refusal to engage in potentially harmful activities is the typical substance of a declaratory judgment action and does not, by itself, preclude a finding that the plaintiff has standing. *See MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. -- , 127 S. Ct. 764, 772-73 (2007). But it is important to distinguish the two harms that surround a declaratory judgment action. The anticipated harm that *causes* one to refrain from the activities may satisfy the "injury-in-fact" element of standing if it is sufficiently imminent and concrete. For reasons that will be made clear in the analysis, the other harm — the harm that *results* from refraining from the potentially harmful activities — is another matter. In the present case, the plaintiffs anticipate that the NSA's interception of telephone and email communications might be detrimental to their overseas contacts, and this perceived harm *causes* the plaintiffs to refrain from that communication (i.e., potentially harmful activity). Because there is no evidence that any plaintiff's communications have ever been intercepted, and the state secrets privilege prevents discovery of such evidence, *see Reynolds*, 345 U.S. at 10, there is no proof that interception would be detrimental to the plaintiffs' contacts, and the anticipated harm is neither imminent nor concrete — it is hypothetical, conjectural, or speculative. Therefore, this harm cannot satisfy the "injury in fact" requirement of standing. Because the plaintiffs cannot avoid this shortcoming, they do not propose this harm — the harm that *causes* their refusal to communicate — as an "injury" that warrants redress. Instead, they propose the injuries that *result* from their refusal to communicate and those injuries do appear imminent and concrete.

Thus, in crafting their declaratory judgment action, the plaintiffs have attempted (unsuccessfully) to navigate the obstacles to stating a justiciable claim. By refraining from communications (i.e., the potentially harmful conduct), the plaintiffs have negated any possibility that the NSA will ever actually intercept their communications and thereby avoided the anticipated harm — this is typical of declaratory judgment and perfectly permissible. *See MedImmune*, 127 S. Ct. at 772-73. But, by proposing only injuries that *result* from this refusal to engage in communications (e.g., the inability to conduct their professions without added burden and expense),

---

[13] Note that a legal determination of objective reasonableness would require additional specific information about the mechanics of the TSP, such as the number of communications being intercepted, the percentage of the total that number represents, the actual selection and screening process, the actual retention, dissemination, and disclosure policy, etc. This information is unavailable due to the State Secrets Doctrine. *See Reynolds*, 345 U.S. at 10.

they attempt to supplant[14] an insufficient, speculative injury with an injury that appears sufficiently imminent and concrete, but is only incidental to the alleged wrong (i.e., the NSA's conduct) — this is atypical and, as will be discussed, impermissible.

Therefore, the injury that would support a declaratory judgment action (i.e., the anticipated interception of communications resulting in harm to the contacts) is too speculative, and the injury that is imminent and concrete (i.e., the burden on professional performance) does not support a declaratory judgment action. This general proposition — the doctrine of standing — is explained more fully in the sections of the analysis regarding each, individual cause of action.

## III.

By claiming six causes of action, the plaintiffs have actually engaged in a thinly veiled, though perfectly acceptable, ruse. To call a spade a spade, the plaintiffs have only one claim, namely, breach of privacy, based on a purported violation of the Fourth Amendment or FISA — i.e., the plaintiffs do not want the NSA listening to their phone calls or reading their emails. That is really all there is to it. On a straightforward reading, this claim does not implicate the First Amendment.[15] The problem with asserting only a breach-of-privacy claim is that, because the plaintiffs cannot show that they have been or will be subjected to surveillance personally, they clearly cannot establish standing under the Fourth Amendment or FISA.[16] The plaintiffs concede as much.[17] In an attempt to avoid this problem, the plaintiffs have recast their injuries as a matter of free speech and association, characterized their claim as a violation of the First Amendment, and

---

[14] To clarify: If the plaintiffs and their overseas contacts were to proceed with the telephone and email communications, in disregard of the TSP (thereby incurring no additional cost, burden, or diminution of professional performance), and none of their communications were ever actually intercepted by the NSA, then there would be no injury to these plaintiffs due to the NSA's conduct. Under this scenario, even if the NSA, unbeknownst to the plaintiffs, did intercept a communication, there would be no tangible injury until the NSA disclosed the information (presumably in a manner demonstrating a direct injury to the plaintiffs or their contacts). Therefore, it is only by refraining from the communications that the plaintiffs can transmute a speculative future injury into an actual present injury.

[15] *See Gordon v. Warren Consol. Bd. of Educ.*, 706 F.2d 778, 781 n.3 (6th Cir. 1983) (explaining that surveillance, which falls under the Fourth Amendment, "does not violate First Amendment rights, even though it may be directed at communicative or associative activities"). The First Amendment protects public speech and the free exchange of ideas, *R.A.V. v. St. Paul*, 505 U.S. 377, 382 (1992), while the Fourth Amendment protects citizens from unwanted intrusion into their personal lives and effects, *Katz v. United States*, 389 U.S. 347, 361 (1967). Otherwise stated, the First Amendment protects one's right to associate and be heard, while the Fourth Amendment protects the right to remain unheard. The First Amendment protects one's posting of a sign in her front yard, while the Fourth Amendment protects her hiding of the same sign in her basement.

[16] *See* Section IV.A.2 (*citing Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.")) *and* Section IV.B.3 (*citing* H.R. Rep. No. 95-1283, at 66 (1978) (Report by the Permanent Select Comm. on Intel., in support of the proposed FISA bill and amendments) ("[T]he term [aggrieved person] is intended to be coextensive [with], but no broader than, those persons who have standing to raise claims under the Fourth Amendment with respect to electronic surveillance.")).

[17] At oral argument, the plaintiffs' counsel conceded that it would be unprecedented for a court to find standing for a person to litigate a Fourth Amendment cause of action without any evidence that the defendant (i.e., government) had actually subjected that particular person to an illegal search or seizure. The plaintiffs' briefs are not to the contrary.

engaged the First Amendment's relaxed rules on standing.[18] This argument is not novel, but neither is it frivolous; it warrants consideration, analysis, and an a full explanation by this court.

At this point, it becomes apparent that my analysis of whether the plaintiffs have standing diverges at a fundamental level from that of the concurring and dissenting opinions. They each employ a single, broad, all-encompassing analysis, with which they attempt to account for all of the plaintiffs' alleged injuries, requested remedies, and legal claims. As much as I would prefer that resolution of this question were so simple, I believe the law demands a particularized analysis of the plaintiffs' three alleged injuries, six asserted legal claims, and two requested forms of relief. *See Cuno*, 126 S. Ct. at 1867 ("[A] plaintiff must demonstrate standing for each claim he seeks to press."); *Laidlaw*, 528 U.S. at 185 ("[A] plaintiff must demonstrate standing separately for each form of relief sought."). Therefore, I believe the complexity of this case calls for a far more specific and comprehensive analysis than that offered by my colleagues.

A comprehensive analysis of all six claims in a single opinion, however, invites some overlap of legal doctrine, precedent, and reasoning. Such overlap similarly invites ambiguity, confusion, and misapplication. To avoid this pitfall, I define the plaintiffs' alleged injuries precisely, confine each cause of action to its own section, and take special care to ensure that I do not improperly carry precedent or legal doctrine from one cause of action to another. The benefit of precision will, I hope, outweigh any annoyance created by strict compartmentalization or redundancy.

## IV.

The analytical approach to the determination of standing for constitutional claims differs from the approach to statutory claims. *See Sierra Club v. Morton*, 405 U.S. 727, 731-32 (1972).

> Whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy is what has traditionally been referred to as the question of standing to sue. Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends upon whether the party has alleged such a personal stake in the outcome of the controversy, as to ensure that the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution. Where, however, Congress has authorized public officials to perform certain functions according to law, and has provided by statute for judicial review of those actions under certain circumstances, the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff.

*Id*. (quotation marks and citations omitted). The Court clarified:

> Congress may not confer jurisdiction on Art. III federal courts to render advisory opinions, or to entertain 'friendly' suits, or to resolve 'political questions,' because suits of this character are inconsistent with the judicial function under Art. III. But where a dispute is otherwise justiciable, the question whether the litigant is a 'proper

---

[18] *See*, *e.g.*, *Eisenstadt v. Baird*, 405 U.S. 438, 445 n.5 (1972) ("Indeed, in First Amendment cases we have relaxed our rules of standing without regard to the relationship between the litigant and those whose rights he seeks to assert precisely because application of those rules would have an intolerable, inhibitory effect on freedom of speech."); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 546-47 (1981) ("The most important exception to this standing doctrine permits some litigants to challenge on First Amendment grounds laws that may validly be applied against them but which may, because of their unnecessarily broad reach, inhibit the protected speech of third parties.").

party to request an adjudication of a particular issue,' is one within the power of Congress to determine.

*Id*. at 732 n.3 (citations omitted).[19]    Therefore, this analysis is separated into two sections — constitutional claims and statutory claims — and, by happenstance, the six causes of action are equally divided, with three in each section.

## A. Constitutional Claims

"The irreducible constitutional minimum of standing contains three requirements": "[1] injury in fact, [2] causation, and [3] redressability." *Steel Co.*, 523 U.S. at 102-03 (citations and footnotes omitted). "Injury in fact" is a harm suffered by the plaintiff that is "concrete and actual or imminent, not conjectural or hypothetical." *Id*. at 103 (quotation marks omitted) (*citing Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). "Causation" is "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Id*. (*citing Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)). "Redressability" is "a likelihood that the requested relief will redress the alleged injury." *Id*. (*citing Warth*, 422 U.S. at 505). This "irreducible constitutional minimum" applies to every claim sought to be litigated in federal court.

### 1. First Amendment

The plaintiffs allege that the NSA has, by conducting the warrantless wiretaps, violated the free speech and free association clauses of the First Amendment. The district court assumed that the plaintiffs had engaged in certain "protected expression," apparently referring to the telephone and email communications. Although the plaintiffs' painstaking efforts to keep these communications confidential belies the contention that this case involves *expression*,[20] I nonetheless assume this is a viable First Amendment cause of action. Standing to litigate this claim requires a showing of three elements: (1) injury in fact, (2) causation, and (3) redressability. *Steel Co.*, 523 U.S. at 102-03.

---

[19] *Sierra Club* twice acknowledges that courts reach this analysis only where it is determined that the controversy at issue is "otherwise justiciable." *Sierra Club*, 405 U.S. at 731-32. Justiciability, of course, includes numerous doctrines, including mootness, standing, the prohibition on advisory opinions, and the political question doctrine. *See Flast v. Cohen*, 392 U.S. 83, 95 (1968). *Sierra Club*'s use of the term "otherwise justiciable" thus refers to the doctrines of justiciability "other" than standing. Assuming that these other justiciability doctrines are satisfied, *Sierra Club* distinguishes between standing analysis for statutory and non-statutory claims. For non-statutory claims, which include the constitutional claims at issue here, *Sierra Club* requires the plaintiffs to show that they have a "personal stake in the outcome of the controversy." *Sierra Club*, 405 U.S. at 732. The Court used this "personal stake in the outcome" language to define Article III standing prior to its adoption of the three-part test in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). But the standing analysis is different for statutory claims. *Sierra Club* instructs courts that "the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff." *Sierra Club*, 405 U.S. at 732. This instruction to begin standing analysis with the statutory language makes perfect sense in light of the well-established legal principle that "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973); *see also Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41 n.22 (1976), (recognizing "Congress' power to create new interests the invasion of which will confer standing"). Thus the analysis of whether the plaintiffs have standing to bring a statutory claim necessarily requires a determination of whether the plaintiffs were injured under the relevant statute.

[20] There is, in fact, a certain view that this is not a First Amendment issue at all. *See Gordon v. Warren Consol. Bd. of Educ.*, 706 F.2d 778, 781 n.3 (6th Cir. 1983) (noting that surveillance, which falls under the Fourth Amendment, "does not violate First Amendment rights, even though it may be directed at communicative or associative activities"). Ultimately, however, this distinction is a merits issue that I need not — and indeed cannot — address at this stage.

### Injury in Fact

"Art. III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Valley Forge Christian Coll. v. Ams. United for Sep. of Church & State, Inc.*, 454 U.S. 464, 472 (1982) (quotation marks omitted). "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm[.]" *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972). The Supreme Court's "clear precedent requir[es] that the allegations of future injury be particular and concrete." *Steel Co.*, 523 U.S. at 109.

The Supreme Court framed the question in *Laird*, 408 U.S. at 10, as "whether the jurisdiction of a federal court may be invoked by a complainant who alleges that the exercise of his First Amendment rights[21] is being chilled by the mere existence, without more, of a governmental investigative and data-gathering activity." The Court held that its plaintiffs, subjects of secret United States Army surveillance, may have suffered a "subjective chill," but did not allege a sufficiently concrete, actual, and imminent injury to entitle them to standing. *Id*. at 15. Something "more" was necessary, and in a passage that is peculiarly applicable to the present case, the Court explained:

> In recent years [we have] found in a number of cases that constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights. In none of these cases, however, did the chilling effect arise merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and additional action detrimental to that individual. Rather, in each of these cases, the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, *and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging*.

*Id.* at 11 (citations omitted; emphasis added); *accord Sinclair,* 916 F.2d at 1114-15 (finding surveillance alone insufficient for standing); *United Presb. Church v. Reagan*, 738 F.2d 1375, 1380 (D.C. Cir. 1984) (finding no injury in fact because "no part of the challenged [surveillance] imposes or even relates to any direct governmental constraint upon the plaintiffs").

I cannot subscribe to a view that the reason the injury in *Laird* was insufficient was because the plaintiffs alleged "only" chilled speech and that, by something "more," the *Laird* Court meant more subjective injury or other injuries that derive from the chilled speech. The plaintiffs in *Laird* were political activists and the speech being chilled was political speech. *Laird*, 408 U.S. at 2. In First Amendment jurisprudence, political speech is the most valued type of speech. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 422 (1992) (Stevens, J., concurring) ("Our First Amendment decisions have created a rough hierarchy in the constitutional protection of speech. Core political speech occupies the highest, most protected position. . . ."). To say that there could be more injury in other circumstances is to suggest that political speech is not valuable in and of itself and that no consequences flow from the chilling of political speech if such consequences are not easily articulable. Certain plaintiffs in the present case contend that the "professional injuries" that flow from the chilling of their "professional" speech is enough to satisfy *Laird*'s requirement of something "more." Under such reasoning, if the *Laird* plaintiffs had alleged a chilling of some

---

**21** *Laird* involved a First Amendment claim. I do not assert or imply that *Laird*'s holding, which I narrowly construe as regarding only a subjective chill *on First Amendment rights*, extends to any other causes of action.

commercial speech, they would have had standing because the lost sales would constitute easily articulable injuries resulting from the chilling, which would — under this view — constitute something "more." This is nonsense, as it would effectively value commercial speech above political speech and protect the former but not the latter. It is also at odds with the remainder of the *Laird* opinion and First Amendment doctrine in general. Consequently, it is not the value of the speech that determines the injury but the level of restraint, and "chilling" is not sufficient restraint no matter how valuable the speech.

Therefore, to allege a sufficient injury under the First Amendment, a plaintiff must establish that he or she is regulated, constrained, or compelled directly by the government's actions, instead of by his or her own subjective chill. *Laird*, 408 U.S. at 11; *Reagan*, 738 F.2d at 1378. The D.C. Circuit's decision in *Reagan*, 738 F.2d at 1380, involved a plaintiff's First Amendment challenge to alleged government surveillance. The *Reagan* court clarified why mere subjective chill deriving from government surveillance is insufficient to establish a concrete injury, stating:

> The harm of 'chilling effect' is to be distinguished from the immediate threat of concrete, harmful action. The former consists of present deterrence [of the plaintiff, by the government,] from First Amendment conduct because of the difficulty [that plaintiff has in] determining the application of a [government practice] to that conduct, and will not by itself support standing.

*Id*. "'Chilling effect' is cited as the *reason* why the governmental imposition is invalid [under the First Amendment] rather than as the *harm* which entitles the plaintiffs to challenge it." *Id*. at 1378. In an attempt to establish harm, the *Reagan* plaintiffs claimed that they were "especially likely to be targets of the unlawful [surveillance] authorized by the order," but the court explained:

> Even if it were conceded that . . . the plaintiffs [were] at greater risk than the public at large, that would still fall far short of the 'genuine threat' required to support this theory of standing, as opposed to mere 'speculative' harm. It must be borne in mind that this order does not *direct* intelligence-gathering activities against all persons who could conceivably come within its scope, but merely *authorizes* them.

*Id.* at 1380 (citations omitted). The *Reagan* court therefore held that the plaintiffs failed to satisfy the injury-in-fact requirement because they did not allege that "any direct governmental constraint" was "threatened or even contemplated against them." *Id*. The present case is no different.

The plaintiffs here contend that the NSA has inflicted First Amendment injury in two ways, both of which prevent them from performing their jobs or pursuing other lawful objectives. The first injury, which went unaddressed by the district court, involves the plaintiffs' own unwillingness to communicate with their overseas contacts by telephone or email. The plaintiffs fear that the NSA may intercept their communications, and therefore, their ethical obligations require them to forgo the communications in order to avoid interception. The injurious consequence of the NSA's conduct, the plaintiffs contend, is that they must either suffer diminished performance in their jobs for lack of communication, or else bear the cost of traveling overseas to meet with these contacts in person.

Even accepting this as a good faith assertion and assuming the factual statements are true, the plaintiffs' first injury still involves two purely speculative fears: (1) that the NSA will actually intercept the plaintiffs' particular communications, and (2) that armed with the fruit of those interceptions, the NSA will take action detrimental to the contacts. If, on the other hand, the plaintiffs could be assured that the NSA would not intercept their communications, or, if interception occurs, that no harm would befall the overseas contacts, then the NSA could continue the TSP

wiretapping without harm to the plaintiffs.[22]  It is not the mere existence of the TSP, but the possibility that the plaintiffs' overseas contacts will be subjected to it, that ultimately results in the alleged harm.  Even assuming these fears are imminent rather than speculative, this is still a tenuous basis for proving a *concrete* and *actual* injury.  That is, even if it were certain that the NSA would intercept these particular plaintiffs' overseas communications, if the overseas contacts were nonetheless willing to communicate with the plaintiffs by telephone or email in spite of the impending interception, then it is doubtful that the plaintiffs (journalists, academics, lawyers, or organizations), who have themselves alleged no personal fear of our government (or basis for fear of our government), would still be unwilling or unable to communicate.  The plaintiffs' unwillingness comes not from any anticipated harm to themselves, but from their apprehension for and duty to their overseas contacts.[23]

Moreover, even if their allegations are true, the plaintiffs still allege only a subjective apprehension and a personal (self-imposed) unwillingness to communicate, which fall squarely within *Laird,* 408 U.S. at 13-14.  In fact, this injury is even *less* concrete, actual, or immediate than the injury in *Laird.*  In *Laird*, the Army was conducting "massive and comprehensive" surveillance of civilians, secretly and (apparently) without warrants.  The *Laird* plaintiffs alleged that the Army surveillance program caused a chilling effect on their First Amendment rights in that they and others were reluctant to associate or communicate for fear of reprisal, stemming from their fear that the government would discover or had discovered them (and their activities) by way of the secret surveillance.  The harm alleged in the present case is no more substantial; the plaintiffs allege a similar chilling effect on their First Amendment rights, in that they are bound by professional and ethical obligations to refrain from communicating with their overseas contacts due to their fear that the TSP surveillance will lead to discovery, exposure, and ultimately reprisal against those contacts or others.  But unlike the *Laird* plaintiffs, the plaintiffs here do not assert that they personally anticipate or fear any direct reprisal by the United States government, or that the TSP data is being widely circulated or misused.  Indeed, the district court stated that, to date, no one has been exposed or prosecuted based on information collected under the TSP. *ACLU v. NSA*, 438 F. Supp. 2d at 771.

The plaintiffs attempt to distinguish *Laird.*  They first contend that they have alleged a chilling of their own communications, whereas the *Laird* plaintiffs did not.  But the *Laird* plaintiffs alleged the same amount (or lack) of personalized surveillance as the present plaintiffs claim, and both alleged a chilling of their own communications.  Even if this distinction were accurate, it would not alter *Laird*'s holding that federal courts lack jurisdiction over cases in which the plaintiff "alleges that the exercise of his First Amendment rights is being chilled by the mere existence, without more, of a governmental investigative and data-gathering activity." *Laird*, 408 U.S. at 10.  The plaintiffs next argue that they have alleged a present injury, namely, an inability to engage in the communication necessary to perform their professional duties, whereas the plaintiffs in *Laird* alleged only a speculative future harm.  But the injury alleged here is just as attenuated as the future

---

[22] As discussed in Section II, this scenario could result in a breach of the plaintiffs' privacy under the Fourth Amendment, but the present analysis concerns only the First Amendment cause of action.  The Fourth Amendment, and harms attributable to a defendant's breach of its protections, necessitate a different analysis. *See* Section IV.A.2.

[23] The plaintiffs who are lawyers take this argument one step further, alleging that their concerns render them incapable of communicating with their clients and others, which their duty of zealous representation to these clients demands.  Because they assume with their "well founded belief" that their communications will be intercepted, they assert that knowingly engaging in such communications would breach their duty to keep those communications confidential.  Therefore, they argue, their professionally imposed ethical obligations make the alleged effects more acute.  As a lawyer, I am certainly mindful of these concerns, but I cannot escape the fact that they are premised on the plaintiffs' duties to their clients, and not on a personal harm to themselves.  A client, after all, can waive such confidentiality, and if a fully informed overseas client who does not fear the NSA chooses to communicate with full awareness that the NSA might be listening, then the lawyer would not breach any duty by engaging in such communication.

harm in *Laird*; the present injury derives solely from the fear of secret government surveillance, not from some other form of direct government regulation, prescription, or compulsion. *Id*. at 11. Finally, the plaintiffs argue that the *Laird* plaintiffs' reactions to the surveillance were unreasonable because there was no illegal conduct alleged in that case. *Laird*, however, did not discuss the reasonableness of its plaintiffs' response; it held that the mere subjective chill arising from the government's investigative activity — reasonable or not — is insufficient to establish First Amendment standing. *Id*. at 15-16; *see also Reagan*, 738 F.2d at 1378 (rejecting an identical attempt to distinguish *Laird*). I find these attempts to distinguish *Laird* unpersuasive.

The plaintiffs have directed us to several other decisions as support for their assertion that their professional injuries constitute something "more" than subjective chill. *See*, *e.g.*, *Meese v. Keene*, 481 U.S. 465 (1987); *Ozonoff v. Berzak*, 744 F.2d 224 (1st Cir. 1984); *Paton v. LaPrade*, 524 F.2d 862 (3d Cir. 1975). I reiterate that the something "more" required by *Laird* is not merely more subjective injury, but is the exercise of governmental power that is regulatory, proscriptive, or compulsory in nature, and that directly regulates, proscribes, or compels the plaintiffs. And these three cases involve plaintiffs who can show direct injury because the government *did* directly regulate, order, or constrain them. These cases certainly do not help the present plaintiffs, who are not subject to any direct government regulation, order, or constraint. Rather, to the extent the plaintiffs claim that they are prevented, required, compelled, or coerced in their actions, it is due not to any direct and immediate order or regulation by the government, but to circumstances stemming from the plaintiffs' own subjective apprehension that (1) their communications will be intercepted by the NSA and (2) that interception will be detrimental to their overseas contacts. This is not a concrete, actual, and imminent injury for purposes of establishing standing. *See Laird*, 408 U.S. at 11; *Reagan*, 738 F.2d at 1378-80.

In *Meese v. Keene*, 481 U.S. at 465, the plaintiff, Mr. Keene, a lawyer and a member of the state legislature, wanted to exhibit certain films that a federal statute required be labeled as "political propaganda." *Id*. at 469-70. The Court found that the harm to Mr. Keene's personal, political, and professional reputation, that would result from his exhibiting films labeled "propaganda," constituted injury in fact. *Id*. at 472. It is evident from even a cursory reading of the case, however, that Mr. Keene was subject to a *regulatory* statute that directly and expressly *ordered* the labeling of the films in the manner that would cause the harm. *Id*. at 472-74. The plaintiffs in the present case are not regulated by the NSA's operation of the TSP in any way, nor are they directly ordered to do or refrain from doing anything. *Meese* offers no support for the plaintiffs' position.

In *Ozonoff v. Berzak*, 744 F.2d at 224, the plaintiff, Dr. Ozonoff, sought employment with the World Health Organization, and the government ordered him to submit to a loyalty investigation as a condition of seeking the job. *Id*. at 225. The First Circuit found that this requirement created a speech- and association-related qualification for the WHO job, which effectively punished Dr. Ozonoff for joining certain organizations or expressing certain views. The court held that this requirement created a concrete injury, satisfying the injury-in-fact element. *Id*. at 229. In contrast, the NSA's operation of the TSP does not directly *order* or *require* the plaintiffs to do anything; instead, it is the plaintiffs' subjective apprehension (that the NSA might intercept their communication) that compels, coerces, or motivates the plaintiffs to alter their behavior. As with *Meese*, *Ozonoff* offers no support for the plaintiffs' position under the present circumstances.

Finally, in *Paton v. LaPrade*, 524 F.2d at 862, Ms. Paton challenged the government's retention of an FBI file on her alleged involvement with the Socialist Workers Party because the existence of that file "endanger[ed] her future educational and employment opportunities." *Id*. at 868. The Third Circuit found a sufficiently concrete future injury deriving from the existence of that file. *Id*. Ms. Paton was not only subject to government regulation, she *knew and could prove* that the government had intercepted *her* specific mail (not just mail of a like kind) and was maintaining an FBI file on *her* particular activities (not just activities of a like kind). In stark contrast, the

plaintiffs in the present case allege only their suspicion and fear (i.e., their "well founded belief") that their contacts are likely targets of the TSP or that their communications are likely to be intercepted. As documented in the present record, the plaintiffs have not demonstrated and cannot demonstrate that the NSA is monitoring their particular personal activities.

I find no basis — either factual or legal — upon which to distinguish *Laird* from the First Amendment claim raised by the plaintiffs here, and I conclude that *Laird* controls this claim. But let me reemphasize, just to be perfectly clear, that I do not contend that *Laird* controls this entire case — it does not. *Laird* controls the First Amendment *claim*, based on the first type of injury. The plaintiffs' first alleged injury, arising from a personal subjective chill, is no more concrete, actual, or imminent than the injury alleged in *Laird*. The injury in *Laird* was insufficient to establish standing for a First Amendment cause of action; the plaintiffs' first injury is less than or, at best, equal to that in *Laird*; and the plaintiffs' first injury is likewise insufficient to establish standing.

The plaintiffs' second injury is the unwillingness of their overseas contacts, clients, witnesses, and sources to communicate by telephone or email, due to their fear that the NSA will intercept the communications. The district court, in its standing analysis, framed the issue this way:

> The Plaintiffs in this case are not claiming simply that the [NSA]'s surveillance has 'chilled' them from making international calls to sources and clients.[24] *Rather, they claim that Defendants' surveillance has chilled their sources, clients, and potential witnesses from communicating with them.* The alleged effect on Plaintiffs is a concrete, actual inability to communicate with witnesses, sources, clients and others without great expense which has significantly crippled Plaintiffs, at a minimum, in their ability to report the news and competently and effectively represent their clients.

*ACLU v. NSA,* 438 F. Supp. 2d at 769 (emphasis added). Under this view, the plaintiffs claim that their contacts have been chilled, which prevents them from communicating with these contacts.[25]

In *Presbyterian Church v. United States*, 870 F.2d 518, 520 (9th Cir. 1989), the Ninth Circuit considered a claim by plaintiff churches that "INS agents entered the churches wearing 'body bugs' and surreptitiously recorded church services" in violation of the First and Fourth Amendments. The district court had dismissed the claims for lack of standing, based on the plaintiffs' failure to show injury in fact, opining that the protections of the First Amendment extend not to corporations but to individuals, because "churches don't go to heaven." *Id.* at 521. On appeal, the Ninth Circuit reversed, finding that the plaintiff churches had pled a sufficient injury:

> When congregants are chilled from participating in worship activities [and] refuse to attend church services because they fear the government is spying on them and taping their every utterance, all as alleged in the complaint, we think a church suffers *organizational injury* because its ability to carry out its ministries has been impaired.

---

[24] In fact, the plaintiffs *are* claiming that the NSA's surveillance (coupled with their own ethical obligations) has chilled them from making international calls to sources and clients, as has been discussed throughout this opinion thus far. The district court simply misunderstood the extent of the plaintiffs' claims.

[25] In finding an injury on this theory — the unwillingness of the plaintiffs' overseas contacts to communicate due to their fear that the NSA is eavesdropping — the district court relied on affidavits submitted by several of the individual plaintiffs. None of the overseas contacts provided an affidavit or testimony of their alleged fear; the theory is based solely on the plaintiffs' own testimony, which is self-serving and may be inadmissible as hearsay. Ultimately, however, the questionable character of this evidence has no bearing on this injury-in-fact analysis, because the outcome is the same even if I assume it to be true.

*Id*. at 522 (emphasis added).  The Ninth Circuit then distinguished *Laird*:

> Although *Laird* establishes that a litigant's allegation that it has suffered a subjective 'chill' does not necessarily confer Article III standing, *Laird* does not control this case.  The churches in this case are not claiming simply that the INS surveillance has 'chilled' them from holding worship services.  Rather, they claim that the INS surveillance has chilled individual congregants from attending worship services, and that this effect on the congregants has in turn interfered with the churches' ability to carry out their ministries.  The alleged effect on the churches is not a mere subjective chill on their worship activities; it is a concrete, demonstrable decrease in attendance at those worship activities.  The injury to the churches is 'distinct and palpable.' *Laird* has no application here.

*Id.* (citations omitted).

In one sense, the Ninth Circuit's decision could be read as concluding that the churches suffered injury based on the actions of third parties (i.e., individual parishioners) — a reading that supports the plaintiffs' arguments in favor of standing.[26]  In another sense, however, the Ninth Circuit's decision may be confined to the unique idea of "organizational injury"; a church is, after all, an organization comprising a congregation of parishioners, and these congregants are properly viewed as intrinsic to the church organization, rather than as separate third parties.  This reading of *Presbyterian Church* would weaken its application to the present context because the overseas third-party clients, contacts, and sources in this case are not affiliated with the plaintiffs in the same intrinsic manner as are parishioners with a church.[27]  None of the plaintiffs have alleged any "organizational injury" in the present context.[28]

Having acknowledged these alternative interpretations of *Presbyterian Church*, it is unnecessary to resolve that issue definitively on this record.  Injury in fact is but one of the criteria necessary to establish standing, and ultimately, it is not determinative of this case.  Either of the other two criteria — causation or redressability — might ultimately defeat the plaintiffs' claim of standing, even if the plaintiffs' alleged injury is deemed adequate to state an injury in fact.

### *Causation*

"[F]ederal plaintiffs must allege some threatened or actual injury  *resulting from the putatively illegal action* before a federal court may assume jurisdiction." *Simon*, 426 U.S. at 41 (citations and footnotes omitted; emphasis added).  "In other words, . . . a federal court [may] act only to redress injury that fairly can be traced to the challenged action of the defendant, and *not injury that results from the independent action of some third party not before the court.*" *Id*. at 41-42 (emphasis added).  Causation "depends considerably upon whether the plaintiff is himself an object of the action . . . at issue." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  When causation hinges on independent third parties, the plaintiff has the burden of showing that the third

---

[26] But see the discussion of the causation element in this First Amendment analysis, *infra*, regarding the difficulties of obtaining standing based on the conduct of third-party actors.

[27] The plaintiffs have not claimed membership in any overriding "organization" that would include the plaintiffs *and* the overseas contacts.  There has been no suggestion that the plaintiff journalists, academics, or lawyers are members of al Qaeda, or that their overseas contacts — presumably suspected by the NSA of being al Qaeda operatives or affiliates — are (or desire to be) members of some organization of American journalists, academics, or lawyers.

[28] Certain plaintiffs are organizations (American Civil Liberties Union, Council on American Islamic Relations, Greenpeace) and it is therefore possible that these plaintiffs, on a different record, might assert organizational injury.

parties' choices "have been or will be made in such a manner as to produce causation and permit redressability of injury." *Id.* at 562.

In the present case, the "putatively illegal action" is the NSA's interception of overseas communications without warrants (specifically FISA warrants), and the "threatened or actual injury" is the added cost of in-person communication with the overseas contacts (or correspondingly, the diminished performance resulting from the inability to communicate). Therefore, to show causation, the plaintiffs must show that, but for the lack of warrants (or FISA compliance), they would not incur this added cost. There are two causal pathways based on the two types of alleged injury. In the first: (1) the NSA's warrantless wiretapping, (2) creates in the plaintiffs a "well founded belief" that their overseas telephone and email communications are being intercepted, which (3) requires the plaintiffs to refrain from these communications (i.e., chills communication), and (4) compels the plaintiffs to travel overseas to meet personally with these contacts in order to satisfy their professional responsibilities, thereby (5) causing the plaintiffs to incur additional costs. In the second: (1) the NSA's warrantless wiretapping (2) causes the "well founded belief," which (3) compels the overseas contacts to refuse to communicate by telephone or email (i.e., chills communication), thereby (4) requiring in-person communication, with its (5) associated additional costs. The district court attempted to articulate this relationship: "All of the Plaintiffs contend that the TSP has caused clients, witnesses and sources to discontinue their communications with plaintiffs out of fear that their communications will be intercepted." *ACLU v. NSA*, 438 F. Supp. 2d at 767 (footnote omitted). From this, the district court theorized: "Plaintiffs would be able to continue using the telephone and email in the execution of their professional responsibilities if the Defendants were not undisputedly and admittedly conducting warrantless wiretaps of conversations." *Id.* at 769. In considering these causal pathways, I question the second step (whether the "well founded belief" is actually founded on the warrantless wiretapping) and refute the third step (whether the unwillingness to communicate is actually caused by the warrantless character of the wiretaps).

The underpinning of the second step is questionable. The plaintiffs allege that they have a "well founded belief" that their overseas contacts are likely targets of the NSA and that their conversations are being intercepted. The plaintiffs have no evidence, however, that the NSA has actually intercepted (or will actually intercept) any of their conversations. No matter what the plaintiffs and others might find "reasonable," the evidence establishes only a *possibility* — not a probability or certainty — that these calls might be intercepted, that the information might be disclosed or disseminated, or that this might lead to some harm to the overseas contacts. While this lack of evidence is not, by itself, enough to *disprove* causation, the absence of this evidence makes the plaintiffs' showing of causation less certain and the likelihood of causation more speculative.

The third step is unsupportable. In this step, the plaintiffs allege, and the district court found, that it is *the absence of a warrant* (and all that goes with it[29]) that has chilled the plaintiffs and their overseas contacts from communicating by telephone or email. *See ACLU v. NSA*, 438 F. Supp. 2d at 769 ("Plaintiffs would be able to continue using the telephone and email in the execution of their professional responsibilities if the Defendants were not undisputedly and admittedly conducting

---

[29] The well-known Fourth Amendment warrant requirement involves interjection of a neutral and detached magistrate, demonstration of probable cause, and description of the things to be seized or the place to be searched. *See Dalia v. United States*, 441 U.S. 238, 255 (1979); *United States v. U.S. Dist. Ct.* (*Keith*), 407 U.S. 297, 316 (1972). The more obscure FISA warrant requirement involves a petition by a federal official, with the approval of the Attorney General, 50 U.S.C. § 1804(a), to a special FISA Court, § 1803(a), for an order approving the electronic surveillance for foreign intelligence purposes, § 1805, based upon "probable cause to believe that the target of the electronic surveillance is a foreign power or the agent of a foreign power," § 1805(a)(3)(A). The FISA petition and order must include, among other things, provisions to limit the duration, §§ 1805(a)(10), -(c)(1)(E), -(e), and content, §§ 1804(a)(6), 1805(c)(1)(C), 1806(i), of the surveillance, and provisions to ensure the minimization of the acquisition, retention, and dissemination of the information, §§ 1804(a)(5), 1805(a)(4), -(c)(2(A), 1806, 1801(h).

warrantless wiretaps of conversations."). This allegation does not stand up under scrutiny, however, and it is not clear whether the chill can fairly be traced to the absence of a warrant, or if the chill would still exist without regard to the presence or absence of a warrant. The insufficiency of this step leads to a breakdown in the causal pathway. *See Simon*, 426 U.S. at 42-43; *Laird*, 408 U.S. at 14 n.7 ("Not only have respondents left somewhat unclear the precise connection between the mere existence of the challenged system and their own alleged chill, but they have also cast considerable doubt on whether they themselves are in fact suffering from any such chill.").

A wiretap is always "secret" — that is its very purpose — and because of this secrecy, neither the plaintiffs nor their overseas contacts would know, with or without a warrant, whether their communications were being tapped. Therefore, the NSA's secret possession of a warrant would have no more effect on the subjective willingness or unwillingness of these parties to "freely engage in conversations and correspond via email," *see ACLU v. NSA*, 438 F. Supp. 2d at 770, than would the secret absence of that warrant. The plaintiffs have neither asserted nor proven any basis upon which to justifiably conclude that the mere absence of a warrant — rather than some other reason, such as the prosecution of the War on Terror, in general, or the NSA's targeting of communications involving suspected al Qaeda terrorists, affiliates, and supporters, in particular — is the cause of the plaintiffs' (and their overseas contacts') reluctance to communicate by telephone or email.

The plaintiffs have argued that if the NSA were to conduct its surveillance in compliance with FISA, they would no longer feel compelled to cease their international telephone and email communications.[30] But again, even if the NSA had (secretly) obtained FISA warrants for each of the overseas contacts, who the plaintiffs themselves assert are likely to be monitored, the plaintiffs would still not have known their communications were being intercepted, still faced the same fear of harm to their contacts, still incurred the same self-imposed (or contact-imposed) burden on communications and, therefore, still suffered the same alleged injury. The plaintiffs' theory relies on their contention that their ethical obligations require them to cease telephone or email communications any time they believe the private or privileged information in those communications might be discovered or disclosed to the detriment of their clients, sources, or contacts. Assuming that this contention is true, it must also be true that this ethical obligation would arise whenever, and continue so long as, the plaintiffs believe their contacts to be the types of people likely to be monitored by the NSA.

The imposition of FISA requirements into this scenario would not change the likelihood that these overseas contacts are the types of people who the plaintiffs believe would be monitored. Nor would it change the plaintiffs' "well founded belief" that the NSA is intercepting their communications with these individuals, the plaintiffs' ethical obligations, or the overseas contacts' subjective fears. Even under the plaintiffs' depiction, it would merely assure the plaintiffs and their contacts that — while their international telephone and email communications with al Qaeda affiliates are still just as likely to be intercepted — the NSA will obtain FISA Court orders, which will presumably limit the duration and content of the acquisition and the use and dissemination of the acquired information. The plaintiffs, however, have not asserted, explained, or proven how a change in the duration or content of the NSA's interceptions — purely hypothetical changes that are unknown and unknowable based on the established record and the State Secrets Doctrine — would alleviate their fears. Specifically, the plaintiffs have not proffered any types or topics of communication, from which they are currently refraining, but about which — upon the imposition

---

[30] FISA's applicability (i.e., the plaintiffs' standing to bring a cause of action under FISA) is addressed separately in Section IV.B.3, *infra*. The present discussion, which concerns only the plaintiffs' assertion that their First Amendment injuries are caused by the NSA's failure to comply with FISA (or would be redressed by imposing FISA's requirements), assumes FISA's applicability and does not address standing *vis a vis* a FISA cause of action.

of FISA's limitations and protections — they would thereafter "freely engage in conversations and correspond[ence] via email." *See ACLU v. NSA*, 438 F. Supp. 2d at 770.

Some plaintiffs (especially those who are lawyers) assert that the imposition of FISA minimization — to limit the use and dissemination of the information acquired — would relieve their fears sufficiently to satisfy their ethical obligations because it would ensure that those communications would remain confidential and privileged in the event of a subsequent criminal prosecution, removal proceeding, military tribunal, etc. Therefore, they argue, imposition of FISA requirements would alter the type and content of their communications. This theory, however, is predicated on the assumption that their current fears and apprehensions are justified — and there is no support for this assumption. First, there is no evidence in the current record from which to presume that the information collected by the NSA via warrantless wiretapping will be used or disclosed for any purpose other than national security. Next, there is no evidence in the record from which to presume that the NSA is not complying with, or even exceeding, FISA's restrictions on the acquisition, retention, use, or disclosure of this information (i.e., FISA's minimization techniques). Finally, there is no basis to presume that traditional *post-hoc* remedies, such as the Exclusionary Rule or FISA's civil suit provision, 50 U.S.C. § 1810, would not adequately deter the use or dissemination of this information. Consequently, this disconnect in the plaintiffs' theory is unavoidable, and the plaintiffs' injury is not fairly traceable to the mere absence of FISA compliance.

Under the plaintiffs' second form of injury (i.e., the refusal by the overseas contacts to communicate by telephone or email), this third step in the causal pathway is further disrupted by the independent decisions of the third-party overseas contacts. In *Simon*, the Supreme Court held that, due to the independence of third-party actors, its plaintiffs could not prove a causal connection between the defendant's misconduct and the alleged injury:

> The complaint here alleged only that [the government], by the adoption of Revenue Ruling 69-545, had 'encouraged' [the third-party] hospitals to deny services to [the indigent plaintiffs]. . . . [But, it] is purely speculative whether the denials of service [i.e., the alleged harm] specified in the complaint fairly can be traced to [the government's] 'encouragement' or instead result from decisions made by the [third-party] hospitals without regard to the tax implications [i.e., government conduct].

*Simon*, 462 U.S. at 42-43. In the present case, as in *Simon*, it is possible that the overseas contacts' refusal to communicate with the plaintiffs has no relation to the putatively illegal government action of wiretapping without FISA compliance. The mere fact that the United States government is aggressively prosecuting a worldwide War on Terror — in which, by the plaintiffs' own "well founded belief," these contacts are likely suspects — would appear sufficient to chill these overseas contacts regardless of the absence of FISA protections. Notably, the record contains no testimony, by affidavit or otherwise, from any of the overseas contacts themselves as to the cause of their refusal to communicate; it contains only the plaintiffs' self-serving assertions and affidavits.

The plaintiffs have not shown a sufficient causal connection between the complained-of conduct (i.e., the absence of a warrant or FISA protection) and the alleged harm (i.e., the inability to communicate). This inadequacy is further exemplified in the analysis of redressability.

### *Redressability*

"Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co.*, 523 U.S. at 107. Redressability thus requires "that prospective relief will remove the harm," *Warth*, 422 U.S. at 505, and the plaintiff must show "that he personally would benefit in a tangible way from the court's intervention," *id*. at 508 (footnote omitted). In the prototypical redressability case, *Linda R.S. v.*

*Richard D.*, 410 U.S. 614, 615 (1973), a single mother sought to compel the State to enforce a criminal statute against the father of her illegitimate child and imprison him for his failure to pay child support. The Supreme Court acknowledged that the mother had "no doubt suffered an injury stemming from the failure of her child's father to contribute support payments." *Id.* at 618. The Court reasoned, however, that even if she "were granted the requested relief, it would result only in the jailing of the child's father," and not remedy the harm caused by his failure to pay child support. *Id.* The Court thus held that "the 'direct' relationship between the alleged injury and the claim sought to be adjudicated, which . . . is a prerequisite of standing," was absent in that case. *Id.*

In the present case, the plaintiffs requested a declaratory judgment and an injunction. They theorize that their injury (i.e., deficient professional performance or the additional cost of in-person communication) will be redressed by a declaration that the NSA's practice of warrantless wiretapping is unlawful, because it naturally follows that the unlawful conduct will be prohibited. The declaratory judgment thus forms the basis for an injunction prohibiting interception of communications without FISA compliance. The district court agreed, declaring the NSA's conduct illegal and imposing an injunction, on the belief that its injunction would redress the plaintiffs' injury by assuring them "that they could freely engage in conversations and correspond via email without concern, at least without notice, that such communications were being monitored." *ACLU v. NSA*, 438 F. Supp. 2d at 770-71. This theory of redressability rests on the premise that the NSA's compliance with FISA's warrant requirements will entice the plaintiffs and their contacts to "freely engage in conversations and correspond via email without concern." The likelihood of this outcome, however, "can, at best, be termed only speculative," *see Linda R.S.*, 410 U.S. at 618; it is just as likely (if not more likely) that, even with the imposition of a warrant requirement, the plaintiffs' current situation will not change — their fears will not be abated.

The TSP is designed and operated for the prevention of terrorism, and the NSA is interested only in telephone and email communications in which one party to the communication is located outside the United States and the NSA has a "reasonable basis to conclude that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda, or working in support of al Qaeda." It is reasonable to assume that the FISA Court would authorize the interception of this type of communication, *see* 50 U.S.C. § 1805, and keeping this likelihood in mind, the issuance of FISA warrants would not relieve any of the plaintiffs' fears of being overheard; it would relieve them only of the fear that the information might be disseminated or used against them. *See* 50 U.S.C. §§ 1804(a)(5); 1801(b)(1)-(4); 1806(a) & (h) (minimization requirements).[31] Recall, however, that the NSA has not disclosed or disseminated any of the information obtained via this warrantless wiretapping. This "remedy" would therefore not alter the plaintiffs' current situation and, accordingly, would not redress the injuries alleged.

---

[31] FISA does not necessarily prohibit even the interception of attorney-client communications. Because FISA states that "[n]o otherwise privileged communication obtained in accordance with [FISA] shall lose its privileged character," 50 U.S.C. § 1806(a), it therefore follows that FISA, at least in some instances, authorizes the interception of privileged communications, which presumably includes communications between attorney and client. For example, FISA might not prohibit the interception of attorney-client communications under circumstances where the NSA adheres to a policy of complete non-disclosure. Due to the State Secrets Doctrine, the plaintiffs do not (and cannot) know whether the NSA actually adheres to a policy of complete non-disclosure, but based on the record evidence, it certainly remains possible. The plaintiffs have never alleged, nor is there evidence in the present record to suggest, that the information collected by the NSA under the TSP has been disclosed to anyone for any purpose. *See ACLU v. NSA*, 438 F. Supp. 2d at 771 ("the perceived need for secrecy has apparently required that no person be notified that he is aggrieved by the activity, and there have been no prosecutions, no requests for extensions or retroactive approvals of warrants"). In any event, FISA's general requirement that electronic surveillance may proceed only upon issuance of a FISA Court warrant is not absolute, as FISA provides for instances in which a prior warrant may be unnecessary, at least for a short period of time. *See, e.g.*, 50 U.S.C. § 1805(f) (emergency situations).

Neither will the requested injunctive relief increase the likelihood that the plaintiffs and their overseas contacts will resume telephone or email communications. As discussed previously, "warrantless" and "secret" are unrelated things. All wiretaps are secret, and the plaintiffs are not challenging the *secret* nature, but only the *warrantless* nature, of the TSP. Because all wiretaps are secret, neither the plaintiffs nor their overseas contacts would know — with or without warrants — whether their communications were being tapped, and the secret possession of a warrant would have no more effect on the subjective willingness or unwillingness of these parties to "freely engage in conversations and correspond via email" than would the secret absence of that warrant. Thus, as a practical matter, the mere issuance of a warrant would not alleviate either the plaintiffs' or the contacts' fears of interception, and consequently, would not redress the alleged injury. Even if the wiretaps were not secret — that is, if the overseas contacts and the plaintiffs were actually notified beforehand that the NSA was tapping their communication — this knowledge would not redress the alleged injury. It is patently unreasonable to think that those who are reluctant to speak when they *suspect* the NSA of listening would be willing to speak once they *know* the NSA is listening.

The district court's injunction is also insufficient to relieve the plaintiffs' fear of reprisal against their contacts. A warrant requirement will not protect the overseas contacts from prosecution in all circumstances, *see In re Sealed Case*, 310 F.3d. 717, 731 (F.I.S.C.R. 2002), which leaves some doubt whether this will allay their fears enough to entice them to resume unreserved communications with the plaintiffs. Ironically, the *absence* of a warrant would be more likely to prohibit the government from using the intercepted information in a subsequent prosecution, due to the probability that the Exclusionary Rule would bar the admission of information obtained without a warrant. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961). The warrant requirement does many things; it does not, however, remedy the injuries alleged by the plaintiffs in this case.

Similarly, to the extent the plaintiffs or their contacts fear some misconduct by the NSA (in the discovery, disclosure, or dissemination of the information), the mere requirement of a warrant, FISA or otherwise, will not guarantee the prevention of that misconduct, and therefore fails to satisfy the redressability element. In *Leeke v. Timmerman*, 454 U.S. 83, 84-85 (1981), federal prison inmates, who had filed criminal charges against prison guards for a beating that occurred during a prison uprising, filed suit in federal court to facilitate the issuance of arrest warrants for the guards. On review, the Supreme Court found that the issuance of an arrest warrant "is simply a prelude to actual prosecution," because "the decision to prosecute is solely within the discretion of the prosecutor [and] issuance of the arrest warrant in this case would not necessarily lead to a subsequent prosecution." *Id.* at 86-87. The Court held that the inmates lacked standing because there was "no guarantee that issuance of the arrest warrant[s] would remedy claimed past misconduct of guards or prevent future misconduct." *Id.* at 86. Any such guarantee (i.e, that the issuance of a FISA warrant will prevent future FISA misconduct) is similarly lacking in the present case.

Consequently, the district court's declaration against *warrantless* wiretaps is insufficient to redress the plaintiffs' alleged injury because the plaintiffs' self-imposed burden on communications would survive the issuance of FISA warrants. The only way to redress the injury would be to enjoin *all* wiretaps, even those for which warrants are issued and for which full prior notice is given to the parties being tapped. Only then would the plaintiffs be relieved of their fear that their contacts are likely under surveillance, the contacts be relieved of their fear of surveillance, and the parties be able to "freely engage in conversations and correspond via email without concern." Because such a broad remedy is unavailable, the plaintiffs' requested relief, which is much narrower, would not redress their alleged injury.

For the foregoing reasons, the plaintiffs in the present action have no standing to pursue their First Amendment claim. Even if they could demonstrate injury, they cannot establish causation, and their alleged injury is not redressable by the remedy they seek.

## 2. *Fourth Amendment*

The plaintiffs allege that the NSA has, by conducting the warrantless wiretaps, violated the "plaintiffs' privacy rights guaranteed by the Fourth Amendment." The district court — asserting a heretofore unprecedented, *absolute* rule that the Fourth Amendment "requires prior warrants for *any* reasonable search," *ACLU v. NSA*, 438 F. Supp. 2d at 775 — agreed and granted the plaintiffs' motion for summary judgment on this theory, *id.* at 782.

However, the Supreme Court has made clear that Fourth Amendment rights are "personal rights" which, unlike First Amendment rights, may not be asserted vicariously. *See Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978). The Court explained in *Rakas*:

> Under petitioners' target theory, a court could determine that a defendant had standing [] without having to inquire into the substantive question of whether the challenged search or seizure violated the Fourth Amendment rights of that particular defendant. However, having rejected petitioners' target theory and reaffirmed the principle that *the rights assured by the Fourth Amendment are personal rights, which may be enforced [] only at the instance of one whose own protection was infringed by the search and seizure*, the question necessarily arises whether it serves any useful analytical purpose to consider this principle a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim. . . . Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of 'standing,' will produce no additional situations in which evidence must be excluded. The inquiry under either approach is the same. But we think the better analysis forth-rightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing.

*Id.* at 138-39 (quotation marks, citations, footnotes, and edits omitted; emphasis added); *see also Ellsberg v. Mitchell*, 709 F.2d 51, 65 (D.C. Cir. 1983) ("An essential element of each plaintiff's case is proof that he himself has been injured. Membership in a group of people, 'one or more' members of which were exposed to surveillance, is insufficient to satisfy that requirement.").

The plaintiffs do not, and cannot,[32] assert that any of their own communications have ever been intercepted. Instead, they allege only a belief that their communications are being intercepted, based on their own assessment of their overseas contacts as people who are likely to fall within the NSA's broad, public description of its targets. As acknowledged by plaintiffs' counsel at oral argument, it would be unprecedented for this court to find standing for plaintiffs to litigate a Fourth Amendment cause of action without any evidence that the plaintiffs themselves have been subjected to an illegal search or seizure. *See Rakas*, 439 U.S. at 133-34.

## 3. *Separation of Powers*

The plaintiffs allege that the NSA has, by conducting the warrantless wiretaps, "violat[ed] the principle of the separation of powers because [the NSA's conduct] was authorized by President Bush in excess of his Executive authority under Article II of the United States Constitution and is contrary to limits imposed by Congress." This two-part accusation — that President Bush (1) exceeded his presidential authority under the Constitution, and (2) violated a statutory limit imposed upon that authority by Congress — presupposes that the Constitution gives Congress the authority to impose limits on the President's powers under the present circumstances. The district

---

[32] The plaintiffs' prospective inability to assert that any of their personal communications have been intercepted is due to the State Secrets Doctrine. *See Reynolds*, 345 U.S. at 10.

court agreed with the plaintiffs' allegation *in toto*, and declared the NSA's conduct a violation of the Separation of Powers Doctrine.  *See ACLU v. NSA*, 438 F. Supp. 2d at 779-79.

A plaintiff asserting a claim under the Separation of Powers Doctrine must, like all other plaintiffs seeking to bring a claim in federal court, demonstrate injury in fact, causation, and redressability.  *INS v. Chadha*, 462 U.S. 919, 936 (1983) (requiring an "injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury"); *see also Buckley v. Valeo*, 424 U.S. 1, 117 (1976) (stating that "litigants with sufficient concrete interests at stake may have standing to raise constitutional questions of separation of powers").  Here, the plaintiffs contend that the executive branch (i.e., the NSA at the direction of the President) has, by instituting the TSP's practice of warrantless wiretapping, acted in excess of its constitutional or statutory limitations, thereby encroaching upon the powers expressly reserved to another branch (i.e., Congress).  The NSA's violation of the Separation of Powers Doctrine, the plaintiffs say, has caused them to fear that the NSA might intercept their communications with their overseas contacts, preventing them from performing their jobs or pursuing other lawful objectives without incurring additional burden and expense.

To prove causation, the plaintiffs must connect the alleged separation-of-powers violation ("the putatively illegal action") to the burden on the performance of their professional obligations (the alleged injury).  *See Simon*, 426 U.S. at 41.  Six steps separate the putatively illegal conduct from the alleged injury:  (1) the President allegedly exceeded his allotted authority by authorizing the NSA to conduct warrantless wiretapping as part of its enhanced national security (i.e., counter-terrorism) operations and the worldwide War on Terror, causing (2) the NSA to institute its practice of warrantless wiretapping under the TSP, causing (3) the plaintiffs' "well founded belief" that the NSA is intercepting their telephone and email communications, causing (4) either the plaintiffs themselves or the overseas contacts to refrain from these communications, causing (5) the plaintiffs either to underperform in their professional capacities or to travel to meet personally with these contacts, causing (6) the additional burden on performance of the plaintiffs' professional duties.

This record simply does not permit the kind of particularized analysis that is required to determine causation.  Ignoring for a moment the first two steps in the analysis, it is clear that the third and fourth are problematic.  The plaintiffs have presented no evidence to support their alleged "well founded belief" that their conversations are being intercepted.  The evidence establishes only a *possibility* — not a probability or certainty — that these communications might be intercepted, disclosed, or disseminated.  Furthermore, the *reasonableness* of this possibility is indeterminable, due to the limited record before us and the State Secrets Doctrine.  Unlike each of the cases in which the Supreme Court has found standing for a Separation of Powers claim, the plaintiffs in this case do not, and cannot,[33] assert that they themselves have actually been subjected to the conduct alleged to violate the Separation of Powers.  *See, e.g., Chadha*, 462 U.S. at 923, 930, 935-36 (reviewing whether one "House of Congress" could order the plaintiff deported); *Buckley*, 424 U.S. at 117 (reviewing whether the Federal Election Commission could make rulings regarding the plaintiff); *Palmore v. United States*, 411 U.S. 389, 390 (1973) (reviewing whether the plaintiff could be tried before non-Article III courts); *Glidden Co. v. Zdanok*, 370 U.S. 530, 532-33 (1962) (reviewing whether the plaintiffs' cases could be adjudicated by judges designated from non-Article III courts).  The Supreme Court has been clear that the injury must be "distinct and palpable, and not abstract or conjectural," so as to avoid "generalized grievances more appropriately addressed in the representative branches" and the electoral process.  *Allen*, 468 U.S. at 751 (citations omitted).

---

[33] The plaintiffs' prospective inability to assert that any of their personal communications have been intercepted is due to the State Secrets Doctrine.  *See Reynolds*, 345 U.S. at 10.

It is also unclear from the record whether the plaintiffs' or their contacts' refusal to communicate can fairly be traced to the President's authorization of an ambiguous warrantless wiretapping program, or if that same refusal would exist regardless of the authorization of the TSP. And any wiretap would be merely one component of counter-terrorist or military intelligence surveillance. Those such as the present plaintiffs, who choose to communicate with individuals located overseas who are by the plaintiffs' own reckoning individuals reasonably suspected to be al Qaeda terrorists, affiliates, or supporters, should expect that those communications will be subject to heightened monitoring and surveillance for national security or military purposes. Therefore, the plaintiffs have no evidence to support a conclusion that the President's authorization of the TSP would have any more effect on the parties' respective apprehensions than would the broader circumstances of the War on Terror and heightened national security.

Because the plaintiffs cannot demonstrate that the alleged violation of the Separation of Powers has caused their injury, they lack standing to litigate their separation-of-powers claim. It is therefore not necessary to address redressability, the third element of standing.

Finally, I note that the district court stated that, unless it found standing for these plaintiffs, the President's action would be insulated from judicial review. This idea, however, is neither novel nor persuasive. "The assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974). Nevertheless, the district court editorialized that, if it "were to deny standing based on the unsubstantiated minor distinctions drawn by Defendants, the President's actions in warrantless wiretapping, in contravention of FISA, Title III, and the First and Fourth Amendments, would be immunized from judicial scrutiny. It was never the intent of the Framers to give the President such unfettered control . . . ." *ACLU v. NSA*, 438 F. Supp. 2d at 771.

The Supreme Court has confronted this suggestion and expressly rejected it, explaining its reasoning at some length:

> It can be argued that if respondent is not permitted to litigate this issue, no one can do so. In a very real sense, the absence of any particular individual or class to litigate these claims gives support to the argument that the subject matter is committed to the surveillance of Congress, and ultimately to the political process. Any other conclusion would mean that the Founding Fathers intended to set up something in the nature of an Athenian democracy or a New England town meeting to oversee the conduct of the National Government by means of lawsuits in federal courts. The Constitution created a *representative* Government with the representatives directly responsible to their constituents at stated periods of two, four, and six years; that the Constitution does not afford a judicial remedy does not, of course, completely disable the citizen who is not satisfied with the 'ground rules' established by the Congress for reporting expenditures of the Executive Branch. Lack of standing within the narrow confines of Art. III jurisdiction does not impair the right to assert his views in the political forum or at the polls. Slow, cumbersome, and unresponsive though the traditional electoral process may be thought at times, our system provides for changing members of the political branches when dissatisfied citizens convince a sufficient number of their fellow electors that elected representatives are delinquent in performing duties committed to them.

*United States v. Richardson*, 418 U.S. 166, 179 (1974). The Court noted in *Laird*: "there is nothing in our Nation's history or in this Court's decided cases, including our holding today, that can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities of the [executive branch] would go unnoticed or unremedied." *Laird*, 408 U.S. at 16.

The plaintiffs allege that the President, as an actor in our tripartite system of government, exceeds his constitutional authority by authorizing the NSA to engage in warrantless wiretaps of overseas communications under the TSP. But this court, not unlike the President, has constitutional limits of its own and, despite the important national interests at stake, cannot exceed its allotted authority. *See Steel Co.*, 523 U.S. at 125 n.20 ("[O]ur standing doctrine is rooted in separation-of-powers concerns."); *Flast*, 392 U.S. at 97 (stating that Article III standing limitations "confine federal courts to a role consistent with a system of separated powers"). It would ill behoove us to exceed our authority in order to condemn the President or Congress for exceeding theirs.

## B. Statutory Claims

In addition to their three constitutional claims, the plaintiffs present statutory claims under the APA, Title III, and FISA (or a combination thereof). The first step is to consider whether any of these statutes "authorize[] review at the behest of the plaintiff[s]" — i.e., whether these statutes (1) govern the NSA's challenged conduct and (2) provide the plaintiffs a means of judicial review. *See Sierra Club*, 405 U.S. at 732. The availability of a statutory claim, however, does not relieve the plaintiffs of the need to establish constitutional standing to litigate that claim. *See Raines*, 521 U.S. at 820 n.3 ("It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.").[34]

This standing analysis includes consideration of both constitutional and prudential principles. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11-12 (2004). The irreducible constitutional minimum of standing contains three requirements: (1) injury in fact, (2) causation, and (3) redressability. *Steel Co.*, 523 U.S. at 102-03. The prudential standing doctrine embodies "judicially self-imposed limits on the exercise of federal jurisdiction." *Bennett v. Spear*, 520 U.S. 154, 161 (1997). Because these prudential principles are "limits" on standing, they do not themselves create jurisdiction; they exist only to remove jurisdiction where the Article III standing requirements are otherwise satisfied. A prudential standing principle of particular relevance to statutory causes of action is the "zone-of-interest" test, which "limits . . . the exercise of federal jurisdiction" where a plaintiff's claim falls outside "the zone of interest protected by the law invoked." *Allen*, 468 U.S. at 751.[35] The APA, Title III, and FISA are each addressed separately, followed by consideration of a cause of action which, the plaintiffs theorize, arises from the interaction of Title III and FISA.

---

[34] *Raines* stands for the proposition that Congress cannot enact a statute that directly grants standing to a plaintiff who otherwise does not satisfy the Article III requirements. But *Raines* does not indicate that Congress cannot provide standing indirectly by enacting a statute that creates a new legal interest, "the invasion of which will confer standing." *See Simon*, 426 U.S. at 41 n.22. Analysis of the plaintiffs' statutory claims thus requires a detailed consideration of the statute at issue, to discern whether Congress "create[d] a statutory right or entitlement the alleged deprivation of which can confer standing to sue." *See Warth*, 422 U.S. at 514. Thus, in my opinion, the mere fact that these plaintiffs cannot show they were subject to surveillance under the TSP — while sufficient to demonstrate lack of standing for their constitutional claims — does not foreclose them from bringing their statutory claims. Assessment of whether the plaintiffs have standing to litigate their statutory claims requires more — an analysis of the rights and interests protected therein.

[35] The Supreme Court first announced the zone-of-interest test in a case involving the APA, stating that "[t]he question of standing . . . concerns . . . whether the interest sought to be protected by the complainant is arguably within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970). Although this original formulation implied that the zone-of-interest test may be a means of establishing standing, the Supreme Court has since made it clear that the zone-of-interest test is a prudential *limitation*, not an affirmative means of establishing standing. *See Allen*, 468 U.S. at 751; *Valley Forge*, 454 U.S. at 474-75. The Court also has distinguished various instances in which the zone-of-interest test applies. Suits brought under the APA are the most prevalent cases employing that test, *see Camp*, 397 U.S. at 153, and in those cases the zone of interest is broader because of the "generous review provisions" enumerated in the APA, *Bennett*, 520 U.S. at 163. The test also has been listed among the generally applicable prudential limitations of standing, *see Allen*, 468 U.S. at 751, where the zone of interest, depending upon the statute at issue, is often narrower than under the APA, *see Bennett*, 520 U.S. at 163.

### 1. Administrative Procedures Act

The Administrative Procedures Act ("APA"), 5 U.S.C. §§ 101-913, governs the conduct of federal administrative agencies, which presumably includes the NSA, *see* 5 U.S.C. § 701(b)(1). The APA provides that "[a] person suffering legal wrong because of any *agency action*, or adversely affected or aggrieved by *such action* within the meaning of any relevant statute, shall be entitled to judicial review thereof." 5 U.S.C. § 702 (emphasis added). The APA authorizes judicial review for "[a]gency action made reviewable by statute and *final agency action* for which there is no other adequate remedy in a court." 5 U.S.C. § 704 (emphasis added).[36] Thus, to bring a cause of action under the APA, the plaintiffs, first and foremost, must complain of "agency action."

"Agency action" is defined in the APA as "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). This definition is divided into three parts "begin[ning] with a list of five categories of decisions made or outcomes implemented by an agency — agency rule, order, license, sanction[, or] relief." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004) (quotation marks omitted).

> All of those categories involve *circumscribed, discrete agency actions*, as their definitions make clear: [1] 'an agency statement of . . . future effect designed to implement, interpret, or prescribe law or policy' (rule); [2] 'a final disposition . . . in a matter other than rule making' (order); [3] a 'permit . . . or other form of permission' (license); [4] a 'prohibition . . . or taking [of] other compulsory or restrictive action' (sanction); or [5] a 'grant of money, assistance, license, authority,' etc., or 'recognition of a claim, right, immunity,' etc., or 'taking of other action on the application or petition of, and beneficial to, a person' (relief).

*Id.* (*quoting* 5 U.S.C. §§ 551(4), (6), (8), (10), (11)) (emphasis added). The second part of the "agency action" definition — "the equivalent or denial thereof" — must be a discrete action or the denial of a discrete action, otherwise it would not be *equivalent* to the five listed categories. *Id.* And the final part of the definition — a "failure to act" — is "properly understood as a failure to take an agency action." *Id.* Under Supreme Court precedent, classic examples of "agency action" include the issuance of an agency opinion, *see Bennett*, 520 U.S. at 157, or a declaratory ruling, *see Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 977-78 (2005).

Here, however, the plaintiffs are not complaining of "agency action" as defined in the APA, and the record contains no evidence that would support such a finding. The plaintiffs challenge the NSA's warrantless interception of overseas communications, the NSA's failure to comply with FISA's warrant requirements, and the NSA's presumed failure to comply with FISA's minimization procedures. This is conduct, not "agency action." Furthermore, there is no authority to support the invocation of the APA to challenge generalized conduct.

Looking at the "five categories" of enumerated "agency action," the NSA's surveillance activities, as described by the three facts of record, do not constitute, nor are they conducted pursuant to, any agency rule, order, license, sanction, or relief. Although the plaintiffs labeled the NSA's surveillance activities as "the Program," and the district court labeled it the "TSP," the NSA's wiretapping is actually just general conduct given a label for purposes of abbreviated reference. The plaintiffs do not complain of any NSA rule or order, but merely the generalized practice, which — so far as has been admitted or disclosed — was not formally enacted pursuant

---

[36] Admittedly, this provision is seldom considered from the present viewpoint, and is generally considered as merely the means by which Congress waived sovereign immunity in actions seeking relief other than money damages. *See Presbyterian Church*, 870 F.2d at 524.

to the strictures of the APA, but merely authorized by the President (albeit repeatedly, and possibly informally). Nor do the plaintiffs challenge any license, sanction, or relief issued by the NSA.

The plaintiffs do not complain of anything *equivalent to* agency action, which also requires some discrete action by the NSA. *See Norton*, 542 U.S. at 62. The plaintiffs are not challenging any sort of "circumscribed, discrete" action on the part of the NSA, but are seeking to invalidate or alter the NSA's generalized practice of wiretapping certain overseas communications without warrants. *See id.* at 64 ("[t]he limitation to discrete agency action precludes [a] broad programmatic attack"). Similarly, the plaintiffs have not alleged that the NSA *failed to perform* a *discrete* agency action. When challenging an agency's failure to perform, the APA "empowers a court only to compel an agency to perform a ministerial or non-discretionary act." *Id.* The plaintiffs contest the NSA's failure to adhere to FISA's warrant requirement and minimization procedures. Even assuming, *arguendo*, that the warrant requirement and minimization procedures are discrete agency actions, those procedures are replete with discretionary considerations, *see* 50 U.S.C. § 1801(h), thus disqualifying them from this definition of agency action under the APA.

No matter how the plaintiffs' claims are characterized, they do not challenge *agency action* as it is defined in the APA. Accordingly, the plaintiffs have not asserted a viable cause of action under the APA.[37]

## 2. Title III

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. §§ 2510-22, generally regulates the government's interception of wire, oral, and electronic communications. *See United States v. Ojeda Rios*, 495 U.S. 257, 259 (1990); 18 U.S.C. § 2516. The first relevant question is whether Title III applies to the type of surveillance conducted by the NSA under the TSP, considering Title III's express limitations:

> Nothing contained in this [statute (i.e.,Title III)] . . . shall be deemed to affect [1] the acquisition by the United States Government of foreign intelligence information from international or foreign communications, or [2] foreign intelligence activities conducted in accordance with otherwise applicable Federal law involving a foreign electronic communications system, utilizing a means other than electronic surveillance as defined in section 101 of the Foreign Intelligence Surveillance Act of 1978, and [3] procedures in this [statute (i.e.,Title III)] . . . and the Foreign Intelligence Surveillance Act of 1978 shall be the exclusive means by which electronic surveillance, as defined in section 101 of such Act, and the interception of domestic wire, oral, and electronic communications may be conducted.

18 U.S.C. § 2511(2)(f). When this statutory language is parsed into its three individual clauses, its limitations become clear. The first clause disclaims Title III applicability generally — acknowledging that Title III does not apply to "the acquisition by the United States Government of foreign intelligence information from international or foreign communications." The second clause

---

[37] It is noteworthy that the plaintiffs' APA claim fails for an additional reason. To the extent the plaintiffs rely on the APA provision allowing judicial review for "*final agency action* for which there is no other adequate remedy in a court," *see* 5 U.S.C. § 704 (emphasis added), they must demonstrate that the alleged agency action is "final." "As a general matter, two conditions must be satisfied for agency action to be 'final.'" *Bennett*, 520 U.S. at 177. "First, the action must mark the 'consummation' of the agency's decisionmaking process." *Id.* at 177-78. "And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 178 (quotation marks omitted). Because the NSA's surveillance activities do not constitute "agency action," the analysis of whether they are final agency action is strained and awkward. It nevertheless is clear that the NSA's wiretapping does not consummate any sort of agency decisionmaking process nor does it purport to determine the rights or obligations of others. For this additional reason, the plaintiffs cannot assert a claim for judicial review under the APA.

disclaims Title III applicability specifically — recognizing that Title III does not govern "foreign intelligence activities conducted in accordance with otherwise applicable Federal law involving a foreign electronic communications system, utilizing a means other than electronic surveillance as defined in [FISA]." The final clause, which is known as the "exclusivity provision," recognizes the respective roles of Title III and FISA, by stating that the "procedures in [Title III] and [FISA] shall be the exclusive means by which electronic surveillance, as defined in section 101 of [FISA], and the interception of domestic wire, oral, and electronic communications may be conducted."[38]

The first clause of § 2511(2)(f) — stating that Title III does not govern the acquisition of "foreign intelligence information from international or foreign communications" — expressly disclaims application of Title III to surveillance activities of the type at issue in the present case. The NSA monitors international communications for the purpose of acquiring foreign intelligence about terrorist organizations; this type of surveillance falls squarely under the disclaimer found in the first clause of § 2511(2)(f). By its own terms, then, Title III does not apply to the conduct of which the plaintiffs complain.[39] *Cf. United States v. U.S. Dist. Ct.* (*Keith*), 407 U.S. 297, 306 (1972) (finding "the conclusion inescapable," as to the pre-FISA version of Title III, "that Congress only intended to make clear that [Title III] simply did not legislate with respect to national security surveillances").

Because the first clause of § 2511(2)(f) expressly disclaims Title III's application to this case, it is unnecessary to construe the second and third clauses. But, it is worth acknowledging that these two clauses raise complex legal issues which cannot be resolved on the present record. The second clause explains that Title III does not apply if four factors are all satisfied: (1) the defendant is engaged in "foreign intelligence activities"; (2) the defendant is acting "in accordance with otherwise applicable Federal law"; (3) the defendant's surveillance involves a "foreign electronic communications system"; and (4) the defendant utilizes "a means other than electronic surveillance" as defined in FISA. These factors raise a host of intricate issues, such as whether the NSA's wiretapping actually involves "electronic surveillance" as defined in FISA, and whether the NSA is acting in accordance with federal law, such as the Authorization for Use of Military Force ("AUMF"), Pub. L. 107-40, § 2, 115 Stat. 224 (2001). Some of these issues involve sophisticated legal questions or complex factual questions. But, resolving these issues is unnecessary because the first clause of § 2511(2)(f) conclusively disclaims Title III's application.

It is likewise unnecessary, at this point, to delve into the numerous issues raised by the third clause, i.e., the exclusivity provision. The exclusivity provision differs from the first two clauses of § 2511(2)(f), in that it does not merely disclaim Title III's application. Instead, it states that Title III and FISA shall be the "exclusive means" by which particular types of surveillance may occur, thus prescribing the separate roles of Title III and FISA, rather than the application of Title III alone. The plaintiffs assert a statutory cause of action for the NSA's alleged violation of the exclusivity

---

[38] This third clause is discussed in further detail in Section IV.B.4, *infra*, titled "The Exclusivity Provision."

[39] Even assuming, *arguendo*, that Title III applies to the NSA's internationally focused surveillance activities, the plaintiffs cannot maintain the action for relief brought in this case. Title III prescribes equitable relief in only a few instances, none of which applies here. Two provisions in Title III authorize injunctive relief for claims brought by the government. *See*, *e.g.*, 18 U.S.C. § 2521 ("the Attorney General may initiate a civil action . . . to enjoin" a violation of Title III); § 2511(5)(a)(ii)(A) ("the Federal Government shall be entitled to appropriate injunctive relief" when a "person" violates 18 U.S.C. § 2511(5)). Because the plaintiffs are not representatives of or otherwise affiliated with the federal government, neither of these provisions permits injunctive relief in this case. Another Title III provision authorizes "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of [Title III]" to recover declaratory or equitable relief from a "person or entity, *other than the United States*, which engaged in that violation." 18 U.S.C. § 2520(a) (emphasis added). This provision does not help the plaintiffs because under these provisions neither declaratory nor injunctive relief is available against the United States government and the plaintiffs cannot prove interception.

provision, which I address separately in Section IV.B.4, *infra*. It is, therefore, unnecessary to dissect the exclusivity provision at this point in the analysis.

Because the first clause of § 2511(2)(f) states that Title III does not apply to the internationally focused surveillance activities challenged in this case, the plaintiffs have not asserted a viable cause of action under Title III.

### 3. FISA

The Foreign Intelligence Surveillance Act of 1978 ("FISA"), 50 U.S.C. § 1801 *et seq.*, — as the separate and distinct counterpart to Title III — governs the interception of electronic communications involving foreign intelligence information. *See* 50 U.S.C. § 1802(a)(1). FISA is fraught with detailed statutory definitions and is expressly limited, by its own terms, to situations in which the President has authorized "electronic surveillance," as defined in 50 U.S.C. § 1801(f), for the purposes of acquiring "foreign intelligence information," as defined in 50 U.S.C. § 1801(e).

First, the surveillance in question must acquire "foreign intelligence information," which includes "information that relates to . . . the ability of the United States to protect against . . . international terrorism." 50 U.S.C. § 1801(e)(1)(B). In the present case, the NSA intercepts communications in which it has a "*reasonable basis* to conclude that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda, or working in support of al Qaeda." *See* Press Briefing by Att'y Gen. Alberto Gonzales and Gen. Michael Hayden, Principal Deputy Dir. for Nat'l Intelligence (Dec. 19, 2005), *available at* http://www.whitehouse.gov/news/releases/2005/12/print/20051219-1.html (last visited July 2, 2007) (emphasis added). The proclaimed purpose is to prevent future terrorist attacks, *see id.* ("This is a very concentrated, very limited program focused at gaining information about our enemy."), and thus the NSA's conduct satisfies this statutory requirement.

Next, the interception must occur by "electronic surveillance." According to the plaintiffs, the government's admission that it intercepts telephone and email communications — which involve electronic media and are generally considered, in common parlance, forms of electronic communications — is tantamount to admitting that the NSA engaged in "electronic surveillance" for purposes of FISA. This argument fails upon recognition that "electronic surveillance" has a very particular, detailed meaning under FISA — a legal definition that requires careful consideration of numerous factors such as the types of communications acquired, the location of the parties to the acquired communications, the location where the acquisition occurred, the location of any surveillance device, and the reasonableness of the parties' expectation of privacy. *See* 50 U.S.C. § 1801(f).[40] The plaintiffs have not shown, and cannot show, that the NSA's surveillance activities

---

[40] FISA defines "electronic surveillance" in exactly four ways:

(1) the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire or radio communication sent by or intended to be received by a particular, known United States person who is in the United States, if the contents are acquired by intentionally targeting that United States person, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes;

(2) the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire communication to or from a person in the United States, without the consent of any party thereto, if such acquisition occurs in the United States, but does not include the acquisition of those communications of computer trespassers that would be permissible under section 2511(2)(i) of title 18, United States Code;

(3) the intentional acquisition by an electronic, mechanical, or other surveillance device of the contents of any radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes, and if both the sender and all

include the sort of conduct that would satisfy FISA's definition of "electronic surveillance," and the present record does not demonstrate that the NSA's conduct falls within FISA's definitions.

Finally, even assuming, *arguendo*, that FISA applies to the NSA's warrantless wiretapping, the plaintiffs cannot sustain a claim under FISA. FISA's civil suit provision permits an "aggrieved person" to bring a cause of action for a violation of that statute:

> An *aggrieved person*, other than a foreign power or an agent of a foreign power, as defined in [50 U.S.C. § 1801(a) or (b)(1)(A)], respectively, who has been subjected to an *electronic surveillance* or about whom information obtained by *electronic surveillance* of such person has been disclosed or used in violation of [50 U.S.C. § 1809] shall have a cause of action against any person who committed such violation and shall be entitled to recover --
>
> (a) actual damages, but not less than liquidated damages of $ 1,000 or $ 100 per day for each day of violation, whichever is greater;
>
> (b) punitive damages; and
>
> (c) reasonable attorney's fees and other investigation and litigation costs reasonably incurred.

50 U.S.C. § 1810 (emphasis added). There are at least three reasons why the plaintiffs cannot maintain their claims under FISA's statutory authorization. First, the plaintiffs have not alleged, and the record does not contain sufficient facts from which to conclude, that they are "aggrieved persons." FISA defines an "aggrieved person" as "a person who is the target of an electronic surveillance or any other person whose communications or activities were subject to electronic surveillance." 50 U.S.C. § 1801(k). "[T]he term [aggrieved person] is intended to be coextensive [with], but no broader than, those persons who have standing to raise claims under the Fourth Amendment with respect to electronic surveillance." H.R. Rep. No. 95-1283, at 66 (1978) (*citing Alderman v. United States*, 394 U.S. 165 (1969)) (Report by the Permanent Select Committee on Intelligence, in support of the proposed FISA bill and amendments). The plaintiffs have not shown that they were actually the target of, or subject to, the NSA's surveillance; thus — for the same reason they could not maintain their Fourth Amendment claim — they cannot establish that they are "aggrieved persons" under FISA's statutory scheme. Second, as previously discussed, the plaintiffs have not demonstrated that the NSA's wiretapping satisfies the statutory definition of "electronic surveillance," which is also required by FISA's liability provision. Third, FISA does not authorize the declaratory or injunctive relief sought by the plaintiffs, but allows only for the recovery of money damages. No matter how these claims are characterized, the plaintiffs have not asserted a viable FISA cause of action.

---

intended recipients are located within the United States; or

> (4) the installation or use of an electronic, mechanical, or other surveillance device in the United States for monitoring to acquire information, other than from a wire or radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes.

50 U.S.C. § 1801(f). The present record, which contains three facts regarding the TSP, offers no indication as to where the interception may occur or where any surveillance device is located. Nor does it offer any basis to conclude that particular people located in the United States are being targeted.

### 4. The Exclusivity Provision

The plaintiffs attempt to bring an ambiguous statutory cause of action under Title III and FISA jointly, based on their allegation that the TSP violates the "exclusivity provision" of § 2511(2)(f). The exclusivity provision states that Title III and FISA "shall be the exclusive means by which electronic surveillance, as defined in section 101 of [FISA], and the interception of domestic wire, oral, and electronic communications may be conducted." 18 U.S.C. § 2511(2)(f). This provision contains two separate and independent, albeit parallel, statements: (1) Title III "shall be the exclusive means by which . . . the interception of domestic wire, oral, and electronic communications may be conducted," and (2) FISA "shall be the exclusive means by which electronic surveillance, as defined in section 101 of [FISA] . . . may be conducted." This provision does not foreclose the possibility that the government may engage in certain surveillance activities that are outside of the strictures of both Title III and FISA.

The plaintiffs cannot assert a viable cause of action under this provision. It is undisputed that the NSA intercepts international, rather than domestic, communications, so, as already explained, Title III does not apply. Moreover, because the plaintiffs have not shown, and cannot show, that the NSA engages in activities satisfying the statutory definition of "electronic surveillance," the plaintiffs cannot demonstrate that FISA does apply. Consequently, this entire provision is inapplicable to the present circumstances.

The plaintiffs, however, read this provision as stating that Title III and FISA are together the "exclusive means" by which the NSA can intercept *any* communication, and that these two statutes collectively govern *every* interception (i.e., if not FISA then Title III, and if not Title III then FISA — there are no other options). Specifically, the plaintiffs contend that the NSA cannot lawfully conduct any wiretapping (under the TSP or otherwise) in a manner that is outside *both* the Title III and the FISA frameworks; the NSA's conduct *must* fall within the governance of one statute or the other. Based on this reading, the plaintiffs believe that they need not demonstrate the specific applicability of either statute — that is, they need not demonstrate *either* that the NSA is engaging in "electronic surveillance," in order to place it under FISA,[41] *or* that the NSA is engaging in domestic surveillance, in order to place it under Title III.

The plaintiffs' theory is premised on the assertion that FISA and Title III, collectively, require warrants for the legal interception of any and all communications, and appears to be that because the NSA has publicly admitted to intercepting certain overseas communications without warrants, one must infer that the NSA has violated one or the other of these two statutes. The consequence of this inference — the plaintiffs would have us find — is a violation of § 2511(2)(f), which is not a violation of either Title III or FISA individually, but instead a violation of the collective application of the two. Thus, according to the plaintiffs, the NSA has violated the "exclusivity provision" of § 2511(2)(f), and based on this (presumed) violation, the plaintiffs have standing to bring a cause of action under this statutory provision.

The intended inferential "logic" of the plaintiffs' theory falls apart upon recognition of their faulty premise. As previously explained, "electronic surveillance" under FISA does not cover all types of foreign surveillance, but instead has a very particular and detailed definition. The plaintiffs point to no provision in FISA, Title III, or any other statute that states that the four definitions "electronic surveillance" listed in FISA are the only kind of "electronic surveillance" that could ever be conducted. And the fact that the "exclusivity provision" is expressly limited to electronic surveillance "as defined in section 101 of [FISA]" leaves room to infer that other electronic

---

[41] This, of course, begs the question of why Congress would define "electronic surveillance" — in four explicit ways — if, as the plaintiffs contend, a demonstration that the interception is "electronic surveillance" is unnecessary.

surveillance is possible. Therefore, the plaintiffs cannot prove that FISA applies. More importantly, this inability to prove that the interceptions are "electronic surveillance" does not, as the plaintiffs theorize, lead to an inescapable conclusion that Title III applies. It simply means that FISA does not apply. On the other hand, it is irrefutable under the first clause of § 2511(2)(f) that Title III does *not* apply to this case because the NSA's wiretapping activities are focused on *international*, rather than domestic, communications. To read this entire statute in the way that the plaintiffs suggest is to create an internal contradiction, which courts are loath to do. Rather, the unavailability of the evidence necessary to prove (or disprove) that the NSA is engaging in "electronic surveillance" compels a conclusion that the plaintiffs cannot demonstrate that either statute applies.

But even assuming, *arguendo*, that the plaintiffs have posited a proper reading of the exclusivity provision, and that the NSA's warrantless wiretapping violates that provision, "the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 688 (1979). The question of whether a statute implicitly creates a cause of action "is basically a matter of statutory construction." *Transam. Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15 (1979). "The ultimate question is one of congressional intent, not one of whether this [c]ourt thinks that it can improve upon the statutory scheme that Congress enacted into law." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578 (1979).

The exclusivity provision does not appear to create such an implied cause of action. In cases where a court implies a cause of action, "the statute in question at least prohibit[s] certain conduct or create[s] federal rights in favor of private parties." *Id.* at 569. This "exclusivity provision," however, does not proscribe conduct as unlawful or confer rights on private parties. Moreover, the structure of Title III — the statute in which the exclusivity provision is found — suggests that Congress did not intend to create a private cause of action. Title III expressly states that the "remedies and sanctions described in this chapter . . . are the only judicial remedies and sanctions for nonconstitutional violations of [Title III]." 18 U.S.C. § 2518(10)(c). Thus, Title III explicitly lists the only available remedies and means of statutory relief. Because it is unreasonable to assume that Congress implicitly (i.e., silently) intended to create a third avenue of statutory relief with the exclusivity provision (in addition to the express causes of action contained in Title III and FISA themselves), the provision does not provide any basis for a cause of action.

When considering statutory claims, "the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff." *Sierra Club*, 405 U.S. at 732. The plaintiffs asserted three statutory bases — the APA, Title III, and FISA — and none of these three statutes, individually or collectively, provides an express or implied cause of action that "authorizes review" of the plaintiffs claims. *See id.* Therefore, the plaintiffs cannot establish standing to litigate their statutory claims, and further explanation is unnecessary. The plaintiffs have, however, raised certain other arguments that warrant mention.

## C. Additional Considerations

Having proceeded methodically through the standing analysis, I address the plaintiffs' only remaining arguments, which defy classification under a compartmentalized approach. Under the first of these arguments, the plaintiffs rely heavily on the Supreme Court's decision in *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167 (2000), as support for their allegation of injury in fact. In *Laidlaw*, the Court considered whether the plaintiffs had Article III standing to bring a claim under the citizen-suit provision of the Clean Water Act, 33 U.S.C. § 1365(a). Therefore, *Laidlaw* is immediately distinguishable with regard to the constitutional claims. *See Sierra Club*, 405 U.S. at 732 (noting the difference in the standing analysis, as between constitutional and statutory claims). If *Laidlaw* is to offer the plaintiffs any support at all, it is only with respect to their statutory claims.

*Laidlaw* is a case involving particular statutory claims and well-defined environmental injuries, however, and differs significantly from the present context, which involves dramatically different statutory claims and far less palpable alleged injuries. In this sense, it is noteworthy that the *Laidlaw* Court explicitly confined its injury-in-fact reasoning to environmental cases, stating: "*environmental plaintiffs* adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Laidlaw*, 528 U.S. at 183 (quotation marks omitted; emphasis added). Because the injuries and claims in *Laidlaw* differ in a significant way from those alleged by the plaintiffs in the present case, *Laidlaw* offers only minimal support for the plaintiffs' position.

Setting aside the fact that *Laidlaw* is an environmental case involving a particular, statutorily-created claim, the Court's analysis in *Laidlaw* remains unpersuasive in the present context. The *Laidlaw* Court found that the plaintiffs had standing to challenge Laidlaw's discharge of pollutants into a river because the discharge "curtail[ed] their recreational use of that waterway and would subject them to other economic and aesthetic harms." *Id*. at 184. In its standing analysis, the Court distinguished *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.7 (1983), which had held that a plaintiff lacked standing to seek an injunction against the enforcement of a police choke-hold policy because he could not credibly allege that he faced a realistic threat from the policy. The *Lyons* Court had noted that "'[t]he reasonableness of Lyons' fear is dependent upon the likelihood of a recurrence of the allegedly unlawful conduct,' and his 'subjective apprehensions' that such a recurrence would even take place were not enough to support standing." *Laidlaw*, 528 U.S. at 184 (quoting *Lyons*, 461 U.S. at 108 n.8). In contrast, the *Laidlaw* Court found a concrete, actual injury based on the plaintiffs' showing that the defendant's unlawful discharge of pollutants into a particular river was ongoing and may reasonably have caused nearby residents to curtail their use of that waterway. The facts of the present case are more analogous to *Lyons* than *Laidlaw*. Unlike the plaintiffs in *Laidlaw*, the present plaintiffs have curtailed their communications despite the absence of any evidence that the government has intercepted their particular communications — or by analogy to *Laidlaw*, without any evidence that the defendant has polluted their particular river. Rather, like the plaintiffs in *Lyons*, the present plaintiffs claim a threat from the government's policy and are chilled by their subjective apprehension that the government is intercepting their communications. This conclusion is therefore consistent with the holding and reasoning of *Laidlaw*.[42]

The plaintiffs' assertion that numerous other district courts have found standing to challenge the TSP is also unpersuasive. Other cases involving non-similarly situated plaintiffs are typically irrelevant to the issue of standing because standing reflects whether "a particular person is a proper party to maintain the action." *Flast*, 392 U.S. at 100; *see also Raines*, 521 U.S. at 819 ("We have consistently stressed that a plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him."). In any event, the existing district court decisions regarding this TSP reveal a wholly different picture from that presented by the plaintiffs. Neither of the two district courts to address claims against the NSA's operation of the TSP found that their plaintiffs had standing. In *Al-Haramain Islamic Foundation, Inc. v. Bush*, 451 F. Supp. 2d 1215, 1226 (D. Or. 2006), unlike the present case, the plaintiffs purported to have evidence proving that their own communications had actually been intercepted.

---

[42] Even assuming, *arguendo*, that *Laidlaw* assists in establishing a cognizable and concrete injury, the obstacles to causation and redressability present here were absent there. Moreover, *Laidlaw*'s redressability analysis is entirely inapplicable to the present case. The redressability analysis in *Laidlaw* considered whether civil penalties paid to the government, rather than the plaintiffs, could redress the plaintiffs' alleged injuries. *Laidlaw*, 528 U.S. at 185. The Court determined that "the civil penalties sought by [the plaintiffs] carried with them a deterrent effect that made it likely, as opposed to merely speculative, that the penalties would redress [the plaintiffs'] injuries by abating current violations and preventing future ones." *Id*. at 187. This analysis, as to the deterrent effect of civil damages, does not apply in the present case, which does not involve any claims for damages but only for injunctive and declaratory relief.

Based in part on that evidence, the district court found that the "plaintiffs should have an opportunity to establish standing and make a *prima facie* case, even if they must do so *in camera*." *Id.* The court did not, however, definitively decide the standing issue at that stage of its proceeding. In *Tooley v. Bush*, No. 06-306, 2006 U.S. Dist. Lexis 92274, 2006 WL 3783142, at *24 (D.D.C. Dec. 21, 2006), the district court found that the plaintiff lacked standing because he did not provide "any factual basis for his conclusion that he ha[d] been the subject of illegal wiretaps." Two other cases challenged a telecommunications provider's (rather than the NSA's) participation in the TSP. In *Terkel v. AT&T Corp.*, 441 F. Supp. 2d 899, 919-20 (N.D. Ill. 2006), the district court found that the plaintiffs were unable to establish standing against AT&T because they could not show that AT&T had disclosed their records to the government. In *Hepting v. AT&T Corp.*, 439 F. Supp. 2d 974, 999-1000 (N.D. Cal. 2006), the district court found that the plaintiffs had standing against AT&T, but refused to consider the government's actions in its standing inquiry. Consequently, these cases provide no support for the plaintiffs' position in the present case.

Based on the evidence in the record, as applied in the foregoing analysis, none of the plaintiffs in the present case is able to establish standing for any of the asserted claims. At oral argument, we asked the plaintiffs' counsel if we should remand for further proceedings on the issue of standing. Counsel asserted that the plaintiffs' injuries were clear and undisputed in the record and there was no need to remand for a hearing or admission of additional evidence on this issue. But even to the extent that additional evidence may exist, which might establish standing for one or more of the plaintiffs on one or more of their claims, discovery of such evidence would, under the circumstances of this case, be prevented by the State Secrets Doctrine. *See, e.g.*, *Reynolds*, 345 U.S. at 10-11; *Tenenbaum*, 372 F.3d at 777; *Halkin v. Helms*, 690 F.2d 977, 981 (D.C. Cir. 1982).

## V.

The district court dismissed the data mining aspect of the plaintiffs' claim, finding that the plaintiffs could not establish a *prima facie* case without resorting to privileged information. *ACLU v. NSA*, 438 F. Supp. 2d at 765. The plaintiffs press this issue as a cross-appeal.

A thorough review of the complaint, the district court opinion, and the arguments presented on appeal, makes it clear that the plaintiffs allege no separate injury in connection with the alleged data-mining aspect of the TSP. Therefore, this standing analysis applies equally, and the plaintiffs' cross-appeal must be dismissed for lack of jurisdiction. *See Steel Co.*, 523 U.S. at 109-10.

## VI.

We hold that the plaintiffs do not have standing to assert their claims in federal court. Accordingly, we **VACATE** the order of the district court and **REMAND** this case to the district court with instructions to **DISMISS** for lack of jurisdiction.

---

**CONCURRING IN THE JUDGMENT**

---

JULIA SMITH GIBBONS, Circuit Judge, concurring. The disposition of all of the plaintiffs' claims depends upon the single fact that the plaintiffs have failed to provide evidence that they are personally subject to the TSP. Without this evidence, on a motion for summary judgment, the plaintiffs cannot establish standing for any of their claims, constitutional or statutory.[1] For this reason, I do not reach the myriad other standing and merits issues, the complexity of which is ably demonstrated by Judge Batchelder's and Judge Gilman's very thoughtful opinions, and I therefore concur in the judgment only.

The case or controversy requirement in Article III of the Constitution determines the power of the federal courts to entertain a suit, establishing an "irreducible constitutional minimum of standing" that is required for both constitutional and statutory claims. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *O'Shea v. Littleton*, 414 U.S. 488, 493 n.2 (1974). The Constitution "requires the party who invokes the court's authority to show that he *personally* has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) (quotation marks omitted) (emphasis added). This personal injury must be "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical." *Defenders of Wildlife*, 504 U.S. at 560 (citations and quotation marks omitted); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (noting that the relevant showing is the injury to the plaintiff, not the environment). In order for a plaintiff to show that the injury from a government policy is actual and imminent, a plaintiff must demonstrate that he personally would be subject to the future application of that policy. *City of Los Angeles v. Lyons*, 461 U.S. 95, 106 n.7 (1983); *see Laidlaw*, 528 U.S. at 184; *Davis v. Scherer*, 468 U.S. 183, 189 n.7 (1984). A plaintiff's fear that he will be subject to the policy is insufficient; "[i]t is the reality of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions."[2] *Lyons*, 461 U.S. at 107 n.8; *see Laidlaw*, 528 U.S. at 184.

Judge Gilman's opinion arrives at the opposite conclusion, relying exclusively on its reading of *Laidlaw*. It concludes that the attorney-plaintiffs need not show that they have ever been or will

---

[1] Although Judge Batchelder clearly disagrees about the depth of treatment required, at least with respect to the plaintiffs' constitutional claims and FISA claim, she appears to agree that the plaintiffs' failure to demonstrate that they have been subject to the TSP is fatal to their constitutional standing. (*See* Batchelder Op. 9-10 (discussing all the claims generally and FISA specifically); *id.* at 13-14, 18 (First Amendment); *id.* at 23 (Fourth Amendment); *id.* at 24 (Separation of Powers).) We may differ, however, with respect to the plaintiffs' other statutory claims because Judge Batchelder determines that the statutes do not apply without reaching the issue of constitutional standing. My reading of Supreme Court precedent suggests that we must reach the constitutional standing issue first with respect to all the claims. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89, 92-93 (1998) (warning that a court must determine constitutional standing before addressing the "existence of a cause of action"); *see also Sierra Club v. Morton*, 405 U.S. 727, 732 & n.3 (1972) (noting that the inquiry as to "whether the statute in question authorizes review at the behest of the plaintiff" occurs where a dispute is "otherwise justiciable" because Article III jurisdiction is present). Because in my view the plaintiffs have no constitutional standing to raise any of their claims, I find it unnecessary to discuss the applicability of the other statutes.

[2] This is not to say that a plaintiff lacks standing until a defendant has acted. A "genuine threat" of enforcement of a policy against a plaintiff who is demonstrably subject to that policy supports standing. *See Steffel v. Thompson*, 415 U.S. 452, 475 (1974). But that case differs from one in which a plaintiff cannot establish that he is subject to the policy but merely fears that he is subject to the policy that may be enforced, which cannot support standing. *See, e.g., United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1380 (D.C. Cir. 1984).

ever be actual subjects of surveillance but rather only the "reasonableness of their fear" that they will be subjects of surveillance. (Gilman Op. 44, 50.) In doing so, Judge Gilman transforms the holding in *Laidlaw*, under which the plaintiffs who were *in fact subject to defendant's conduct* had standing because they reasonably feared harm from that conduct, into a much broader proposition, under which plaintiffs may establish standing by showing merely that they possess a reasonable *fear of being subject to defendant's allegedly harmful conduct*. This distinction is critical to "[t]he relevant showing for purposes of Article III standing, . . . injury to the plaintiff," *Laidlaw*, 528 U.S. at 181, as the Supreme Court made clear in distinguishing *Laidlaw* from *Lyons*. In *Laidlaw*, the Court noted that in *Lyons*, a policy of chokehold use existed, but the plaintiff's "'subjective apprehensions' that such a recurrence [of the unlawful conduct] would even *take place* were not enough to support standing." *Laidlaw*, 528 U.S. at 184. The plaintiff's fear of being subject to conduct of the defendant under the chokehold policy was insufficient to support standing. The Supreme Court further explained that standing was present in *Laidlaw* because "in contrast, it is undisputed that Laidlaw's unlawful conduct . . . was occurring . . . . [T]hen, the only 'subjective' issue here is 'the reasonableness of the fear' that led the affiants to respond to that concededly ongoing conduct" by refraining from use of the polluted areas. *Id.* (brackets omitted). The Court noted that it differed from the dissent in seeing nothing "'improbable' about the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms." *Id.* Thus, in *Laidlaw*, the plaintiff's *fear of harm* from the defendant's undisputed conduct—conduct that would also undisputably affect plaintiffs personally if they undertook their desired activities—was sufficient to support standing. *Id.* at 184-85. In summary, I read *Laidlaw* to require that plaintiffs demonstrate that they (1) are in fact subject to the defendant's conduct, in the past or future, and (2) have at least a reasonable fear of harm from that conduct.

The *Laidlaw* majority's discussion of *Lyons* and its observations about the *Laidlaw* plaintiffs explain exactly why plaintiffs here are like the plaintiff in *Lyons*, who lacked standing, and unlike those in *Laidlaw*, who had standing. Like the plaintiffs in *Laidlaw* and *Lyons*, the plaintiffs in the present case may have a reasonable fear of harm from the defendants' conduct. *See id.* at 184-85 (finding plaintiffs' fear of "economic and aesthetic harms" from "illegal discharges of pollutants" to be "entirely reasonable"); *Lyons*, 461 U.S. at 100 (describing the deaths of those who were subject to chokeholds). But *Laidlaw* and *Lyons* differ in outcome based on whether the plaintiffs have established that they are in fact subject to the conduct of the defendants. Here, plaintiffs fear being subject to a government policy of surveillance and have alleged that they and those with whom they communicate have ceased their normal communication. If they instead continued their normal activities, they would still be fearful, but whether they would actually be subject to surveillance is purely speculative. They are like the *Lyons* plaintiff who can show nothing more than a fear of the use of a chokehold. *See Laidlaw*, 528 U.S. at 184 (discussing the "'subjective apprehensions' that such a recurrence would even *take place*" in *Lyons*). By contrast, if the *Laidlaw* plaintiffs had resumed their abandoned activities, they would definitely have been subject to the defendant's conduct—illegal discharges into the river. *See id.* (contrasting Laidlaw's "concededly ongoing conduct" of "continuous and pervasive illegal discharges of pollutants into a river . . . nearby").

Judge Gilman's attempt to distinguish *Lyons* from the case at bar is directly contrary to the Supreme Court's own reading of that case. It is immaterial that the likelihood that Lyons would be subject to the chokehold policy may be far more remote than the likelihood that the attorney-plaintiffs in this case may be subject to the warrantless surveillance policy. (*See* Gilman Op. 45-46.) As *Laidlaw* makes clear, a plaintiff must be actually subject to the defendant's conduct, not simply afraid of being subject to it, regardless of how reasonable that fear may be. The Supreme Court's distinction between *Laidlaw* and *Lyons* was one of kind, not degree. *See Laidlaw*, 528 U.S. at 184 (distinguishing between the "subjective apprehensions that such a recurrence would even *take place*" in *Lyons* and the "subjective issue [of] the reasonableness of the fear" that pollutants would cause "economic and aesthetic harms" in *Laidlaw*) (internal quotation marks and brackets omitted). Here,

the attorney-plaintiffs lack standing because they have failed to present evidence that they are personally subject to the warrantless surveillance policy; that is, the attorney-plaintiffs have failed to present evidence as to whether, in the government's view, "there are reasonable grounds to believe that a party to the [attorney-plaintiffs'] communication[s] is affiliated with al Qaeda."

Judge Gilman attempts to distinguish *United Presbyterian Church* on its facts by confounding the different injuries alleged in that case. The plaintiffs in that case alleged three different kinds of injuries: (1) "the 'chilling' of constitutionally protected activities," *United Presbyterian Church*, 738 F.2d at 1377; (2) "the immediate threat of being targeted for surveillance," *id.*; and (3) direct injury from surveillance taken against them, *id.* at 1380 & n.2. As the plaintiffs in this case have no evidence that they have ever been subject to the TSP, Judge Gilman correctly distinguishes the D.C. Circuit's reasoning on the third alleged injury. (Gilman Op. 46 (discussing the "direct injury" and quoting in part *United Presbyterian Church*, 738 F.3d at 1380-81 ("The third kind of harm [the plaintiffs] allege is . . . too generalized and nonspecific to support a complaint. . . . There is no allegation or even suggestion that any unlawful action to which the [plaintiffs] have been subjected in the past was the consequence of the presidential action they seek to challenge.")).) Judge Gilman ignores the D.C. Circuit's reasoning on the second alleged injury, for which it found that the plaintiffs lacked standing based upon the same distinction made by the Supreme Court in *Laidlaw*. The D.C. Circuit noted that the plaintiffs would have standing if they were subject to an "immediate threat of concrete, harmful action." *United Presbyterian Church*, 738 F.2d at 1380. However, it concluded that the plaintiffs' allegations that "their activities are such that they are especially likely to be targets of the [surveillance] authorized by the order" were insufficient to support standing because those allegations only "place[d] the plaintiffs at greater risk" of being subject to surveillance. *Id.* There is no relevant factual difference between the *United Presbyterian Church* plaintiffs, whose activities the D.C. Circuit conceded made them more likely to be subject to surveillance, *id.*, and the attorney-plaintiffs in this case, whose representation of "exactly the types of clients" targeted by the TSP makes them more likely to be targeted by the TSP, (Gilman Op. 47).

Unlike the plaintiffs in *United Presbyterian Church* and this case, in every case cited by Judge Gilman in which standing was found, the plaintiff was clearly subject to conduct of the defendant about which the plaintiff complained. *See Meese v. Keene*, 481 U.S. 465, 473 (1987) (noting that the three films the plaintiff sought to show were identified as "political propaganda"); *Steffel*, 415 U.S. at 459 (noting that the plaintiff's fear of prosecution was not speculative because he had been personally threatened with prosecution); *Ozonoff v. Berzak*, 744 F.2d 224, 228 (1st Cir. 1984) (noting that "[a]s one who has worked for the WHO in the past and who has filed an employment application again seeking work," the plaintiff felt constrained by the loyalty standards); *Paton v. La Prade*, 524 F.2d 862, 865, 870-71, 873 (3d Cir. 1975) (noting that "Paton's name and address were ascertained as a result of the mail cover" and concluding the plaintiff had standing because "she may have sustained or be immediately in danger of sustaining a direct injury as a result" of the FBI investigation directed against her, which resulted from the mail cover).

In applying any understanding of constitutional standing, it is important to recognize the burden of proof required. "The party invoking federal jurisdiction bears the burden of establishing the[] elements" of standing. *Defenders of Wildlife*, 504 U.S. at 561. "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* As this case was decided on the government's motion for summary judgment, the plaintiffs "must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." *Id.* (quoting Fed. R. Civ. P. 56(e)). Applying my formulation of the standing requirements, the plaintiffs have failed to meet this burden because there is no evidence in the record that any of the plaintiffs are personally subject to the TSP. Judge Gilman frequently refers to the attorney-plaintiffs' allegations, (Gilman Op. 44, 47, 48), and concludes that the "attorney-plaintiffs have alleged a[] . . . concrete and particularized injury," (Gilman Op. 47). On

summary judgment, however, the plaintiffs' mere allegations are insufficient, and although the publicly admitted information about the TSP "supports" them, (Gilman Op. 48), it does not satisfy the plaintiffs' burden. In applying his formulation of the standing requirement, the reasonableness of plaintiffs' fear, Judge Gilman concludes that "[t]he likelihood that [the plaintiff in *Lyons*] would again find himself in a chokehold by the Los Angeles police seems to me far more remote than the ongoing concern of the attorney-plaintiffs here that their telephone or email communications will be intercepted by the TSP." (Gilman Op. 45-46.) Unfortunately for the plaintiffs' position, besides Judge Gilman's subjective assessment, there is no evidence as to the likelihood the plaintiffs will be surveilled for this court to consider on summary judgment.

Under any understanding of constitutional standing, the plaintiffs are ultimately prevented from establishing standing because of the state secrets privilege.[3] As Judge Batchelder notes, plaintiffs have not challenged the government's invocation of the privilege or its application. All three members of the panel have reviewed the documents filed by the government under seal that arguably are protected by the privilege. The state secrets privilege operates as a bar to the admission of evidence to which the privilege attaches, and the plaintiff must proceed without the benefit of such evidence. *See United States v. Reynolds*, 345 U.S. 1, 11 (1953); *see also Ellsberg v. Mitchell*, 709 F.2d 51, 65 (D.C. Cir. 1983). Where the privilege prevents the plaintiff from producing sufficient evidence to establish his or her *prima facie* case, the court must dismiss the claim. *Kasza v. Browner*, 133 F.3d 1159, 1166 (9th Cir. 1998). In this way, the state secrets privilege has prevented the plaintiffs from conducting discovery that might allow them to establish that they are personally subject to the TSP, as I believe constitutional standing requires. However, where the privilege deprives the government of a valid defense to the plaintiff's claim, the court must also dismiss the claim. *Tenenbaum v. Simonini*, 372 F.3d 776, 777 (6th Cir. 2004); *Kasza*, 133 F.3d at 1166. Even applying Judge Gilman's formulation of the standing requirement, the court cannot avoid the state secrets privilege.[4] Evidence arguably protected by the state secrets privilege may well be relevant to the reasonableness of the plaintiffs' fear. Whether that evidence is favorable to plaintiffs or defendants, its unavailability requires dismissal. That it may be unsatisfying that facts pertinent to the standing inquiry are unavailable can have no bearing on the disposition of this case. If the state secrets privilege prevents the plaintiffs from presenting adequate evidence of their

---

[3] Judge Batchelder's decision does not discuss the implications of the state secrets privilege because, under her reading of *Laird v. Tatum*, 408 U.S. 1 (1972), the plaintiffs can establish standing only if they are "regulated, constrained, or compelled directly by the government's actions," (Batchelder Op. at 13), not if their injury "aris[es] from a personal subjective chill" caused by the existence of government surveillance, (Batchelder Op. 16; *see* Batchelder Op. 14-15). The implication of this reasoning is that even if the plaintiffs had evidence that they were personally subject to the TSP, they would not have standing if the government was only conducting surveillance.

It is not clear to me that *Laird* must be read this way. The language in *Laird* about regulation, proscription, and compulsion to me seems merely descriptive of the facts in prior cases in which the Supreme Court had found standing. *Laird* could be read as holding that when the *only* harm alleged is chilled speech, then the exercise of governmental power must be regulatory, proscriptive, or compulsory in nature. *See Laird*, 408 U.S. at 11, 13-14. Here, the plaintiffs' professional injuries are arguably a harm beyond chilled speech. Furthermore, because the plaintiffs in *Laird* alleged only chilled speech, *Laird* does not directly address whether other injuries that derive from the chilled speech must be discounted. *See id.* at 13-14. Given this ambiguity, I see no need to express an opinion as to the extent of *Laird*'s holding and whether the plaintiffs could establish standing were they to provide evidence that they were personally subject to surveillance.

In any event, even under Judge Batchelder's reasoning, the state secrets privilege plays a prominent role that must be acknowledged. Because of the state secrets privilege, the plaintiffs are unable to conduct discovery to determine if information from the TSP is used in such a way as to satisfy the requirements that Judge Batchelder finds in *Laird*.

[4] Judge Gilman's opinion does not dispute the majority opinion's contention that the plaintiffs' standing would be undermined if the NSA hypothetically adhered to a policy of complete nondisclosure, but rather criticizes the analysis as speculation. (Gilman Op. 51.) It correctly notes that we cannot know whether such a policy exists "[a]bsent a public revelation from the NSA." (Gilman Op. 51.) However, it misapprehends the impact of this observation. The plaintiffs' claims fail not because of the majority's speculation that such a policy exists but rather because the state secrets privilege precludes the NSA from disclosing whether it exists.

standing, we must dismiss their claims.  If the state secrets privilege prevents the government from presenting evidence that might refute the plaintiffs' allegations that they are likely to be surveilled and undercut the reasonableness of their asserted fear, we must also dismiss the plaintiffs' claims.

————————————

**DISSENT**

————————————

RONALD LEE GILMAN, Circuit Judge, dissenting.  My colleagues conclude that the plaintiffs have not established standing to bring their challenge to the Bush Administration's so-called Terrorist Surveillance Program (TSP).  A fundamental disagreement exists between the two of them and myself on what is required to show standing and whether any of the plaintiffs have met that requirement.  Because of that disagreement, I respectfully dissent.  Moreover, I would affirm the judgment of the district court because I am persuaded that the TSP as originally implemented violated the Foreign Intelligence Surveillance Act of 1978 (FISA).

## I.  ANALYSIS

**A.    Procedural posture**

This case comes to us in a relatively unique procedural posture.  In the district court, the plaintiffs moved for partial summary judgment.  They filed a statement of undisputed facts in support of that motion.  The government then filed its own motion to dismiss or, in the alternative, a motion for summary judgment.  In this motion, the government asserted that the plaintiffs could not establish standing and that the state-secrets privilege barred their claims.  But the government did not contest the plaintiffs' statement of undisputed facts or provide its own statement of undisputed facts.  The district court was therefore bound by the requirements of Rule 56(e) of the Federal Rules of Civil Procedure, which provides as follows:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

After reviewing the affidavits and related supporting material submitted in support of the plaintiffs' motion, the district court found that they had set forth the necessary facts to meet the prerequisites for standing.  The court then considered the plaintiffs' claims on the merits and granted their motion as to all but their datamining claim.

Despite this procedural posture, the lead opinion asserts that the record presently before us contains only "three publicly acknowledged facts about the TSP—(1) it eavesdrops, (2) without warrants, (3) on international telephone and email communications in which at least one of the parties is a suspected al Qaeda affiliate."  Lead Op. at 3.  For the reasons both stated above and set forth below, I believe that this description significantly understates the material in the record presently before us.

**B.    Standing**

*1.    Injury in fact*

Article III of the U.S. Constitution "requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant."  *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) (quotation marks omitted).  This is sometimes referred to as the "direct injury" or the "distinct and palpable injury" requirement.  *Laird v. Tatum*,

408 U.S. 1, 13 (1972); *Valley Forge*, 454 U.S. at 475.  The Supreme Court has defined "injury in fact" as "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and quotation marks omitted).  An association has standing to sue on behalf of its members when "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citation omitted).

Moreover, as the lead opinion acknowledges, only one plaintiff need establish standing to satisfy Article III's case-or-controversy requirement. *Mass. v. Envtl. Prot. Agency*, 127 S. Ct. 1438, 1453 (2007) ("Only one of the petitioners needs to have standing to permit us to consider the petition for review."); *see also Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (finding the Article III requirement satisfied where at least one plaintiff could establish standing).  The position of the attorney-plaintiffs, in my opinion, is the strongest for the purpose of the standing analysis.  This is not to say that the journalists and the scholars do not have standing.  They might.  But because only one plaintiff need establish standing, I will focus my discussion on the attorney-plaintiffs.

The lead opinion criticizes the attorney-plaintiffs for asserting multiple causes of action despite "hav[ing] one claim," but this is hardly a "ruse," whether "perfectly acceptable" or not as the lead opinion would have it.  Lead Op. at 9.  The Supreme Court's recent decision in *DaimlerChrysler Corp. v. Cuno*, 126 S. Ct. 1854, 1868 n.5 (2006), indeed reiterates that a litigant cannot "by virtue of his standing to challenge one government action, challenge other governmental actions that did not injure him."  In the present case, however, the plaintiffs seek to challenge the only action that has injured them—the NSA's implementation of the TSP—and they do so by "identifying all grounds" against that action.  *Id.* at 1868 n.5.  Thus, I do not believe that this case requires "a particularized analysis of the plaintiffs' three alleged injuries, six asserted legal claims, and two requested forms of relief."  Lead Op. at 10.

I now return to the first element of the standing analysis.  Despite the willingness of the lead opinion to assume that the attorney-plaintiffs' asserted injuries could be "deemed adequate to state an injury in fact," Lead Op. at 17, its analysis suggests the opposite.  I have accordingly set forth below the reasons why I conclude that the attorney-plaintiffs have demonstrated that no such assumption is needed because they have actually stated an injury in fact.

The attorney-plaintiffs assert a claim for the injuries flowing from the failure of the TSP to comply with FISA's requirements that "minimization procedures" be utilized to protect privileged communications—such as between attorneys and their clients—from interception or, if intercepted, from subsequent disclosure.  Contrary to the lead opinion's characterization of the attorney-plaintiffs' assertions, the harm alleged here in fact "causes the plaintiffs to refrain from" potentially harmful conduct.  Lead Op. at 8.  I find that the distinction the lead opinion attempts to draw between a harm that *causes* an injury and a harm that *results* from an injury is ultimately unpersuasive.  To my mind, the attorney-plaintiffs have articulated an actual or imminent harm flowing from the TSP.

The lead opinion's contrary view is largely based on its reading of the D.C. Circuit's interpretation of *Laird*; namely, that "a plaintiff must establish that he or she is regulated, constrained, or compelled directly by the government's actions, instead of by his or her own subjective chill."  Lead Op. at 13 (citing *Laird*, 408 U.S. at 11, and *United Presbyterian Church v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984)).  In fact, the lead opinion says that *Laird* controls, and that the injury alleged here is at best no more concrete than that in *Laird*.  Lead Op. at 16.  The lead opinion then analogizes the injury to the attorney-plaintiffs' ability to perform their professional duties as a chill on "commercial speech."  Drawing on this commercial-speech analogy—an

argument never raised by the government—the lead opinion rejects the plaintiffs' contention of having suffered an injury in fact because, as so characterized by the lead opinion, the consequence "would effectively value commercial speech above political speech." Lead Op. at 13. But there is no legal support offered for the lead opinion's contention that the plaintiffs' inability to perform their jobs is nothing more than the equivalent of a chill on commercial speech. Lead Op. at 12-13. In addition, the lead opinion's commentary on the relative value of different forms of speech is not a point raised by either of the parties or, to my mind, in any way relevant to the resolution of this case. For this reason, I find the lead opinion's discussion ranking the value of political speech over commercial speech puzzling. I instead believe that *Laird* is distinguishable because the attorney-plaintiffs have in fact alleged a concrete, imminent, and particularized harm flowing from the TSP.

On appeal, the government contends that any litigation about the TSP must be premised on the three general facts that the government has publicly disclosed: (1) the TSP exists, (2) it operates without warrants, and (3) it intercepts "only communications that originate or conclude in a foreign country, and only if there are reasonable grounds to believe that a party to the communication is affiliated with al Qaeda." According to the government, the plaintiffs cannot demonstrate that they were actually targets of the TSP and thus cannot show more than a "subjective chill" on their activities. The government asserts that the plaintiffs cannot establish standing because the state-secrets privilege prevents us from testing the plaintiffs' allegations that they have been or likely will be subject to surveillance under the TSP. Moreover, the government argues that the plaintiffs improperly seek to assert the rights of third parties, such as their overseas contacts, clients, and sources, who are not presently before the court.

The attorney-plaintiffs respond that they have suffered concrete, particularized injuries as a result of the TSP. Specifically, they contend that the TSP puts them in the position of abrogating their duties under applicable professional-responsibility rules if they communicate with clients and contacts via telephone or email. The TSP, in short, allegedly prevents them from doing their jobs. Specifically, the attorney-plaintiffs contend that they have had to travel internationally for face-to-face meetings at a significant expense in terms of time and money. They claim that their ability to conduct research and factfinding has been limited, if not entirely thwarted, as a result.

The attorney-plaintiffs, as part of their representation of clients accused of being enemy combatants or of providing aid to organizations designated as terrorist groups, declare that they have conducted internet research on terrorism, religion, politics, and human-rights issues in parts of the Middle East and South Asia. They further state that they have reviewed web sites where topics including jihad, kidnapping, and other terrorist acts are discussed. As part of their work on behalf of their clients, these attorneys have communicated with potential witnesses, experts, lawyers, and other individuals who live and work outside the United States about subjects such as terrorism, jihad, and al-Qaeda. The attorney-plaintiffs contend that because of the TSP, they have ceased telephone or email communications about substantive issues with their overseas contacts. This is because the TSP, unlike FISA, provides no minimization procedures to protect attorney-client communications.

Under FISA, an application for an order authorizing surveillance must include a description of the minimization procedures that will be utilized to protect privileged communications. 50 U.S.C. § 1804(a)(5). "Minimization procedures" are "specific procedures . . . that are reasonably designed . . . to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons." 50 U.S.C. § 1801(h)(1); *see also* 50 U.S.C. §§1801(h)(2)-(4) (providing a further definition of the term). Privileged communications remain such under FISA. 50 U.S.C. § 1806(a) ("No otherwise privileged communication obtained in accordance with, or in violation of, the provisions of this subchapter shall lose its privileged character."); *id.* § 1806(h).

As noted above, the lead opinion finds that *Laird* controls this case. Lead Op. at 16. Although the lead opinion then asserts that it limits its application of *Laird* to only the attorney-plaintiffs' First Amendment claim, its analysis suggests otherwise. *Laird* addressed the question of "whether the jurisdiction of a federal court properly may be invoked by a complainant who alleges that the exercise of his First Amendment rights is being chilled by the *mere existence, without more*, of a governmental investigative and data-gathering activity that is alleged to be broader in scope than is reasonably necessary for the accomplishment of a valid governmental purpose." 408 U.S. at 10 (emphasis added). The case stands for the proposition that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Id.* at 13-14. In *Laird*, the Court found that the U.S. Army, in its capacity as a domestic peacekeeping body, had collected information on "public activities that were thought to have at least some potential for civil disorder." *Id.* at 6. "The information itself was collected by a variety of means, but it is significant that the principal sources of information were the news media and publications in general circulation." *Id.*

I believe that the attorney-plaintiffs here allege a distinct set of facts that is legally distinguishable from those set forth in *Laird*. Unlike in the present case, the *Laird* plaintiffs simply articulated "speculative apprehensiveness that the Army may at some future date misuse the information in some way that would cause direct harm to [them]." 408 U.S. at 13-14. The Court stated that the plaintiffs "freely admit that they complain of no specific action of the Army against them . . . . There is no evidence of illegal or unlawful surveillance activities." *Id.* at 9.

In contrast to *Laird*, the attorney-plaintiffs here complain of specific present harms, not simply of some generalized fear of the future misuse of intercepted communications. The TSP forces them to decide between breaching their duty of confidentiality to their clients and breaching their duty to provide zealous representation. Neither position is tenable. The attorney-plaintiffs must travel to meet in person with clients and sources in order to avoid the risk of TSP surveillance. Unlike the situation in *Laird*, the attorney-plaintiffs in the present case allege that the government is listening in on private person-to-person communications that are not open to the public. These are communications that any reasonable person would understand to be private. The attorney-plaintiffs have thus identified concrete harms to themselves flowing from their reasonable fear that the TSP will intercept privileged communications between themselves and their clients.

To survive the government's standing-to-sue challenge, the attorney-plaintiffs do not have to demonstrate that their past communications have in fact been intercepted by the TSP. In *Laidlaw*, for example, the Supreme Court found that environmental groups had standing to sue a polluter where their members declared "that they would use the nearby North Tyger River for recreation if Laidlaw were not discharging pollutants into it." 528 U.S. at 184. The Court did not require the plaintiffs to show that the pollutants had actually harmed the environment, instead finding that their members' "reasonable concerns about the effects of [Laidlaw's] discharges directly affected those affiants' recreational, aesthetic, and economic interests," and that these concerns "present[ed] dispositively more than the mere general averments and conclusory allegations found inadequate" in prior cases. *Id.* at 183-84 (citation and quotation marks omitted).

A similar conclusion was reached by the Fourth Circuit in *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149 (4th Cir. 2000). In *Gaston Copper*, the court found that the plaintiff had standing based on his assertion that he used the affected lake less than he would have otherwise as a result of the ongoing pollution, despite the lack of evidence showing an objective environmental change in the lake. *Id.* at 156, 159.

Both the *Laidlaw* and the *Gaston Copper* plaintiffs asserted more than "a mere academic or philosophical interest," *Gaston Copper*, 204 F.3d at 159, or "an ingenious academic exercise in the conceivable." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412

U.S. 669, 688 (1973). The attorney-plaintiffs in the case before us likewise have alleged a harm far beyond the academic in their challenge to the TSP.

In reaching the opposite conclusion, the lead opinion attempts to distinguish *Laidlaw* by noting that the plaintiffs there brought their complaint under the citizen-suit provision of the Clean Water Act, a fact that the lead opinion asserts "offers only minimal support" for the plaintiffs in the present case. Lead Op. at 34. Although the plaintiffs in that case did indeed base their cause of action on an environmental statute, the Supreme Court still analyzed whether they satisfied the constitutional standing requirements of Article III. *See Laidlaw*, 528 U.S. at 180-89. The fact that the Clean Water Act contained a citizen-suit provision did not absolve the courts of examining the constitutional standing of the particular plaintiffs before them. I therefore find the lead opinion's treatment of *Laidlaw* unpersuasive. As in *Laidlaw*, I have analyzed the attorney-plaintiffs' assertions of Article III standing and have concluded that they satisfy those requirements.

The concurring opinion also criticizes my interpretation of *Laidlaw*, describing it as "transform[ing] the holding" in that case. Concurring Op. at 37. I do not believe that this characterization holds up under scrutiny. In discussing the case, the concurring opinion describes the *Laidlaw* plaintiffs as "in fact subject to defendant's conduct" of discharging pollutants in excess of permitted amounts into the North Tyger River. *Id.* (emphasis omitted). The Supreme Court, to be sure, noted that "it is undisputed that Laidlaw's unlawful conduct . . . was occurring," but nonetheless found nothing "improbable about the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms." *Laidlaw*, 528 U.S. at 184 (citation and quotation marks omitted).

The concurring opinion then argues, in reference to the *Laidlaw* plaintiffs, that their "*fear of harm* from the defendant's undisputed conduct—conduct that would also undisputably affect plaintiffs personally if they undertook their desired activities—was sufficient to support standing." Concurring Op. at 37 (emphasis in original). Similarly, the concurring opinion acknowledges that "the plaintiffs in the present case may have a reasonable fear of harm from the defendants' conduct." *Id.* It goes on to state, however, that the attorney-plaintiffs lack standing because they "must be actually subject to the defendant's conduct, not simply afraid of being subject to it." *Id.* Because I believe that the plaintiffs in the present case *are* "actually subject to the defendant's conduct" within the meaning of *Laidlaw*, I respectfully disagree with my colleague's conclusion.

To my mind, the concurring opinion describes, rather than distinguishes, the situation of the attorney-plaintiffs. The concurring opinion would hold that the attorney-plaintiffs must demonstrate that they have personally been subject to surveillance under the TSP in order to have standing to sue. This is akin to Laidlaw's argument that the plaintiffs should have been required to demonstrate that Laidlaw's mercury discharge violations caused them to "sustain[] or face[] the threat of any 'injury in fact' from Laidlaw's activities." *Laidlaw*, 528 U.S. at 181. But the Supreme Court rejected such an argument, stating that the plaintiffs need only show "the reasonableness of the fear that led the affiants to respond to that concededly ongoing conduct . . . ." *Id.* at 184 (brackets and quotation marks omitted).

Both the lead and concurring opinions proceed to analogize the present case to two cases that I find distinguishable. One is *Los Angeles v. Lyons*, 461 U.S. 95 (1983), where the Supreme Court denied standing for injunctive relief to a Los Angeles motorist who had been subjected to a chokehold by the police during a routine traffic stop. *Id.* at 100. The Court reasoned in part that the plaintiff's "subjective apprehensions" that "a recurrence of the allegedly unlawful conduct" would occur were insufficient to support standing. *Id.* at 107 n.8. But the likelihood that Lyons would again find himself in a chokehold by the Los Angeles police seems to me far more remote than the ongoing concern of the attorney-plaintiffs here that their telephone or email communications will

be intercepted by the TSP. Based upon the principles set forth in *Laidlaw*, the "reasonableness of the fear" of the attorney-plaintiffs in the present case strikes me as being well beyond what is needed to establish standing to sue. *See Laidlaw*, 528 U.S. at 184.

Pushing the lead opinion's reasoning still further, the concurring opinion argues that the attorney-plaintiffs "can show nothing more than a fear" of "being subject to a government policy of surveillance." Concurring Op. at 37. "By contrast, if the *Laidlaw* plaintiffs had resumed their abandoned activities, they would definitely have been subject to the defendant's conduct—illegal discharge into the river." *Id.* The concurring opinion then asserts that "[t]he Supreme Court's distinction between *Laidlaw* and *Lyons* was one of kind, not degree." *Id.* But I find no support for this assertion, and my colleague's reliance on a quotation from *Laidlaw* for this point strikes me as unpersuasive.

In fact, the *Laidlaw* plaintiffs were personally affected by the defendant's conduct whether they used the waterway or not. Nothing in *Laidlaw* required that the plaintiffs demonstrate that they were all equally likely to be affected by the pollutants, that the pollutants were evenly dispersed through the waterway, or that a plaintiff swimming in the river was more likely than a plaintiff canoeing on the river to be injured. All that was required was that they demonstrate that, given Laidlaw's undisputed conduct, they possessed a reasonable fear of harm. This holds equally true for the attorney-plaintiffs in the present case. The existence of the TSP is undisputed and these plaintiffs are personally affected by the TSP whether they engage in targeted communications or not. In sum, I believe that the distinction between *Laidlaw* and *Lyons* is in fact one of degree, and that the attorney-plaintiffs here occupy a position far closer to the former than to the latter.

The other case to which the lead opinion analogizes the present suit is *United Presbyterian Church v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984). In *United Presbyterian Church*, a group of religious and political organizations, academics, journalists, and a member of Congress challenged the constitutionality of an Executive Order that "specif[ied] the organization, procedures and limitations applicable to the foreign intelligence and counterintelligence activities of the Executive Branch." *Id.* at 1377. The *United Presbyterian Church* plaintiffs sought a declaratory judgment that this Executive Order violated the First, Fourth, and Fifth Amendments to the Constitution, the separation-of-powers doctrine, and the National Security Act of 1947. *Id.* Unlike the attorney-plaintiffs in the present case, however, the *United Presbyterian Church* plaintiffs "fail[ed] to allege that any plaintiff has suffered any injury in fact under the Order." *Id.* (discussing the district court opinion). The D.C. Circuit therefore affirmed the district court's dismissal of the complaint for lack of standing to sue, but that fact-driven result has no bearing on the present case with its dramatically different facts.

In dismissing the complaint, the D.C. Circuit followed *Laird* in concluding that the plaintiffs had alleged no more than a subjective chill. *Id.* at 1378-81. The facts in the present case are substantially different, however, with even the concurring opinion acknowledging that "[h]ere the plaintiffs' professional injuries are arguably a harm beyond chilled speech." Concurring Op. at 39 n.3. To be sure, several of the groups in *United Presbyterian Church* claimed that they had experienced direct injury, such as interception of their mail, disruption of their events, and infiltration of their meetings. *United Presbyterian Church*, 738 F.3d at 1381 n.2. But these allegations were deemed "too generalized" and insufficient because "[t]here is no allegation or even suggestion that any unlawful action to which the appellants have been subjected in the past was the consequence of the presidential action they seek to challenge here." *Id.* at 1380-81. The D.C. Circuit thus concluded that, "[w]ithout such connection, standing to pursue the present suit does not exist." *Id.* at 1381.

Here, in contrast, the attorney-plaintiffs have provided a connection between their injury and the TSP. Specifically, officials in the Bush Administration have publicly stated that the TSP

involves "intercepts" of "international calls" and "communications" where the government "ha[s] a reasonable basis to conclude that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda, or working in support of al Qaeda." Press Briefing by Alberto Gonzales, Att'y Gen., and Gen. Michael Hayden, Principal Deputy Dir. for Nat'l Intelligence (Dec. 19, 2005), http://www.whitehouse.gov/news/releases/2005/12/print/20051219-1.html. These are exactly the types of clients that the attorney-plaintiffs represent. The TSP therefore constitutes a "genuine threat" of harm to the attorney-plaintiffs, *see Steffel v. Thompson*, 415 U.S. 452, 475 (1974), the absence of which doomed the *United Presbyterian Church* plaintiffs' action.

A number of cases have distinguished *Laird* in situations such as this where the plaintiffs have suffered professional injuries. In *Meese v. Keene*, 481 U.S. 465 (1987), for example, a state legislator wished to publicly screen three Canadian-made films about the effects of acid rain and nuclear winter. Under a federal statute, the films would have had to be designated as "political propaganda" in order to be shown in this country. Keene sued for injunctive relief, contending that the statute violated his First Amendment rights. The Supreme Court held that Keene had standing to raise a First Amendment claim on the ground that identifying the films as "political propaganda" threatened to cause him cognizable professional injury. *Id*. at 473. Keene had not in fact shown the films, but alleged that he had standing based on his anticipated harm. The Court agreed, convinced that voters would be less likely to support a candidate associated with propaganda. *Id*. at 475.

Another example is *Ozonoff v. Berzak*, 744 F.2d 224 (1st Cir. 1984), where the First Circuit found standing for a physician who wished to work for the World Health Organization (WHO). An Executive Order required that a U.S. citizen undergo a loyalty check before the WHO could extend an offer of employment to that person, notwithstanding the fact that the WHO was not an entity of the U.S. government. The First Circuit distinguished *Laird* because Ozonoff was alleging more than "the mere existence" of a governmental investigative and data-gathering activity. *Id*. at 229-30. Instead, Ozonoff's alleged injury was that the loyalty check would deter him from joining certain organizations or expressing certain views. Because of the Executive Order, Ozonoff had chosen to limit his organizational affiliations, much as the existence of the TSP has caused the attorney-plaintiffs to limit their telephone and email communications. Unlike Ozonoff, however, the attorney-plaintiffs are stymied in their efforts to do their jobs by the need to limit their communications. I thus believe that the attorney-plaintiffs have alleged an even more concrete and particularized injury than Ozonoff alleged.

A final example comes from the Third Circuit case of *Paton v. LaPrade*, 524 F.2d 862 (3d Cir. 1975), where the court found standing for high-school student Lori Paton, who alleged that the existence of an FBI investigative file about her could impair her future educational and professional opportunities. *Id*. at 868. As part of a high school social studies class on "the contemporary political spectrum," Paton had requested information from the Socialist Workers Party (SWP). *Id*. at 865. The FBI was monitoring mail received and sent by the SWP, resulting in Paton's name and address being recorded and placed in an FBI investigative file. This "mail cover" was in fact directed at the SWP. Like the TSP, the mail cover did not directly compel, proscribe, or regulate Paton. But its effect, like that of the TSP, was to injure her. Paton learned of the file after an FBI agent visited her high school to inquire about her. On these facts, the Third Circuit found that she had standing to challenge the postal regulation authorizing the recording of information about mail going to or from an organization such as the SWP because "she may have sustained or be immediately in danger of sustaining a direct injury" to her present and future educational or professional activities as a result. *Id*. at 871-73.

The lead opinion attempts to distinguish these cases and others like them on the basis that they challenged the "regulatory, proscriptive, or compulsory" exercise of governmental power to which the complainants were presently or prospectively subject. Lead Op. at 12 (quoting *United*

*Presbyterian Church*, 738 F.2d at 1378).  But that type of government power is precisely what is being challenged here.  The attorney-plaintiffs have made credible allegations that the operation of the TSP has compelled them to cease telephone and email communication about sensitive topics with their clients and contacts.  Publicly admitted information about the TSP supports them.

What I believe distinguishes *Meese*, *Ozonoff*, *Paton*, and the like from *Laird* is that the plaintiffs in the first-named cases successfully explained the "precise connection between the mere existence of the challenged system and their alleged chill." *Laird*, 408 U.S. at 13, n.7.  Unlike the *Laird* plaintiffs who conceded that they themselves were not suffering from any chill, the attorney-plaintiffs here have established a reasonable fear that has generated "actual," "imminent," "concrete," and "particularized" harm resulting from the operation of the TSP, a program that lacks any minimization procedures to protect their privileged communications. *See Lujan*, 504 U.S. at 560.

Finally, the concurring opinion would find that the state-secrets privilege prevents the attorney-plaintiffs from establishing an injury in fact.  Concurring Op. at 39 ("[T]he state secrets privilege has prevented the plaintiffs from conducting discovery that might allow them to establish that they are personally subject to the TSP, as I believe constitutional standing requires.").  But this reading expands the reach of the privilege in ways that the caselaw does not support.  Because the state-secrets privilege "operates to foreclose relief for violations of rights that may well have occurred by foreclosing the discovery of evidence that they did occur, it is a privilege not to be lightly invoked." *Halkin v. Helms*, 690 F.2d 977, 990 (D.C. Cir. 1982) (citation and quotation marks omitted); *see also Ellsberg v. Mitchell*, 709 F.2d 51, 57 (D.C. Cir. 1983) ("[T]he privilege may not be used to shield any material not strictly necessary to prevent injury to national security; and, whenever possible, sensitive information must be disentangled from nonsensitive information to allow for the release of the latter.").

The privilege is typically invoked with respect to specific requests for discovery. *See, e.g.*, *Jabara v. Kelley*, 75 F.R.D. 475, 478-79 (E.D. Mich. 1977).  If, however, the state-secrets privilege "deprives the [d]efendants of a valid defense to the [plaintiffs'] claims," then summary judgment may be granted to the defendant. *Tenenbaum v. Simonini*, 372 F.3d 776, 777-78 (6th Cir. 2004).

But unlike in *Jabara* or *Tenenbaum*, the attorney-plaintiffs here seek no additional discovery from the defendants.  Instead, the attorney-plaintiffs argue that they have established standing based on the facts in the public record.  This issue highlights what I believe to be the key difference between the lead and concurring opinions on the one hand and my opinion on the other.  My colleagues believe that the attorney-plaintiffs must establish that they were actually subject to surveillance under the TSP, whereas I conclude that a demonstration of a reasonable, well-founded fear that has resulted in actual and particularized injury suffices.  My reading of the caselaw leads me to conclude that the state-secrets privilege is not so broad as to bar the attorney-plaintiffs from making such a showing.

In short, the critical question in this case is not whether the attorney-plaintiffs have actually been surveilled—because, as the lead opinion aptly notes, a wiretap by its nature is meant to be unknown to its targets—but whether the "reasonableness of the fear" of such surveillance is sufficient to establish that they have suffered actual, imminent, concrete, or particularized harm from the government's alleged unlawful action. *See Laidlaw*, 528 U.S. at 184.  For the reasons discussed above, I believe that the plaintiffs have established such an injury in fact.  I therefore turn to the remaining factors in the Article III constitutional-standing analysis.

### 2.    *Causation*

The plaintiffs must next demonstrate a causal connection between the injury asserted and the government's alleged conduct.  This means that "a federal court [can] act only to redress injury that

fairly can be traced to the challenged action of the defendant, and not . . . that results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976). The "fairly traceable" standard, however, does not require that the defendant's conduct be the sole cause of the plaintiff's injury. *See, e.g.*, *Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 543 (6th Cir. 2004) (finding the causation prong satisfied despite the absence of evidence proving "to a scientific certainty" that the defendant's pollution caused the plaintiff's injury).

In the present case, the lead opinion finds that the attorney-plaintiffs have failed to establish causation due to its characterization of their "two causal pathways based on the two types of alleged injury." Lead Op. at 18. These two pathways are then described as (1) the plaintiffs' decision to cease certain communications as a result of the TSP, and (2) the decision by overseas contacts of the plaintiffs to cease certain communications as a result of the TSP. *Id.* The lead opinion concludes that the plaintiffs "have no evidence . . . that the NSA has actually intercepted (or will actually intercept) any of their conversations." *Id.* Rather, the lead opinion characterizes the evidence in the record as establishing "only a *possibility* — not a probability or certainty — that these calls might be intercepted, that the information might be disclosed or disseminated, or that this might lead to some harm to the [plaintiffs'] overseas contacts." *Id.* (emphasis in original). This "possibility" is too indeterminate, according to the lead opinion, and thus renders "the plaintiffs' showing of causation less certain and the likelihood of causation more speculative." *Id.* The lead opinion also concludes that the absence of a warrant for the alleged surveillance is insufficient to establish causation because "it is not clear whether the chill can fairly be traced to the absence of a warrant, or if the chill would still exist without regard to the presence or absence of a warrant." Lead Op. at 19.

Based upon my reading of the complaint and the subsequent motion for partial summary judgment, I believe that the lead opinion has mischaracterized the attorney-plaintiffs' allegations. What the attorney-plaintiffs themselves allege, in fact, is that the existence of the TSP outside of FISA's minimization procedures has prevented them from communicating by telephone and by email with their clients, contacts, and sources, thus either compelling them to violate their ethical obligations, or requiring them to undertake costly overseas trips; in short, the TSP has prevented them from doing their jobs. In response, the lead opinion asserts that "there is no evidence in the record from which to presume that the NSA is not complying with, or even exceeding, FISA's restrictions on the acquisition, retention, use, or disclosure of [the information acquired] (i.e., FISA's minimization techniques)." Lead Op. at 20.

This unsupported assertion is belied by statements on the public record from Executive Branch officials. With respect to the acquisition of information, the TSP has been described as having a "softer trigger" than FISA, Press Briefing by Alberto Gonzales, Att'y Gen., and Gen. Michael Hayden, Principal Dep'y Dir. for Nat'l Intel. (Dec. 19, 2005), http://www.whitehouse.gov/news/releases/2005/12/print/20051219-1.html, and one that uses a "reasonable belief" standard rather than FISA's probable cause standard for surveillance. *See* Remarks by Gen. Michael V. Hayden, Principal Dep'y Dir. of Nat'l Intel., Address to the Nat'l Press Club, Jan. 23, 2006, http://www.dni.gov/speeches/20060123_speech.htm. A senior official in the Department of Justice further informed Congress in 2006 that, "[a]lthough the [TSP] does not specifically target the communications of attorneys or physicians, calls involving such persons would not be categorically excluded from interception . . . ." Letter from William E. Moschella, Assistant Att'y Gen., to the Honorable F. James Sensenbrenner, Jr. (Mar. 24, 2006), at 55, http://www.fas.org/irp/agency/doj/fisa/doj032406.pdf.

To be sure, the Bush Administration has also asserted that "procedures are in place to protect U.S. privacy rights, including applicable procedures required by Executive Order 12333 and approved by the Attorney General, that govern acquisition, retention, and dissemination of

information relating to U.S. persons." *Id.* A review of this Executive Order, however, reveals that it makes no mention of protecting privileged communications. *See* Exec. Order No. 12,333, 46 Fed. Reg. 59,941 (Dec. 4, 1981). Furthermore, the Administration has claimed that "[b]ecause collecting foreign intelligence information without a warrant does not violate the Fourth Amendment and because the [TSP] is lawful, there appears to be no legal barrier against introducing this evidence in a criminal prosecution." Letter from William E. Moschella, Assistant Att'y Gen., to the Honorable F. James Sensenbrenner, Jr. (Mar. 24, 2006), at 54, http://www.fas.org/irp/agency/doj/fisa/doj032406.pdf.

Which characterization of injury one accepts will largely determine the causation prong (as well as the redressability prong discussed below) of the standing analysis. As one distinguished commentator has noted,

> [t]he central problem in the causation cases is not whether there is a causal nexus among injury, remedy, and illegality; it is how to characterize the relevant injury. Whether the injury is due to the defendant's conduct, or likely to be remedied by a decree in his favor, depends on how the injury is described.

Cass R. Sunstein, *Standing and the Privatization of Public Law,* 88 Colum. L. Rev. 1432, 1464 (1988).

The lead opinion focuses primarily on the lack of evidence that "the NSA has actually intercepted (or will actually intercept) any of [the plaintiffs'] conversations," and on the "the absence of a warrant (and all that goes with it)." Lead Op. at 18 (footnote and emphasis omitted). But as I discussed earlier in Part I.A.1., the attorney-plaintiffs need show only the reasonableness of their fear, not that their fear has in fact been realized. *See, e.g.*, *Laidlaw*, 528 U.S. at 184; *Meese*, 481 U.S. at 475. I thus find the attorney-plaintiffs' characterization of their injury the more persuasive.

Since learning of the existence and operation of the TSP, the attorney-plaintiffs contend that they have ceased communicating by telephone or email about sensitive subjects with their clients and contacts. Whether the potential surveillance is conducted pursuant to a warrant is not the gravamen of their complaint. Their concern is directed at the impact of the TSP on their ability to perform their jobs. The causation requirement does not demand that the government's conduct be the "sole cause" of the attorney-plaintiffs' injury, only that the injury be "fairly traceable" to that conduct. *See Simon*, 426 U.S. at 41; *Am. Canoe Ass'n*, 389 F.3d at 543. If the TSP did not exist, the attorney-plaintiffs would be protected by FISA's minimization procedures and would have no reason to cease telephone or email communication with their international clients and contacts. I therefore conclude that the attorney-plaintiffs have demonstrated a causal connection between their asserted injury and the government's alleged actions.

### 3. *Redressability*

This leaves the issue of whether the attorney-plaintiffs' injury "will be redressed by a favorable decision." *Laidlaw*, 528 U.S. at 181. The lead opinion's redressability analysis appears to make two basic points. First, the lead opinion cites 50 U.S.C. § 1806(a) for the proposition that "the issuance of FISA warrants would not relieve any of the plaintiffs' fears of being overheard; it would relieve them only of the fear that the information might be disseminated or used against them." Lead Op. at 21. The lead opinion also asserts that

> FISA might not prohibit the interception of attorney-client communications under circumstances where the NSA adheres to a policy of complete non-disclosure. Due to the State Secrets Doctrine, the plaintiffs do not (and cannot) know whether the

NSA actually adheres to a policy of complete non-disclosure, but based on the record evidence, it certainly remains possible.

Lead Op. at 21 n.31.  That proposition, however, is itself speculation, as the lead opinion concedes. Absent a public revelation from the NSA, the attorney-plaintiffs (or anyone else, for that matter) will simply never know whether a nondisclosure policy in fact exists.

In the face of this uncertainty, the attorney-plaintiffs must presume the absence of such a policy.  Their ethical obligations require them to do so, lest they run the risk of revealing confidential and possibly incriminating information directly to the government.  The reasonable concern about the possibility of disclosure—not the disclosure itself—triggers those obligations. Similarly, the simple assertion that

[t]he TSP is designed and operated for the prevention of terrorism, and the NSA is interested only in telephone and email communications in which one party to the communication is located outside the United States and the NSA has a 'reasonable basis to conclude that one party to the communication is a member of[, affiliated with,] or working in support of al Qaeda,'

Lead Op. at 21, does not mean that the TSP is not and could not be used to facilitate criminal investigation. *Cf. In re Sealed Case*, 310 F.3d 717, 727 (For. Intel. Surv. Ct. Rev. 2002) (stating that FISA does not "preclude or limit the government's use or proposed use of foreign intelligence information . . . in a criminal prosecution.").

The lead opinion contends that there is a lack of "evidence in the present record to suggest[] that the information collected by the NSA under the TSP has been disclosed to anyone for any purpose." Lead Op. at 21 n.31. *But see Al-Haramain Islamic Found. v. Bush*, 451 F. Supp. 2d 1215, 1223-25, 1228-30 (D. Or. 2006) (discussing the effect of the government's inadvertent disclosure of a sealed document that arguably described surveillance of the plaintiffs under the TSP). Notwithstanding the lead opinion's contention, a plain reading of the FISA statute provides no support for the speculative assertion that a "policy of complete non-disclosure" exists within the NSA. FISA's explicit provisions regarding minimization procedures and privileged communications in fact strongly support the opposite conclusion.

The lead opinion's second point is premised on 50 U.S.C. § 1805(f), which sets forth the emergency-based exceptions to the normal FISA procedures.  It cites this subsection for the proposition that "FISA's general requirement that electronic surveillance may proceed only upon issuance of a FISA Court warrant is not absolute, as FISA provides for instances in which a prior warrant may be unnecessary, at least for a short period of time."  Lead Op. at 21 n.31.  I agree that FISA's warrant requirement is "not absolute."  But the "warrant requirement" is besides the point. Instead, FISA's minimization procedures regarding the use of wiretapped information are the only FISA protections that ultimately bear on the redressability prong of the standing analysis in the present case.  The point is that these minimization procedures *are* "absolute" even though the warrant requirement is not.  *See* 50 U.S.C. § 1805(f) ("If the Attorney General authorizes such emergency employment of electronic surveillance, he *shall* require that the minimization procedures required by this subchapter for the issuance of a judicial order be followed.") (emphasis added).

Admittedly, the Supreme Court has furnished little guidance regarding the scope of the redressability inquiry beyond requiring a "'direct' relationship between the alleged injury and the claim sought to be adjudicated." *Linda R.S. v. Richard D.*, 410 U.S. 614, 618 (1973).  But I believe that the present case clearly demonstrates such a direct link between the attorney-plaintiffs' injury and their claim.  The attorney-plaintiffs' redressability arguments revolve around their very real ongoing ethical obligations to their clients, to their profession, and to themselves.  These obligations,

as noted above, exist independently of whether the attorney-plaintiffs' communications with their clients have actually been wiretapped through the TSP, independently of whether the NSA actually adheres to a "policy of complete non-disclosure" for all TSP-wiretapped information, and independently of whether a judicially authorized warrant has actually been procured in advance of the alleged wiretapping. This is where the Supreme Court's 2000 decision in *Laidlaw* again comes directly into play.

The Court in *Laidlaw* found that the plaintiffs had satisfied the redressability prong even though the defendant, during the course of the appeal, had voluntarily ceased the conduct that had initially given rise to the lawsuit. 528 U.S. at 188-89. Here, too, the NSA has allegedly ceased conducting the TSP independently of the FISA court, as discussed in greater depth in Part I.D. below. But as the government's counsel conceded at oral argument, the Executive Branch views itself as free to unilaterally "opt out" of the FISA court's oversight at any time. The civil penalties imposed on the defendant in *Laidlaw*, the Supreme Court held, redressed the plaintiffs' alleged injuries from the prior unauthorized pollutant discharges because those injuries were ongoing and the penalties would generally deter not only that particular defendant, but also others similarly situated to it, from engaging in similar conduct in the future. *See id.* at 187.

Deterrence, in short, is an especially appropriate consideration where, as here, the alleged harm is not "wholly past" but, as publicly acknowledged by the government, instead "ongoing at the time of the complaint and . . . could continue into the future." *Laidlaw*, 528 U.S. at 188 (distinguishing the holding in *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998)). The Court's holding in *Laidlaw* could not be more applicable than it is to the present case: "It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress." *Id.* at 185-86.

The facts alleged by the attorney-plaintiffs here fit this language to a "T." Each of them "faces the threat" that the TSP will harm them in the future, the TSP was undisputedly ongoing at the time that the attorney-plaintiffs filed their lawsuit, and the district court's injunction "effectively abates" the TSP and "prevents its recurrence." The lead opinion's parting assertion that "[t]he only way to redress the injury would be to enjoin *all* wiretaps, even those for which warrants are issued and for which full prior notice is given to the parties being tapped," Lead Op. at 22, provides rhetorical flourish but significantly overstates the attorney-plaintiffs' allegations. Simply requiring that the Executive Branch conform its surveillance-gathering activities to governing law, including the requirements of FISA, will redress the attorney-plaintiffs' injury. More is not needed. I therefore conclude that the attorney-plaintiffs have satisfied the redressability prong of the standing analysis.

### 4.    *Prudential requirements*

The attorney-plaintiffs must satisfy the requirements of prudential standing in addition to satisfying the Article III constitutional requirements. Specifically, they must demonstrate that they are asserting their own interests rather than those of a third party, *see Allen v. Wright*, 468 U.S. 737, 751 (1984), and that they are asserting a personalized claim rather than a generalized grievance. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 23-25 (1998). Other prudential-standing requirements exist that are not universally applied in all cases. One such requirement is the so-called zone-of-interests test. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 400 n.16 (1987) (noting that the zone-of-interests test "is most usefully understood as a gloss on the meaning of § 702" of the Administrative Procedures Act). This test requires plaintiffs to show that they are "within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett v. Spear*, 520 U.S. 154, 162 (1997).

### a.    *Generalized grievance and personal interest*

Prudential-standing requirements preclude litigation in federal court "when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all of a large class of citizens," or where a plaintiff seeks to "rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). The fact that a harm is widely shared, however, will not by itself preclude standing if the harm is also concrete and particularized. *Mass. v. Envtl. Protection Agency*, 127 S. Ct. 1438, 1456 (2007) ("[W]here a harm is concrete, though widely shared, the Court has found 'injury in fact.'") (quoting *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998))).

In the present case, the attorney-plaintiffs have alleged specific and concrete injuries to themselves and to their ability to engage in their professional work due to the operation of the TSP. They allege that they are unable to engage in telephone and email communications with clients and contacts because the identity of those clients and contacts, some of whom have been charged with links to terrorism or terrorist organizations, fall within the ambit of the TSP. Because the government has admitted that the TSP has operated outside of FISA and does not distinguish attorneys from any other person whose telephone or email communications might be under electronic surveillance, the attorney-plaintiffs have been unable, consistent with their ethical responsibilities to their clients and to the bar, to engage in privileged communications. They must instead incur the significant financial and professional burden of traveling to meet in person with clients and contacts.

The TSP has thus injured the attorney-plaintiffs both personally and professionally. For these reasons and for the reasons previously discussed in my analysis of injury in fact in Part I.B.1. above, I conclude that the attorney-plaintiffs are asserting personalized, individual harms rather than generalized grievances or the rights of a third party.

### b.    *Zone of interests*

The zone-of-interests test is the other prudential standing requirement that the attorney-plaintiffs must satisfy. They must show that they are arguably within the zone of interests of "a relevant statute." 5 U.S.C. § 702; *Clarke*, 479 U.S. at 396. The Supreme Court has clarified "that the breadth of the zone of interests varies according to the provisions of law at issue, so that what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the generous review provisions of the APA may not do so for other purposes." *Id*. at 163 (quotation marks omitted).

In the present case, the attorney-plaintiffs do not raise a cause of action under FISA or under Title III; instead, their cause of action arises under the APA. Under § 702 of the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. A plaintiff must therefore "identify some agency action that affects him in the specified fashion." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) (quotation marks omitted). Second, the plaintiff must show that he has suffered a "legal wrong" because of that agency action or that he is "adversely affected or aggrieved by that action within the meaning of a relevant statute." *Id*. at 883 (quotation marks omitted).

The Supreme Court said in *Lujan* "that to be adversely affected or aggrieved . . . within the meaning of a statute, the plaintiff must establish that the injury he complains of . . . falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Id*. (quotation marks omitted). "In determining whether the petitioners have standing under the zone-of-interests test to bring their APA claims, we look not to the terms of the [relevant statute's] citizen-suit provision, but to the substantive provisions of the [statute], the alleged violations of which serve as the gravamen of the complaint." *Bennett*, 520 U.S. at 175. The

attorney-plaintiffs here maintain that the TSP violates FISA and Title III by functioning as an electronic surveillance program outside the "exclusive means" of those statutes.

FISA includes a civil-liability provision, which states that

[a]n aggrieved person, other than a foreign power or an agent of a foreign power, as defined in section 1801(a) or (b)(1)(A) of this title, respectively, who has been subjected to an electronic surveillance or about whom information obtained by electronic surveillance of such person has been disclosed or used in violation of section 1809 of this title shall have a cause of action against any person who committed such violation and shall be entitled to recover [actual and punitive damages and reasonable attorney fees and costs].

50 U.S.C. § 1810.  The lead opinion asserts that the attorney-plaintiffs cannot establish that they have a right to sue because they are not "aggrieved persons" under FISA.  An "aggrieved person" is defined as "a person who is the target of an electronic surveillance or any other person whose communications or activities were subject to electronic surveillance."   50 U.S.C. § 1801(k). According to the lead opinion, because the plaintiffs "have not shown that they were actually the target of, or subject to, the NSA's surveillance," they cannot establish a cause of action under FISA. Lead Op. at 32.

The attorney-plaintiffs' challenge, however, is precisely that the TSP has operated *outside* of FISA despite the fact that Congress has declared FISA to be the "exclusive means" for the government to engage in electronic surveillance for foreign intelligence purposes in this country. 18 U.S.C. § 2511(2)(f).  They rely on provisions of FISA and of Title III of the Omnibus Crime Control and Safe Streets Act, which criminalizes the interception and/or disclosure of wire, oral, or electronic communications other than pursuant to those statutes. *See* 50 U.S.C. § 1809(a); 18 U.S.C. § 2511(2)(f).

The lead opinion contends that Title III cannot support standing because the statute provides that "[n]othing contained in this chapter or chapter 121 or 206 of this title, or section 705 of the Communications Act of 1934, shall be deemed to affect the acquisition by the United States Government of foreign intelligence information from international or foreign communications." 18 U.S.C. § 2511(2)(f).  Lead Op. at 29.  But this reading of the statute ignores the remainder of the sentence.  In full, section (2)(f) states as follows:

Nothing contained in this chapter or chapter 121 or 206 of this title, or section 705 of the Communications Act of 1934, shall be deemed to affect the acquisition by the United States Government of foreign intelligence information from international or foreign communications, or foreign intelligence activities conducted in accordance with otherwise applicable Federal law involving a foreign electronic communications system, utilizing a means other than electronic surveillance as defined in section 101 of the Foreign Intelligence Surveillance Act of 1978, *and procedures in this chapter or chapter 121 and the Foreign Intelligence Surveillance Act of 1978 shall be the exclusive means by which electronic surveillance, as defined in section 101 of such Act, and the interception of domestic wire, oral, and electronic communications may be conducted.*

(Emphasis added.)  In light of the fact that Title III deals only with domestic wiretaps to obtain intelligence information relating to certain specified offenses, *see* 18 U.S.C. § 2516, the above-quoted subsection makes quite clear that FISA "shall be the *exclusive means* by which electronic surveillance [for foreign intelligence purposes] . . . may be conducted." *Id.* (emphasis added).

The lead opinion contends, however, that the "exclusive means" provision of Title III and FISA should be read "as two separate and independent, albeit parallel, statements." Lead Op. at 32. Accordingly, the lead opinion asserts, "[t]his provision does not foreclose the possibility that the government may engage in certain surveillance activities that are outside of the strictures of both Title III and FISA." *Id.* But the lead opinion provides no legal support for this novel statutory interpretation and none is apparent to me. This, in my opinion, flies directly in the face of the plain language of FISA and its legislative history. I note, moreover, that the government announced in January of this year that the TSP would henceforth be conducted under the aegis of the FISA Court of Review.

The language of both the FISA statute and its legislative history is explicit: FISA was specifically drafted "to curb the practice by which the Executive [B]ranch may conduct warrantless electronic surveillance on its own unilateral determination that national security justifies it." S. Rep. No. 95-604, pt. I, at 8, *reprinted at* 1978 U.S.C.C.A.N. 3904, 3910; *see also id.* at 3908. When debating FISA, Congress made clear that it intended to prevent the Executive Branch from engaging in electronic surveillance in the United States without judicial oversight, even during times of war. *See* S. Rep. No. 95-701, at 47, *reprinted at* 1978 U.S.C.C.A.N. 3973, 4016 ("This bill will establish the exclusive United States law governing electronic surveillance in the United States for foreign intelligence purposes.").

Congress explicitly refuted the "inherent authority" argument on which the government seeks to justify the TSP's existence:

> Finally, S. 1566 spells out that the Executive cannot engage in electronic surveillance within the United States without a prior judicial warrant. This is accomplished by repealing the so-called executive "inherent power" disclaimer clause currently found in section 2511 (3) of Title 18, United States Code. S. 1566 provides instead that its statutory procedures (and those found in chapter 119 of title 18) "shall be the exclusive means" for conducting electronic surveillance, as defined in the legislation, in the United States. The highly controversial disclaimer has often been cited as evidence of a congressional ratification of the President's inherent constitutional power to engage in electronic surveillance in order to obtain foreign intelligence information essential to the national security. Despite the admonition of the Supreme Court that the language of the disclaimer was "neutral" and did not reflect any such congressional recognition of inherent power, the section has been a major source of controversy. By repealing section 2511(3) and expressly stating that the statutory warrant procedures spelled out in the law must be followed in conducting electronic surveillance in the United States, this legislation ends the eight-year debate over the meaning and scope of the inherent power disclaimer clause.

S. Rep. No. 95-604, pt. I, at 6-7, *reprinted at* 1978 U.S.C.C.A.N. 3904, 3908. In fact, Congress rejected language that would have made FISA and Title III the "exclusive *statutory* means" under which electronic surveillance could be conducted, instead adopting language that made those statutes simply the "*exclusive means*" governing such surveillance. *See* H.R. Conf. Rep. No. 95-1720, at 35, *reprinted at* 1978 U.S.C.C.A.N. 4048, 4064 (emphasis added).

More to the point, the government has publicly admitted that the TSP has operated outside of the FISA and Title III statutory framework, and that the TSP engages in "electronic surveillance." Press Briefing by Alberto Gonzales, Att'y Gen., and Gen. Michael Hayden, Principal Deputy Dir. for Nat'l Intelligence (Dec. 19, 2005), http://www.whitehouse.gov/news/releases/2005/12/print/20051219-1.html (General Hayden: "I can say unequivocally that we have used this program in lieu of [the FISA processes] and this program has been successful."). In January of 2007, in fact, the Bush Administration announced that it had

reached a secret agreement with the Foreign Intelligence Surveillance Court (FISC) whereby the TSP would comply with FISA, a further acknowledgment that the TSP had previously been operating without FISA approval. *See* Letter from Alberto Gonzales, Att'y Gen., to the Honorable Patrick Leahy & the Honorable Arlen Specter (Jan. 17, 2007), at 1 ("[A]ny electronic surveillance that was occurring as part of the Terrorist Surveillance Program will now be conducted subject to the approval of the Foreign Intelligence Surveillance Court."), http://leahy.senate.gov/press/200701/1-17-07%20AG%20to%20PJL%20Re%20FISA%20Court.pdf; *see also* Dan Eggen, *Spy Court's Orders Stir Debate on Hill*, Wash. Post, Jan. 19, 2007, at A06 (reporting on the reaction to the Bush administration's announcement "that it will dismantle the controversial counterterrorism surveillance program run by the National Security Agency and instead conduct the eavesdropping under the authority of the secret Foreign Intelligence Surveillance Court, which issues warrants in spy and terrorism cases").

The lead opinion, however, repeats the government's assertion that none of the plaintiffs have shown "that the NSA's surveillance activities include the sort of conduct that would satisfy FISA's definition of 'electronic surveillance,'" and declares that "the present record does not demonstrate that the NSA's conduct falls within FISA's definitions." Lead Op. at 31. As an initial matter, this argument has been waived because the government failed to raise it before the district court. *See, e.g.*, *United States v. Abdi*, 463 F.3d 547, 563 (6th Cir. 2006) ("It is fundamental, and firmly established by Supreme Court precedent, that appellate courts generally are not to consider an issue brought for the first time on appeal.").

Moreover, the government's contention lacks merit. The Attorney General has publicly acknowledged that FISA "requires a court order before engaging in *this kind of surveillance* . . . unless otherwise authorized by Congress." Press Briefing by Alberto Gonzales, Att'y Gen., and Gen. Michael Hayden, Principal Dep'y Dir. for Nat'l Intel. (Dec. 19, 2005), http://www.whitehouse.gov/news/releases/2005/12/print/20051219-1.html. (Emphasis added.) Other Administration officials have similarly characterized the TSP as being used "in lieu of" FISA. *Id*. These statements indicate that the TSP in fact captures electronic surveillance as defined by FISA, despite the belated effort of Executive Branch officials to disavow this acknowledgment.

There is no doubt in my mind that the attorney-plaintiffs have established that the injury complained of falls within the zone of interests sought to be protected by these statutes. Accordingly, I conclude that they have satisfied the prudential-standing requirements.

### 5.    *Standing summary*

For all of the reasons discussed above, I believe that the attorney-plaintiffs have satisfied both the constitutional and prudential requirements for standing to sue. I therefore conclude that the attorney-plaintiffs are entitled to proceed with their claims against the government for the injuries allegedly flowing from the operation of the TSP.

## C.    Mootness

The last procedural hurdle that the plaintiffs must overcome is the question of mootness. Article III of the Constitution limits the jurisdiction of the federal courts to "actual, ongoing controversies." *Honig v. Doe*, 484 U.S. 305, 317 (1988). Federal courts have "neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them." *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (quotation marks omitted). Mootness became an issue in this case in January of 2007, when the government publicly announced that a judge of the Foreign Intelligence Surveillance Court had issued orders authorizing the government to conduct electronic surveillance of "international communications into or out of the United States where there is probable cause to believe" that one party to the communication is "a member or agent

of al Qaeda or an associated terrorist organization."  Letter from Alberto Gonzales, Att'y Gen., previously cited on p. 56, at 1.

As a result of these orders, electronic surveillance that had been occurring under the TSP "will now be conducted subject to the approval" of the FISC, and "the President has determined not to reauthorize" the TSP.  *Id.* at 1-2.  The government, in short, decided to voluntarily cease electronic surveillance of international communications in this country outside of FISA.  On the ground that such surveillance would henceforth be FISA-compliant, the government argues that we should dismiss this case as moot and vacate the judgment below.  To be sure, if we could be satisfied that the TSP would never be reinstituted, then the government's argument would have merit.  We must therefore determine whether the present situation fits into the voluntary-cessation exception to the mootness doctrine.

Under well-established Supreme Court precedent, the "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot," *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953), because "courts would be compelled to leave the defendant . . . free to return to his old ways."  *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968) (quotation marks omitted).  The test is demanding:  "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," *Concentrated Phosphate*, 393 U.S. at 203, and if "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979).  Moreover, the "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness."  *Laidlaw*, 528 U.S. at 189 (brackets and quotation marks omitted).  The government urges us to find that there is "no longer any live genuine controversy to adjudicate" because the TSP ceased to exist when the President's last authorization for it expired, thus resolving and mooting the plaintiffs' claims.

But the government continues to assert that the TSP did not violate the Constitution or any federal statute prior to the January 2007 FISC orders.  Instead, it contends that "[a]n independent judicial body—the FISA court—has now acted to provide additional and wholly sufficient legal authority for the activity in question."  The government accordingly argues that it "has in no sense terminated its conduct in response to plaintiffs' suit," but rather that the FISC orders "provide[] legal authority that plaintiffs claimed was absent."  Both in its briefs and at oral argument, the government insisted that the FISC orders represent an independent "intervening act of a coordinate branch of government" that suffices to render the voluntary-cessation exception inapplicable.

But the government acknowledged at oral argument that the President maintains that he has the authority to "opt out" of the FISA framework at any time and to reauthorize the TSP or a similar program.  The government also conceded that the FISC orders were actively sought by the Executive Branch, and that the President decided that he would comply with the orders only "after determining that the [FISC] order[s] provide[d] the necessary speed and agility" for TSP-style surveillance.  Most recently, the Director of National Intelligence stated during a congressional hearing that the government continued to believe that the President has the authority under Article II of the Constitution to order the NSA to conduct warrantless electronic surveillance.  James Risen, *Administration Pulls Back on Surveillance Agreement*, N.Y. Times, May 2, 2007, at A18.  These facts do not support a conclusion that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  *Concentrated Phosphate*, 393 U.S. at 203.  Indeed, the government's insistence that the TSP was perfectly lawful and the reservation of its ability to opt out of the FISC orders at any time lend credence to the opposite position.

I therefore conclude that the government has failed to meet its heavy burden of showing that the challenged conduct cannot reasonably be expected to start up again. Accordingly, I conclude that this case is not moot and that this court may properly continue to exercise jurisdiction over it.

## D.    Merits

Without expressing an opinion concerning the analysis of the district court, I would affirm its judgment because I conclude that the TSP violates FISA and Title III and that the President does not have the inherent authority to act in disregard of those statutes. The clearest ground for deciding the merits of this appeal is the plaintiffs' statutory claim, just as the clearest argument for standing is presented by the attorney-plaintiffs. This is not to say that the plaintiffs' other causes of action lack merit, but simply that this case can, and therefore should, be decided on the narrowest grounds possible. *See, e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 457 (1985) ("When a lower court correctly decides a case, albeit on what this Court concludes are unnecessary constitutional grounds, our usual custom is . . . to affirm on the narrower, dispositive ground available.") (quotation marks omitted).

### 1.    *The TSP violated FISA and Title III*

The government contends that "it would be imprudent . . . to address plaintiffs' FISA claim without a district court decision addressing the predicate questions necessary to the resolution of that claim in the first instance." This argument overlooks the fact that an appellate court possessed of proper jurisdiction can affirm on any ground fairly supported by the record. *See In re Cleveland Tankers, Inc.*, 67 F.3d 1200, 1205 (6th Cir. 1995). Moreover, as the following analysis indicates, no predicate findings from the district court are needed to resolve the plaintiffs' statutory argument.

Both FISA and Title III expressly prohibit electronic surveillance outside of their statutory frameworks, as set forth in Part I.B.4.b. above. The language used is unequivocal. In enacting FISA, Congress directed that electronic surveillance conducted inside the United States for foreign intelligence purposes was to be undertaken only as authorized by specific federal statutory authority. *See* 50 U.S.C. § 1809. Title III criminalizes the interception and disclosure of wire, oral, and electronic communications except under certain specified exceptions. *See* 18 U.S.C. § 2511(2)(f). The statute clearly states that chapter 119 and FISA "shall be the *exclusive means* by which electronic surveillance . . . and the interception of domestic wire, oral, and electronic communications may be conducted." *Id.* (emphasis added).

In construing statutory language, we assume that "Congress said what it meant." *United States v. LaBonte*, 520 U.S. 751, 757 (1997). Where the text of a statute is clear, "we need not assess the legislative history of the . . . provision." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001). I nonetheless reiterate that the legislative history of FISA clearly reinforces the conclusion that FISA and Title III constitute the sole means by which electronic surveillance may lawfully be conducted. During a conference session on the FISA legislation, members of Congress rejected language that would have described FISA and Title III as the "exclusive *statutory* means" by which electronic surveillance was permitted, preferring instead the broader construction, "exclusive means." H.R. Conf. Rep. No. 95-1720, at 35 (1978), *reprinted in* 1978 U.S.C.C.A.N. 4048, 4064.

Congress has thus unequivocally declared that FISA and Title III are the exclusive means by which electronic surveillance is permitted. No other authorization can comply with the law. Congress further emphasized this point by criminalizing the undertaking of electronic surveillance not authorized by statute in two separate places in the U.S. Code. *See* 50 U.S.C. § 1809; 18 U.S.C. § 2511(1) & (2)(e). The government, however, contends that Congress authorized the TSP in the aftermath of the September 11, 2001 attacks by enacting the Authorization for Use of Military Force

(AUMF), Pub. L. No. 107-40, 115 Stat. 224 (Sept. 18, 2001). In addition, the government notes that "foreign intelligence gathering is . . . vital to the successful prosecution of war."

But FISA itself expressly and specifically restricts the President's authority even in times of war. The statute provides that "[n]otwithstanding any other law, the President, through the Attorney General, may authorize electronic surveillance without a court order under this subchapter to acquire foreign intelligence information for a period not to exceed fifteen calendar days following a declaration of war by the Congress." 50 U.S.C. § 1811. FISA thus limits warrantless electronic surveillance to the first 15 days following a declaration of war, a more formal action than even the enactment of an authorization for the use of force. This 15-day period of warrantless surveillance was enacted to permit "consideration of any amendment to this Act that may be appropriate during a wartime emergency." H.R. Conf. Rep. 95-1720, at 34, *reprinted at* 1978 U.S.C.C.A.N. 4048, 4063.

To be sure, Congress in 1978 likely did not contemplate a situation such as the one that arose with the attacks of September 11, 2001. But in the aftermath of those attacks, Congress has shown itself both willing and able to consider appropriate amendments to FISA. Congress has in fact amended FISA multiple times since September 11, 2001, increasing the President's authority by permitting "roving" wiretaps and expanding the permissible use of pen-register devices. *See* USA PATRIOT Act of 2001, Pub. L. No. 107-56 §§ 206, 214, *as amended by* Pub. L. No. 109-177, §§ 108, 128 (codified as amended at 50 U.S.C. § 1805 and 18 U.S.C. § 1842).

But Congress has never suspended FISA's application nor altered the 15-day limit on warrantless electronic surveillance. *Id.* The Attorney General has in fact acknowledged that the Bush Administration has never sought an amendment to FISA that might have provided authorization for the TSP or a similar program because certain members of Congress allegedly informed the Administration that such an amendment would be "difficult, if not impossible" to obtain. Press Briefing by Alberto Gonzales, Att'y Gen., http://www.whitehouse.gov/news/releases/2005/12/20051219-1.html.

Yet the TSP is precisely the type of program that FISA was enacted to oversee. A senior Department of Justice official has conceded that the TSP involved warrantless electronic surveillance of communications into and out of the United States. Letter from William Moschella, Assistant Att'y Gen., to the Honorable Pat Roberts, the Honorable John D. Rockefeller, IV, the Honorable Peter Hoekstra, & the Honorable Jane Harman (Dec. 22, 2005), at 1-3, http://www.nationalreview.com/pdf/12%2022%2005%20NSA%20letter.pdf. The TSP, in addition, operated without a court order. Press Briefing by Alberto Gonzales, Att'y Gen., http://www.whitehouse.gov/news/releases/2005/12/print/20051219-1.html.

In arguing that the TSP did not violate FISA, the government contends that Congress authorized such warrantless electronic surveillance when it passed the AUMF. The AUMF states in pertinent part

> [t]hat the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

Pub. L. No. 107-40, 115 Stat. 224 (Sept. 18, 2001).

According to the government, the AUMF provides the authorization necessary to satisfy FISA's prohibition on electronic surveillance "except as authorized by statute." *See* 50 U.S.C.

§ 1809(a).  No reference to surveillance, however, is found in the AUMF.  Instead, the government's argument rests on a general inference to be drawn from the AUMF; in other words, that the phrase "all necessary and appropriate force" encompasses electronic surveillance by implication.  But this interpretation of the AUMF directly conflicts with the specific statutory language of both FISA and Title III.

In particular, the government's argument requires us to accept that the AUMF has implicitly repealed the "exclusive means" provision of Title III.  *See* 18 U.S.C. § 2511(2)(f).  The problem with this position is that neither the caselaw nor the rules of statutory construction support the government's argument.  Certainly the express language of the AUMF cannot sustain such an interpretation because, as noted above, it says nothing about electronic surveillance.  In 18 U.S.C. § 2511, Congress criminalized the undertaking of electronic surveillance except as "specifically provided in this chapter" or as authorized by FISA.  The AUMF is neither "in this chapter" nor designated as an amendment to FISA.  In order to give the government's argument effect then, the AUMF must either repeal the "exclusive means" provision of the original FISA legislation as codified in Title III or work in conjunction with FISA.

"Repeals by implication are not favored," *Ex parte Yerger*, 75 U.S. 85, 105 (1868), and are appropriate only when established by "overwhelming evidence" that Congress intended the repeal and "when the earlier and later statutes are irreconcilable." *J.E.M. Ag. Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 137, 141-42 (2001).  In the present situation, the statutes are easily reconciled:  FISA places limits on the means by which the President may fulfill his duties under the AUMF.  The President is free to engage in surveillance without a warrant up to the limits set by Congress when it enacted FISA, which is in keeping with Congress's stated purpose "to curb the practice by which the Executive Branch may conduct warrantless electronic surveillance on its own unilateral determination that national security justifies it."  S. Rep. No. 95-604, pt. I, at 8, *reprinted at* 1978 U.S.C.C.A.N. 3904, 3910.

FISA, as noted previously, includes explicit provisions for wartime usage.  The government argues that if the AUMF has not implicitly repealed the exclusive-means provision, then the AUMF and FISA must be in conflict, and that the AUMF should trump FISA.  This disregards the fact that shortly after enacting the AUMF, Congress amended certain provisions of FISA through its enactment of the USA PATRIOT Act, as described above.  Congress thus saw no conflict between FISA and the AUMF.  *Cf. al-Marri v. Wright*, No. 06-7427, — F.3d — , —,  2007 WL 1663712, at *22 (4th Cir. Jun. 11, 2007) (concluding that Congress's enactment of the USA PATRIOT Act, with specific provisions relating to the detention of "terrorist aliens" such as the plaintiff, "provides still another reason why we cannot assume that Congress silently empowered the President in the AUMF to order the indefinite military detention without any criminal process of civilian 'terrorist aliens' as 'enemy combatants'").

In addition, the government's argument completely ignores two fundamental principles of statutory construction.  The first relevant principle is that when interpreting potentially conflicting statutes, "a more specific statute will be given precedence over a more general one, regardless of their temporal sequence." *Busic v. United States*, 446 U.S. 398, 406 (1980); *see also Morales v. TWA, Inc.*, 504 U.S. 374, 384-85 (1992) (noting that a specific and "carefully drawn" statute prevails over a more general one).  FISA's provisions regarding wartime electronic surveillance are detailed and specific.  The AUMF, in contrast, sweeps broadly, making no reference at all to electronic surveillance.

To read the statutes as the government suggests would render FISA's provisions relating to wartime usage mere surplusage.  Such a reading would run counter to the second relevant principle of statutory construction that requires courts to "give effect, if possible, to every clause and word of a statute." *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883); *see also United States v. Perry*, 360

F.3d 519, 538 (6th Cir. 2004) (discussing the rule against surplusage in statutory construction). Thus, FISA prevails over the AUMF with respect to electronic surveillance in the context of this case.

In addition, the government's reading of the phrase "except as authorized by statute" strains the legislative record. *See* Elizabeth B. Bazan & Jennifer K. Elsea, Cong. Research Serv., *Presidential Authority to Conduct Warrantless Electronic Surveillance to Gather Foreign Intelligence Information*, at 40 (Jan. 5, 2006), http://www.fas.org/sgp/crs/intel/m010506.pdf (noting that "the legislative history appears to reflect an intention that the phrase 'authorized by statute' was a reference to chapter 119 of Title 18 of the U.S. Code (Title III) and to FISA itself, rather than having a broader meaning"). I accordingly believe that the legislative history does not support the government's reading.

The government also contends that the AUMF can be read as a more specific statute than FISA based on recent Supreme Court jurisprudence. In *Hamdi v. Rumsfeld*, 542 U.S. 507, 519 (2004), a plurality of the Court concluded that "[b]ecause detention to prevent a combatant's return to the battlefield is a fundamental incident of waging war, in permitting the use of 'necessary and appropriate force,' Congress has clearly and unmistakably authorized detention in the narrow circumstances considered here." The plurality then reached the conclusion that "the AUMF is explicit congressional authorization for the detention of individuals in the narrow category we describe," namely individuals who were "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in an armed conflict against the United States there." *Hamdi*, 542 U.S. at 516-17 (plurality) (quotation marks omitted). Despite the stated narrowness of this holding, the government argues that *Hamdi* allows us to read the AUMF as authorizing "signals intelligence" gathering on al-Qaeda and other suspected terrorists, and to construe such signals intelligence as including electronic surveillance targeting U.S. persons inside this country.

But FISA's wartime provision distinguishes the present situation from that raised in *Hamdi*. Congress had not enacted a law at the time of the *Hamdi* decision that specifically authorized the unlimited detention of American citizens during wartime, and the effect of that legislative omission was the subject of the analysis in the *Hamdi* decision. 542 U.S. at 516-25. In contrast, Congress has enacted a law (FISA) that specifically authorizes electronic surveillance within the U.S. for foreign intelligence purposes, and has specifically included a provision dealing with times of war. 50 U.S.C. § 1811. What was thus found to be a reasonable exercise of authority where Congress had been silent becomes an unreasonable exercise where Congress has plainly spoken. *See also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-38 (1952) (Jackson, J., concurring) (discussing the authority of the President and how it relates to congressional enactments).

Finally, the Supreme Court's more recent decision in *Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006), clearly rejected the government's theory of the AUMF. The Court in *Hamdan* declined to read the AUMF as implicitly authorizing the President to override a provision in the Uniform Code of Military Justice (UCMJ) that sets forth the conditions for convening military commissions in lieu of courts-martial. "[T]here is nothing in the text or legislative history of the AUMF even hinting that Congress intended to expand or alter the authorization set forth in Article 21 of the UCMJ." *Hamdan*, 126 S. Ct. at 2775.

The same observation holds true in the present case. Nothing in the AUMF suggests that Congress intended to "expand or alter the authorization" set forth in FISA. Moreover, the text and the legislative history of FISA and Title III make quite clear that the TSP or a similar program can be authorized only through those two statutes. The TSP plainly violated FISA and Title III and, unless there exists some authority for the President to supersede this statutory authority, was therefore unlawful.

### 2.    *Inherent authority*

The government's final defense is that the Constitution grants the President the "inherent authority" to "intercept the international communications of those affiliated with al Qaeda."  A contrary position would, according to the government, "present a grave constitutional question of the highest order."  For that reason, the government contends that we should follow the canon of constitutional  avoidance and construe FISA and the AUMF to avoid any constitutional conflict.  *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (discussing the canon of constitutional avoidance).

But the canon of constitutional avoidance "is not a method of adjudicating constitutional questions by other means."  *Clark v. Martinez*, 543 U.S. 371, 381 (2005) (discussing the role played by the canon of constitutional avoidance in statutory interpretation).  Instead, its purpose is to allow courts to construe a statute so as to avoid serious constitutional problems, "*unless such construction is plainly contrary to the intent of Congress*."  *DeBartolo*, 485 U.S. at 575 (emphasis added).

The Constitution divides the nation's war powers between the Executive and the Legislative Branches.  *See* U.S. Const. art. I, § 8 (setting forth the powers of Congress) & art. II, § 2 (setting forth the powers of the President); *see also Youngstown*, 343 U.S. at 635 (Jackson, J., concurring) (noting that the powers of the President "depend[] upon their disjunction or conjunction with those of Congress").  In contrast to the government's suggestion, the President does not have *exclusive* war powers.  U.S. Const. art. I, § 8 (setting forth the affirmative powers of the Congress, including the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers").

The Constitution expressly grants Congress the power to make laws in the context of national defense.  *Id.*  Moreover, the Constitution requires the President to conform to duly enacted laws.  U.S. Const. art. II, § 3 ("[H]e shall take Care that the Laws be faithfully executed.").  This requirement endures even in times of war.  In *Little v. Barreme*, 6 U.S. (2 Cranch) 170, 177-78 (1804), for example, the Supreme Court held that during the "Quasi War" with France, the President could not give instructions that ran counter to a validly enacted statute, despite the fact that the President's construction seemed to give the law better effect.  The Supreme Court reiterated this principle in *Ex Parte Milligan*, 71 U.S. (4 Wall) 2 (1866), holding that the Habeas Corpus Act of 1863 barred the President from denying habeas corpus rights to a detainee who was captured outside the area of battle.  More recently, the Court held in *Hamdan* that the President "may not disregard limitations that Congress has, in proper exercise of its own war powers, placed on his powers."  *Hamdan*, 126 S. Ct. at 2774 n. 23 (citing *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)).

The Supreme Court fully addressed the question of the inherent authority of the President in *Youngstown*.  There, the Court struck down President Truman's executive order to seize domestic steel-production facilities during the Korean war.  In his famous concurring opinion, Justice Jackson described our tripartite system as one of "separateness but interdependence, autonomy but reciprocity."  *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring).  "Presidential powers are not fixed but fluctuate, depending upon their disjunction or conjunction with those of Congress."  *Id.*  He then laid out the three so-called zones of presidential power as follows:

1.    When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate. . . .

2.    When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain. . . .

3.      When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.

*Id*. at 635-37.

When the President acts in Zone 3, "[c]ourts can sustain exclusive Presidential control in such a case only by disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Id*. at 637-38 (footnote omitted).

We must thus determine into which zone the TSP fits. From that determination, the program will stand or fall. The government argues that the TSP fits into Zone 1, where the President's authority is at its zenith. But this argument ignores Congress's clear directive that FISA and Title III constitute the exclusive means for undertaking electronic surveillance within the United States for foreign intelligence purposes. The result might not be what the President would prefer, but that does not give him license to "disregard limitations" that Congress has "placed on his powers." *Hamdan*, 126 S. Ct. at 2774 n.23. In light of FISA and Title III, I have no doubt that the TSP falls into Zone 3, where the President's authority is at its lowest ebb.

The government, however, turns to a case from the Foreign Intelligence Surveillance Court of Review as support for its argument that the President has "inherent constitutional authority to conduct warrantless foreign intelligence surveillance." *See In re Sealed Case*, 310 F.3d 717, 746 (For. Intel. Surv. Ct. Rev. 2002) (per curiam). To be sure, the *Sealed Case* court stated in dicta that "[w]e take for granted that the President does have" the "inherent authority to conduct warrantless searches to obtain foreign intelligence information." *Id*. at 742. This dicta, however, is unpersuasive because the *Sealed Case* court relied on a Fourth Circuit decision from 1980 that dealt with a challenge to pre-FISA surveillance. *Id*. (discussing *United States v. Truong Dinh Hung*, 629 F.2d 908, 914 n.4 (4th Cir. 1980)).

The *Sealed Case* court discussed *Truong* for the purpose of determining whether the Fourth Circuit had articulated the proper constitutional standard for evaluating a Fourth Amendment challenge to FISA. *Id*. at 742-44. Finding that *Truong* did set forth the proper standard, the *Sealed Case* court applied the same standard to uphold the post-PATRIOT Act version of FISA against a Fourth Amendment challenge. *Id*. at 742. In sum, the dicta in *Sealed Case* cannot overcome the fact that Congress has unequivocally acted within its constitutional power to limit the President's authority over warrantless electronic surveillance within this country.

Finally, all of the courts to have considered the question of whether FISA was constitutional before the statute was amended by the USA PATRIOT Act of 2001 have in fact upheld the statute. *See United States v. Nicholson*, 955 F. Supp. 588, 590 n.3 (E.D. Va. 1997) (collecting cases upholding FISA against various constitutional challenges). Those courts that have considered the constitutionality of FISA since it was amended by the USA PATRIOT Act have likewise upheld the statute against constitutional challenges. *See United States v. Ning Wen*, 477 F.3d 896, 898-99 (7th Cir. 2007) (finding no conflict with the Fourth Amendment where evidence obtained pursuant to a FISA court order was used in a criminal prosecution); *United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005) (noting that "FISA has uniformly been held to be consistent with the Fourth Amendment"); *In re Sealed Case*, 310 F.3d at 746. In light of these persuasive authorities, I find no merit to the government's "inherent authority" argument.

**E.    Plaintiffs' datamining cross-appeal**

The plaintiffs raise a cross-appeal from the district court's grant of summary judgment to the government on the plaintiffs' datamining claim. After a careful review of the record, I conclude that the district court's analysis of this issue and of the preclusive effect of the state-secrets privilege is persuasive. I would therefore not disturb the district court's judgment on the plaintiffs' datamining claim.

## II.  CONCLUSION

The closest question in this case, in my opinion, is whether the plaintiffs have the standing to sue. Once past that hurdle, however, the rest gets progressively easier. Mootness is not a problem because of the government's position that it retains the right to opt out of the FISA regime whenever it chooses. Its AUMF and inherent-authority arguments are weak in light of existing precedent and the rules of statutory construction. Finally, when faced with the clear wording of FISA and Title III that these statutes provide the "exclusive means" for the government to engage in electronic surveillance within the United States for foreign intelligence purposes, the conclusion becomes inescapable that the TSP was unlawful. I would therefore affirm the judgment of the district court.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT


Nos.  06-2095; 06-2140


AMERICAN CIVIL LIBERTIES UNION, *et al.*,

> Plaintiffs - Appellees/Cross-Appellants,

  v.

NATIONAL SECURITY AGENCY, *et al.*,

> Defendants - Appellants/Cross-Appellees.


Filed:  July 6, 2007

Before:  BATCHELDER, GILMAN, and GIBBONS, Circuit Judges.


# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.


THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the order of the district court is VACATED and the case is REMANDED with instructions to DISMISS the case for lack of jurisdiction.


ENTERED BY ORDER OF THE COURT


/s/ Leonard Green
_____
Clerk